PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WARREN SPIVEY, | ) | |
| | ) | CASE NO.  4:16CV0384 |
| Petitioner, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| CHARLOTTE JENKINS, Warden, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Respondent. | ) | [Resolving ECF Nos. 38 and 48] |

Before the Court is Petitioner Warren Spivey's amended petition for writ of habeas

corpus, filed pursuant to 28 U.S.C. § 2254.  Through this petition, Spivey challenges the

constitutionality of his convictions and death sentence, rendered by an Ohio court.  ECF No. 38.

Respondent Warden Charlotte Jenkins ("the State") filed an amended return of writ.  ECF No.

40.  Spivey then filed a traverse.  ECF No. 46.  The State filed a sur-reply.  ECF No. 47.  Spivey

then filed a motion for discovery.  ECF No. 48.  For the following reasons, the Court denies

Spivey's amended petition for writ of habeas corpus.  ECF No. 38.  The Court also denies

Spivey's motion for discovery.  ECF No. 48.

## I. FACTUAL HISTORY

On January 18, 1989, an Ohio county grand jury indicted Spivey for the aggravated

murder of Veda Eileen Vesper and related charges.  The Ohio Supreme Court set out the

following account of Spivey's crimes:

> On January 3, 1989, Warren Spivey, appellant, broke into Veda Eileen Vesper's
> residence at 451 West Ravenwood Avenue in Youngstown, Ohio, attacked Vesper
> with a knife or knives, inflicting multiple stab and/or cut wounds, and brutally beat

her to death. Appellant robbed Vesper of jewelry and other personal property and fled the scene in Vesper's automobile. Later that night, appellant was arrested by police in connection with the murder.

*State v. Spivey*, 81 Ohio St.3d 405, 405 (1998).

## II. PROCEDURAL HISTORY

**A.    State-Court Proceedings**

**1.    Trial Court**

A Mahoning County Grand Jury indicted Spivey on January 18, 1989, on the following four counts: one count of aggravated murder, in violation of Ohio Rev. Code § 2903.01(B), with a death-penalty specification that the murder was committed while Spivey was committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated robbery and/or aggravating burglary, in violation of Ohio Rev. Code § 2929.04(A)(7); one count of aggravated burglary, in violation of Ohio Rev. Code § 2911.11(A)(1)-(3); one count of aggravated robbery, in violation of Ohio Rev. Code § 2911.01(A)(1), (A)(2), and (B); and one count of grand theft motor vehicle, in violation of Ohio Rev. Code § 2913.02(A)(1), (B).  ECF No. 19-1 at PageID #: 303-305.

Spivey entered an initial plea of not guilty to all charges at his arraignment held on January 24,1989.  ECF No. 19-3 at PageID #: 612; ECF No. 20-1 at PageID #: 3481-86.  Soon after, the trial court set a trial date of March 27, 1989.  ECF No. 19-3 at PageID #: 615.  At Spivey's request, however, the trial was later rescheduled for September 6, 1989.  ECF No. 19-3 at PageID #: 643, 650.

(4:16CV0384)

On August 1, 1989, Spivey filed a motion to suppress any oral or written statement to the police on the ground that he did not knowingly, intelligently and voluntarily waive his constitutional rights. ECF No. 19-4 at PageID #: 727-28. The court held a hearing on Spivey's motion on August 23, 1989. *See* ECF No. 20-1 at PageID #: 3706.

On August 15, 1989, Spivey filed a motion with the trial court requesting an order allowing a defense expert to conduct DNA testing of certain items of bloodstained clothing (including a red sweatshirt and black-and-white vest) that had been seized by police during a January 4, 1989, search of Spivey's residence. ECF No. 19-4 at PageID #: 784-85. The trial court conducted a hearing on the motion on August 21, 1989, and granted it. ECF No. 19-4 at PageID #: 793. In addition, due to the scientific testing, the court reset the trial date for September 25, 1989, but cautioned that "[n]o further continuances shall be granted." ECF No. 19-4 at PageID #: 793; *see also* ECF No. 19-4 at PageID #: 808-809.

On August 31, 1989, Spivey moved to continue the September 25 trial date because the DNA testing was not complete. ECF No. 19-4 at PageID #: 811. On September 1, 1989, the trial court ordered the drawing of the special venire for the September 25 trial date. ECF No. 19-4 at PageID #: 813. Defense counsel objected to the drawing of the venire, as the defense had not yet received the DNA test results, which the trial court noted. *Spivey*, 81 Ohio St.3d at 406.

On September 20, 1989, Spivey entered written pleas of not guilty and not guilty by reason of insanity. ECF No. 19-4 at PageID #: 867-68. That same day, he also moved for an order for a psychological evaluation relating to his plea and requested the appointment of Dr. A.

3

James Giannini to evaluate his mental condition at the time of the offenses.  ECF No. 19-4 at PageID #: 869.  The trial court ordered the Forensic Psychiatric Center of District Eleven, Inc. (the "Forensic Center"), and not Giannini, to conduct the examination of Spivey.  ECF No. 19-4 at PageID #: 870.  The next day, September 21, 1989, Spivey moved for an independent psychiatric expert to evaluate his mental state at the time of the offenses, such as Giannini or another psychiatrist chosen by the defense.  ECF No. 19-4 at PageID #: 873-74.  Also that day, Spivey moved for another continuance of the September 25 trial date; he supplemented the motion the following day.  ECF No. 19-4 at PageID #: 871-72, 904-905.

On September 25, 1989, the trial court denied Spivey's motion to suppress his statements to police, finding Spivey "had the ability to comprehend the consequences of executing a waiver of rights form."  ECF No. 19-5 at PageID #: 961-62.  That same day, the court denied Spivey's motions for continuance and appointment of an independent psychiatric expert.  ECF No. 19-5 at PageID #: 954, 963.

However, the next day, September 26, 1989, the trial court appointed Giannini to conduct a psychiatric evaluation of Spivey for purposes of the insanity plea.  ECF No. 19-5 at PageID #: 965.  Giannini completed his psychiatric evaluation of Spivey three days later, on September 29, 1989, finding Spivey was sane at the time of the murder and competent to stand trial.  ECF No. 19-7 at PageID #: 1681-85 (Giannini competency and sanity evaluations).  Dr. Stanley J. Palumbo, a psychologist at the Forensic Center, issued his report at that time, also finding Spivey was sane at the time of the offenses.  ECF No. 19-7 at PageID #: 1686-90 (Palumbo sanity evaluation).

4

(4:16CV0384)

At a pretrial hearing conducted on October 2, 1989, Spivey waived his right to a trial by jury and elected to be tried by a three-judge panel. ECF No. 19-5 at PageID #: 973-74. The panel was designated on October 3, 1989, and the trial was set to commence on October 10, 1989. ECF No. 19-5 at PageID #: 975. On October 6, 1989, Spivey moved for a continuance of the October 10 trial date pending the completion of the DNA testing. *Spivey*, 81 Ohio St.3d at 406.

On October 10, 1989, the parties met in chambers before two of the empaneled judges. The Ohio Supreme Court set forth this account of the proceedings:

> The chambers discussion involved, among other things, a plea agreement that had been reached between the state and the defense. The discussions indicated that appellant had agreed to plead no contest to the charges and specification set forth in the indictment. In exchange, the state agreed that, during the penalty phase, the prosecution would be limited to cross-examination of defense witnesses and would not introduce independent evidence during mitigation except to rebut false or perjured testimony. Additionally, the state agreed to refrain from making any recommendation concerning the death penalty. Following these discussions, appellant appeared before the three-judge panel, withdrew his pleas of not guilty and not guilty by reason of insanity, and entered a written plea of no contest to each count. Following an extensive Crim. R. 11 colloquy between the panel and appellant, the panel accepted appellant's pleas of no contest.

*Id.* at 406-07; *see also* ECF No. 20-3 at PageID #: 4165-82 (transcript of proceeding).

The panel then proceeded to conduct an evidentiary hearing to determine the underlying factual and evidentiary basis for the offenses and capital specification for which Spivey was charged. *See* ECF No. 20-3 at PageID #: at 4182-4270 (transcript of hearing). The panel found Spivey guilty of all charges and the specification. ECF No. 20-3 at PageID #: 4272-73; ECF No. 19-5 at PageID #: 997-98.

The panel scheduled Spivey's mitigation hearing for sentencing for October 30, 1989. ECF No. 19-5 at PageID #: 997-98. On October 20 and 24, 1989, Spivey moved to continue the mitigation hearing because a critical defense witness would not be available from October 28 through November 5. ECF No. 19-5 at PageID #: 1087-91.

Also on October 24, 1989, Spivey filed a motion with the trial court requesting that, based on "newly discovered evidence," it permit him to withdraw his pleas of no contest, vacate its findings of guilt, and proceed to a jury trial. ECF No. 19-5 at PageID #: 1092-94. Spivey attached to the motion a report from Cellmark Diagnostics Laboratory, indicating that the blood on the two articles of clothing seized by police from Spivey's home – namely, the red sweatshirt and black-and-white vest – was not the victim's blood. ECF No. 19-5 at PageID #: 1095. This finding contradicted testimony offered by the State at the October 10 evidentiary hearing on Spivey's no-contest pleas that the blood on this clothing was consistent with the victim's blood. *Spivey*, 81 Ohio St.3d at 407. That evidence, however, was based on non-DNA testing procedures. *Id.* The three-judge panel conducted a hearing on Spivey's motion to withdraw on October 26, 1989. ECF No. 20-4 at PageID #: 4428-80.

On October 27, 1989, the trial court denied Spivey's motion to withdraw his pleas and rescheduled his mitigation hearing for November 13, 1989. ECF No. 19-5 at PageID #: 1103-1106. It found the DNA testing results were not "newly discovered evidence," as Spivey initiated the testing and chose to proceed to trial without the results. ECF No. 19-5 at PageID #: 1104-05. It further found that the test results were not sufficient to rebut the identifying evidence and "other overwhelming evidence" offered by the State, and the State's blood test

results and identification were not the sole identifying piece of evidence upon which Spivey's conviction was based. ECF No. 19-5 at PageID #: 1105.

Spivey's mitigation hearing commenced on November 13, 1989, and concluded on November 17, 1989. *See* ECF No. 20-4 at PageID #: 4560-81; ECF No. 20-5; ECF No. 20-6 (transcript of mitigation hearing). On November 20, 1989, the panel imposed a sentence of death for the aggravated murder of Vesper. ECF No. 19-6 at PageID #: 1182-84, 1212-21; ECF No. 20-7 at PageID #: 5098.[1]

Soon after, on December 1, 1989, Spivey moved for a new trial based on, among other things, the "newly discovered" DNA test results and the panel's improper denial of his motion to withdraw his no-contest pleas and the prosecutor's improper conduct at the mitigation hearing in violation of the plea agreement. ECF No. 19-6 at PageID #: 1204-11. He also filed a motion to remove the panel from hearing and ruling on the motion. ECF No. 19-6 at PageID #: 1264. The panel conducted a hearing on the motion for a new trial on January 12, 1990, at which it denied the removal motion. ECF No. 20-7 at PageID #: 5107. It denied the motion for a new trial on January 18, 1990. ECF No. 19-6 at PageID #: 1267.

### 2. Direct Appeal

Spivey, still represented by Attorneys Tom Zena and R. Scott Krichbaum, filed a timely

---

[1] The panel also sentenced Spivey to ten to twenty years' imprisonment for both the aggravated burglary and aggravated robbery charges and two years' imprisonment for the theft charge, with all sentences to run consecutively. ECF No. 19-6 at PageID #: 1183.

appeal to the Mahoning County Court of Appeals on November 21, 1989. ECF No. 19-6 at PageID #: 1198-99. Soon after, Attorneys Gary Van Brocklin and John Shultz replaced Zena and Krichbaum and filed a motion to file an amended notice of appeal and an amended notice of appeal on February 13, 1990. *See* ECF No. 19-6 at PageID #: 1276-77, 1278. The motion was granted. ECF No. 19-6 at PageID #: 1279-80.

More than five years later, on May 26, 1995, Spivey, through counsel, filed his appellate brief, raising the three following propositions of law:

1. The trial court abused its discretion by failing to allow Appellant to withdraw his plea of no contest when said motion was timely made and rested upon evidence not available at the time of the plea.

2. The trial court abused its discretion by failing to grant Appellant's motion for relief from judgment when the State has violated the Rule 11 agreement which was the basis for the plea.

3. The State failed to comply with Rule 11(F) requiring the State to place the underlying agreement on the record in open court.

ECF No. 19-6 at PageID #: 1295 (capitalization altered). The State filed an appellee brief on October 16, 1995. ECF No. 19-6 at PageID #: 1315-40.

On January 13, 1997, the state appellate court affirmed the trial court's judgment. ECF No. 19-6 at PageID #: 1353-80, 1381; *State v. Spivey*, No. 89 C.A. 172, 1997 WL 16196 (Ohio App. 7th Dist. Jan. 13, 1997).

Spivey, still represented by Attorneys Van Brocklin and Shultz, filed a timely notice of appeal with the Ohio Supreme Court on February 21, 1997. ECF No. 19-7 at PageID #: 1400-1401. Through newly appointed counsel, Patricia Millhoff and John Juhasz, Spivey raised the following

propositions of law in his memorandum in support of jurisdiction:

1. U.S. Const. amend. VI and XIV and Ohio Const. art. I, §§ 10 and [16] guarantee a criminal defendant a fair and impartial jury. A trial court must determine that any waiver of such right is knowingly, intelligently, and voluntarily made.

2. The ineffective assistance of counsel provided to Defendant-Appellant violated his rights to a fair and impartial jury trial and sentence, as guaranteed by the U.S. Const.[] amend. V, VI, VIII, and XIV[,] and by Ohio Const.[] art. I, §§ 5, 9, 10, and 16.

3. A criminal defendant is deprived of due process of law, U.S. Const. amend. XIV, a remedy in the courts by due course of law, and the administration of justice without denial, Ohio Const. art. I, § 16[,] when a trial court accepts a plea of guilty or no contest without a sufficient inquiry into the defendant's competence to waive his constitutional rights.

4. Due process of law, U.S. Const. amend. XIV, and the administration of justice without denial and a remedy by due course of law, Ohio Const. [a]rt. I, § 16, demand that withdrawal of a plea of guilty or no contest before sentence must be freely granted.

5. Ohio's death penalty law, Ohio Rev. Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.04, and 2929.05, violate U.S. Const. amend. V, VI, VIII, and XIV and the immunities specified in Ohio Const.[] art. I, §§ 1, 2, 5, 9, 10, and 16.

   A. Ohio's death penalty law violates U.S. Const. amend. VIII and XIV and Ohio Const. art. I, §§ 1, 2, 9, 10, and 16 because the effective appellate review required by those constitutional provisions is lacking.

   B. Death by [e]lectrocution and [l]ethal [i]njection [v]iolate U.S. Const. amend. VIII and XIV and Ohio Const. art. I, § 9.

   C. Ohio's death penalty law violates the guarantees of due process of law, equal protection of the law, and cruel and unusual punishment specified in U.S. Const. amend. VIII and XIV and Ohio Const. art. I, §§ 2, 9, and 16.

D.    Because Ohio's death penalty is fraught with discrimination, it violates U.S. Const. amend. VIII and XIV and Ohio Const. art. I, §§ 2, 9, and 16.

E.    The unbridled charging discretion given the government results in Ohio's death penalty being in violation of U.S. Const. amend. VIII and XIV and Ohio Const. art. I, §§ 2, 9, and 16.

F.    Ohio's death penalty violates the Ohio Constitution; Ohio Const. art. I, §§ 1, 2, 9, 10, and 16.

G.    Ohio's death penalty law violates the constitutional guarantees of the effective assistance of trial counsel and trial before an impartial jury, U.S. Const. amend. VI and XIV and Ohio Const. art. I, §§ 5 and 10.

H.    The Ohio death penalty violates U.S. Const. amend. VI and XIV and Ohio Const. art. I, §§ 2, 5, 10, and 16 because the statutes permit denial of impartial jury.

I.    The Ohio death penalty fails to provide adequate guidelines for deliberation and therefore violates U.S. Const.[] amend. VIII and XIV and Ohio Const.[] art. I, § 9.

J.    The Ohio death penalty law violates the [r]ights to a [j]ury [t]rial and to be [f]ree from [s]elf-incrimination; U.S. Const.[] amend. V, VI, and XIV and Ohio Const.[] art. I, §§ 1, 5, 10, and 16.

K.    The Ohio death penalty law fails to provide a meaningful proportionality review and therefore violates U.S. Const. amend.[] VIII and XIV and Ohio Const.[] art. I, § 9.

L.    The Ohio death penalty law fails to provide [a]dequate [a]ppellate [a]nalysis and accordingly violates U.S. Const.[] amend. VIII and XIV and Ohio Const.[] art. I, § 9.

M.    The requirement that death be imposed in certain circumstances violates U.S. Const.[] amend. VIII and XIV and Ohio Const.[] art. I, § 9.

N.    The Ohio law fails failure (sic) to require trial courts to make a decision about appropriateness, and therefore violates U.S. Const.[] amend. VIII and XIV and Ohio Const.[] art. I, § 9.

6.  Ohio's mandatory sentencing scheme prevented the panel of three judges from deciding whether death was the appropriate punishment in violation of Appellant's rights as guaranteed by U.S. Const.[] amend. VIII and XIV and Ohio Const.[] art. I, §§ 9 and 16.

7.  Failure of the Ohio Supreme Court to consider errors not raised in the Court of Appeals is a denial of access to the courts required by Ohio Const. art. I, §§ 1 and 16.

8.  The proportionality review that this Court must conduct in the present capital case pursuant to Ohio Rev. Code. [] § 2929.05 is fatally flawed and therefore the present death sentence must be vacated pursuant to the U.S. Const. amend. V, VIII and XIV; Ohio Const. art. I, §§ 5[] and 16; and Ohio Rev. Code. [] § 2929.05.

9.  The three judge panel may not base its decision on non-statutory aggravating factors. To do so is violative of Ohio Rev. Code [] § 2929.04.

10. When the State violates the Ohio Crim. R. 11 plea agreement, the court must permit the opportunity for the withdrawal of the plea.

ECF No. 19-7 at PageID #: 1418-38. The State failed to file a timely appellate brief, and the court denied its request for leave to file one. *See* ECF No. 19-7 at PageID #: 1637-40.

The Ohio Supreme Court affirmed Spivey's convictions and death sentence on April 22, 1998. ECF No. 19-7 at PageID #: 1698, 1699-1741; *Spivey*, 81 Ohio St.3d at 408.

### 3.  Post-Conviction Proceedings

#### a.  Petition to Vacate Convictions and Death Sentence

Meanwhile, on September 20, 1996, Spivey, represented by Attorney Millhoff, filed a petition to vacate his convictions and death sentence in the trial court. ECF No. 19-8 at PageID #: 1812-1913. He raised the following grounds for relief:

1.  The judgment and sentence against Petitioner Spivey are void or voidable because he was not competent to waive a jury in violation of the 5, 6, 8, and

11

14th [A]mendments to the United States Constitution, and Section[s] 2, 5, 9, 10, and 16[,] Article I of the Ohio Constitution.

2.      The judgment and sentence against Petitioner Spivey are void or voidable because he was incompetent to enter a plea of no contest.

3.      The judgment and sentence against Petitioner Spivey are void or voidable because the Court denied him due process of law by failing to sua sponte request a competency evaluation prior to his jury waiver and the fact that the Court told counsel if the [C]ourt agreed to a jury waiver "the court did not want to see a Motion for a Competency Evaluation."

4.      As a result of [the prosecutor's failure to insure that a proper inquiry was conducted into Petitioner's competency to waive his right to a jury trial and enter a plea of no contest,] Petitioner Spivey's rights as guaranteed by the following provisions of the Untied (sic) States Constitution were violated: (1) the prohibition against cruel and unusual punishment guaranteed by the Eighth Amendment; (2) substantive due process and other unenumerated rights guaranteed by the Ninth Amendment; (3) the due process and equal protection clauses of the Fourteenth Amendment; (4) the rights to effective assistance of counsel, to confrontation, and to a fair and impartial jury guaranteed by the Sixth Amendment; (5) the guarantees of procedural and substantive due process protected by the Fifth Amendment; and (6) the Compulsory Process Clause of the United States Constitution.

5.      Petitioner Spivey's convictions and/or sentences are void or voidable because defense counsel failed to timely request an independent evaluation of serology evidence found on Spivey's clothing.

6.      The judgment against Petitioner Spivey is void or voidable because he waived his right to trial by jury without being informed that by waiving a jury he subjected himself to an increased risk of death in violation of his constitutional rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 5 and 16, Article I of the Ohio Constitution.

7.      The judgment and conviction against Petitioner Spivey are void or voidable because his waiver of his right to a jury trial was invalid.

8.      The imposition and planned execution of the death sentence under Ohio law and practice upon the Petitioner is void and/or voidable.

9. Petitioner Spivey's convictions and/or sentences are void or voidable because the Ohio [d]eath [p]enalty [s]cheme is unconstitutional on its face and as applied and is in violation of the United States Constitution and Ohio Constitution.

10. Petitioner Spivey's convictions and/or sentences are void or voidable because the Ohio death penalty is in violation of international laws and Article VI of the United States Constitution.

11. Petitioner Spivey's convictions and/or sentences are void or voidable because the death penalty is disproportionately meted out to those defendants who are racial minorities and/or those defendants who are accused of killing white victims.

12. Petitioner Spivey's convictions and/or sentences are void or voidable due to the mandatory nature of Ohio's capital sentencing statute.

13. Petitioner Spivey's death sentence is void and/or voidable because the three-judge panel considered non-statutory aggravating factors, as evidenced by their decision and findings regarding sentencing at the penalty phase.

14. Petitioners (sic) convictions are void or voidable in that Spivey was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section[s] 10 and 16 [of the] Ohio [Constitution].

15. Petitioner Spivey's convictions are void or voidable in that the three[-]judge panel utilized numerous non[-]statutory aggravating factors in determining that the aggravating factors outweigh[ed] the mitigating factors. . . .

16. Petitioner Spivey's convictions are void or voidable in that one of the members of his panel, Judge Jenkins[,] was predisposed to the death penalty.

17. Petitioner Spivey's convictions are void or voidable in that his plea of no contest was taken in a closed, private setting[,] thereby violating his right to a public trial.

18. The judgment and conviction against Petitioner Spivey are void or voidable in that his prosecution was politically motivated.

19. The judgment against Petitioner Spivey is void or voidable because his death sentence was secured through the use of a statutory scheme that violated his

constitutional rights as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2 and 9, Article I of the Ohio Constitution.

ECF No. 19-8 at PageID #: 1816, 1824, 1829, 1831-32, 1833-34, 1835-36, 1837; ECF No. 19-9 at PageID #: 1854, 1856, 1858-59, 1860, 1862, 1864, 1867-68, 1869, 1870-71.[2]

On November 1, 1996, Spivey filed a motion requesting the appointment of experts and leave to conduct discovery. ECF No. 19-9 at PageID #: 1930-37.[3] The State filed an answer on December 12, 1996. ECF No. 19-9 at PageID #: 1942-44. It filed a motion for summary judgment on March 14, 1997. ECF No. 19-9 at PageID #: 1950-73.

On February 8, 1998, the court appointed Attorney Juhasz to represent Spivey, replacing Attorney Millhoff.[4] ECF No. 19-9 at PageID #: 1976-77. On February 10, 1998, Spivey requested, and was granted, leave to conduct further discovery. ECF No. 19-9 at PageID #: 1979-80. On June 17, 1998, the trial court denied the State's summary judgment motion. ECF No. 19-10 at PageID #: 2068. In August and September of 1999, Spivey deposed his trial counsel, Attorneys Zena and Krichbaum, as well as the prosecutor, James Philomena. ECF No. 19-11 at PageID #: 2136-38; ECF No. 20-8 at PageID #: 5461-5596 (transcripts).

The trial court then conducted an evidentiary hearing on Spivey's post-conviction

---

[2] These claims are renumbered here because Spivey's amended petition omitted an eighteenth ground for relief.

[3] There is no record of the trial court ruling on this motion.

[4] Karena Heitman was Attorney Juhasz's co-counsel from about September 1998 to May 1999. *See* ECF No. 19-10 at PageID #: 2095, 2124.

petition on October 18 and 22, 1999. ECF No. 19-10 at PageID #: 2123; ECF No. 20-7 at PageID #: 5270-5460. In his final argument, Spivey waived all but claims 1 through 4, 7, 14, and 18. *See* ECF No. 19-11 at PageID #: 2155, 2208. The trial court dismissed Spivey's post-conviction petition on May 1, 2000. ECF No. 19-11 at PageID #: 2204-11.

Spivey, still represented by Attorney Juhasz, filed a timely notice of appeal to the Seventh District Court of Appeals of Ohio. ECF No. 19-11 at PageID #: at 2228-31. He raised the following six assignments of error:

1. The trial court abused its discretion in denying the first cause of action of the petition for post-conviction relief, as there was credible evidence that Appellant was not competent to stand trial and hence not competent to waive a jury.

2. The trial court abused its discretion in denying the second cause of action of the petition for post-conviction relief, as there was credible evidence that Appellant was not competent to stand trial and hence not competent to enter a plea of no contest.

3. The trial court abused its discretion in denying the third cause of action of the petition for post-conviction relief, as there was credible evidence that Appellant was not competent to stand trial and hence not competent to waive a jury or enter a plea of no contest; the trial court failed *sua sponte,* to seek a competence evaluation; and the prosecutor failed to seek a competence evaluation.

4. The trial court abused its discretion in denying the seventh cause of action of the petition for post-conviction relief, as there was credible evidence that Appellant was not advised of the mathematical probability that he would receive a death sentence, which was enhanced by waiver of the jury.

5. The trial court abused its discretion in denying the fourteenth cause of action of the petition for post-conviction relief, as there was credible evidence that Appellant was deprived of the effective assistance of trial counsel.

6. The trial court abused its discretion in denying the nineteenth cause of action of the petition for post-conviction relief, as there was credible evidence that

Appellant was deprived of due process and subjected to cruel and unusual punishment because his prosecution was politically motivated.

ECF No. 19-12 at PageID #: 2297-99 (capitalization altered).

The state appellate court affirmed the trial court's decision. ECF No. 19-12 at PageID #: 2427-42, 2443; *State v. Spivey*, No. 00CA 106, 2002 WL 418373 (Ohio App. 7th Dist. March 15, 2002).

Spivey, still represented by Attorney Juhasz, then appealed that judgment to the Ohio Supreme Court on April 29, 2002. ECF No. 19-12 at PageID #: 2452, 2453-55. In his memorandum in support of jurisdiction, he set forth the following two propositions of law:

1. U.S. Const. amend. XIV and Ohio Const. art. I, § 16 prohibit a court from accepting a jury waiver or plea of guilty or no contest when a criminal defendant is incompetent to stand trial, as the standard for competence to stand trial, enter a plea, or waive a constitutional right are the same.

2. It is a denial of the effective assistance of trial counsel to fail to assert incompetence to stand trial where facts indicate a defendant incapable of knowingly, voluntarily, and intelligently waiving constitutional liberties. U.S. Const. amend. VI and XIV; Ohio Const. art. I, § 10.

ECF No. 19-12 at PageID #: 2457 (capitalization altered). The State filed an opposition brief.

ECF No. 19-13 at PageID #: 2495-2508.

The Ohio Supreme Court declined jurisdiction and dismissed the appeal on July 3, 2002.

ECF No. 19-13 at PageID #: 2509; *State v. Spivey*, 96 Ohio St.3d 1440 (2002).

### b. Application to Reopen Direct Appeal

On March 31, 1997, Spivey, represented by Attorney Millhoff, filed an application to reopen his direct appeal in the Seventh District Court of Appeals of Ohio, pursuant to Ohio Appellate Rule 26(B) and *State v. Murnahan*, 63 Ohio St.3d 60 (1992). ECF No. 19-13 at PageID #: 2520-42. He also was represented by Attorney Juhasz. *See* ECF No. 19-13 at PageID #: 2543. In his application, he asserted that his appellate counsel failed to raise on direct appeal the following assignments of error:

1. The trial court erred to the prejudice of appellant in not making a specific inquiry into defendant's competency to waive a jury trial.

2. The trial court erred to the prejudice of appellant in not making an appropriate inquiry into appellant's competency to enter a plea of no contest.

3. The appellant was denied the effective assistance of trial counsel when counsel failed to timely request an independent evaluation of serology evidence found on Spivey's clothing.

4. The Ohio [d]eath [p]enalty statute is unconstitutional in that if a panel of three judges unanimously finds that the aggravating circumstances outweigh the mitigating factors the death penalty becomes mandatory.

5. The trial court erred to the prejudice of the appellant when it considered non-statutory aggravating factors, as evidenced by their decision and findings regarding sentencing at the penalty phase.

6. Appellant was denied the effective assistance of counsel throughout his proceedings including but not limited to the following:

   A. Counsel failed to determine if appellant was competent to waive a jury trial.

   B. Counsel agreed to allow numerous jurors to be excused for cause for non-statutory reasons thereby eliminating a large number of potential jurors from the jury array.

17

        C.      Counsel advised appellant to enter a no contest plea in chambers outside the presence of his friends or family.

        D.      Counsel advised appellant to plead no contest without an agreement to remove the specifications that made appellant eligible for the death penalty.

        E.      Counsel failed to timely request an examination of certain blood evidence.

        F.      Counsel allowed appellant to enter a no contest plea prior to the receipt of the serology results.

7.      Appellant's plea was taken in a closed, private setting violating his right to a public trial.

8.      The trial court erred by considering evidence which was not relevant and highly prejudicial.

9.      The appellant was denied the effective assistance of counsel when trial counsel failed to request a change of venue.

10.      The trial court erred in failing to change the venue of appellant's trial in light of the media saturation the community experienced.

11.      Appellant was denied the right to a fair trial because critical portions of the proceedings were conducted outside of his presence and/or were not made part of the record.

ECF No. 19-13 at PageID #: 2522-23.  The State opposed the application.  ECF No. 19-13 at PageID #: 2545-55.

The state appellate court denied Spivey's reopening application on February 11, 1998.

ECF No. 19-13 at PageID #: 2564-76.

Spivey, still represented by Attorney Millhoff, appealed the denial of reopening to the

Supreme Court of Ohio.  ECF No. 19-13 at PageID #: 2577-78.[5]  In his memorandum in support

of jurisdiction, he raised the following two propositions of law:

> 1.    Failure of appellate counsel to raise the ineffective assistance of trial counsel rendered Spivey's appellate representation ineffective pursuant to the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

> 2.    A criminal defendant is deprived of due process of law when a trial court accepts a plea of guilty or no contest without a sufficient inquiry into the defendant's competence and failure to raise this issue on appeal constitutes ineffective assistance of appellate counsel.  United States Constitution, amend. V, VI, VIII, IX[;] Ohio Const. [a]rt. 1, [§§] 10, 16.

ECF No. 19-13 at PageID #: 2591.

The Ohio Supreme Court affirmed the court of appeals' denial of Spivey's application for

reopening on November 25, 1998.  Id. at 25; ECF No. 19-13 at PageID #: 2645.

### c.    Successive Post-Conviction Petition (*Atkins*)

On June 26, 2002, Spivey, represented by Attorney Juhasz, filed in the trial court a

motion for appointment of counsel to prosecute a successive post-conviction petition.  ECF No.

19-13 at PageID #: 2690-2707.  Through the petition, he explained, he sought to raise a claim

---

[5]  Spivey filed a memorandum in support of jurisdiction along with his notice of appeal.  *State v. Spivey*, 84 Ohio St.3d 24, 24 (1998).  The State filed an opposing memoranda.  *Id*.  These jurisdictional pleadings were filed despite the fact that an appeal from a denial of a motion to reopen an appeal in a capital case was an appeal of right pursuant to S. Ct. Prac. R. II(A)(1).  *Id.*  The court then dismissed the appeal on June 22, 1998, for want of prosecution, as no briefs had been filed in accordance with court's rules of practice.  *Id.* at 24-25; ECF No. 19-13 at PageID #: 2583.  On July 2, 1998, however, Spivey moved the court to reconsider that decision, which it granted, and the court restored the appeal to the active docket.  *Id.* at 25.  The court proceeded to treat the memoranda filed as briefs in the case.  *Id.*

under a Supreme Court decision issued just six days before, in *Atkins v. Virginia*, 536 U.S. 304 (2002). ECF No. 19-13 at PageID #:2690-2707. In *Atkins,* the Court banned the execution of intellectually disabled[6] prisoners, but left to the states "'the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399 (1986)). The State responded in a memorandum, acknowledging that it was "aware of the underlying facts and the allegation made as to the mental abilities of the Petitioner in this matter" and agreeing to the appointment of counsel to assist Spivey in raising an *Atkins* claim. ECF No. 19-13 at PageID #: 2708-2709. The trial court granted the motion. ECF No. 19-13 at PageID #: 2711-12.

Spivey filed a successive post-conviction petition asserting his *Atkins* claim on December 20, 2002, nine days after the Ohio Supreme Court decided *State v. Lott*, 97 Ohio St.3d 303 (2002), which set forth the substantive standards and procedural requirements for *Atkins* claims in Ohio. ECF No. 19-13 at PageID #: 2713-17. The State replied by requesting additional time in which to respond to the petition, which the court granted. ECF No. 19-13 at PageID #: 2718, 2720.

---

[6] This Court will use the term "intellectual disability," or "ID," in place of the term "mental retardation" in this opinion. The designation intellectually disabled is now widely used by the medical community, educators and others, since the label mentally retarded long has carried a painful stigma. The terms are synonymous. *See* American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Support* 12 (11th ed. 2010) ("the term ID covers the same population of individuals who were diagnosed previously with mental retardation."); *Hall v. Florida*, 134 S.Ct. 1986, 1990 (2014) ("[p]revious opinions of this Court have employed the term 'mental retardation.' This opinion uses the term 'intellectual disability' to describe the identical phenomenon.").

On March 31, 2003, Spivey requested funds for an expert, which the court granted.  ECF No. 19-13 at PageID #: 2723-24; 2735.  On April 16, 2004, the court approved the appointment of an additional expert to evaluate Spivey, Dr. Jeffrey Smalldon.  ECF No. 19-13 at PageID #: 2742-43.

On September 22, 2004, Spivey then filed a "Motion for Jury Determination of Mental Retardation and for Rejection of Presumption of the IQ Level of 70 to Determine Mental Retardation," which the court denied.  ECF No. 19-14 at PageID #: 2752-87, 2872.  Dr. Smalldon determined that Spivey was not intellectually disabled as defined by either the Diagnostic and Statistical Manual of Mental Disorders–IV–Text Revision or the American Association of Mental Retardation's Mental Retardation Manual.  *State v. Spivey*, No. 12 MA 75, 2014 WL 818640, at *2 (Ohio App. 7th Dist. Feb. 21, 2014); ECF Doc. No. 19-14 at PageID #: 2878-97 (Smalldon *Atkins* report).

The State moved for summary judgment on March 20, 2006, on the ground that Dr. Smalldon had concluded that Spivey's IQ was "too high" for him to qualify as intellectually disabled under *Atkins* and *Lott*.  ECF No. 19-14 at PageID #: 2876-77.  Spivey opposed the motion on July 17, 2006.  ECF No. 19-15 at PageID #: 2909-62.  The trial court denied the State's motion on April 10, 2007.  ECF No. 19-15 at PageID #: 2963.

On October 8, 2008, Spivey filed a "Suggestion that Petitioner is Incompetent" and motion to stay the proceedings to allow for a competency determination.  ECF No. 19-15 at PageID #: 2980-99.  The State opposed the motion.  ECF No. 19-15 at PageID #: 3009-49.  On February 6, 2009, the trial court granted the motion and stayed the case to allow for Spivey's

(4:16CV0384)

competency evaluation, appointing the Forensic Center to conduct the examination. ECF No. 19-15 at PageID #: 3061. The Center's Dr. Thomas Gazley then determined that Spivey was competent to participate in the post-conviction proceedings. *Spivey*, 2014 WL 818640, at *2; ECF No. 20-9 at PageID #: 5857-68 (Gazley competency report).

On March 23, 2010, Spivey requested that Dr. Smalldon conduct a second evaluation of his competence to participate in post-conviction proceedings. ECF No. 19-15 at PageID #: 3069-70. The State opposed the motion. ECF No. 19-15 at PageID #: 3071-75. The trial court denied Spivey's motion, but it permitted the parties to submit proposed questions for Dr. Gazley to use in a re-evaluation of Spivey. ECF No. 19-15 at PageID #: 3076. Spivey complied. ECF No. 19-15 at PageID #: 3079-82. The trial court then ordered Dr. Gazley to conduct a second examination of Spivey's competency, using Spivey's submitted questions, for a supplemental report. ECF No. 19-15 at PageID #: 3083-84. Dr. Gazley submitted the supplemental report. ECF No. 20-9 at PageID #: 5869-77 (Gazley supplemental competency report). Spivey again requested a second evaluation of Spivey's competency, which the court denied. ECF No. 19-15 at PageID #: 3093-98, 3099.

The court held a competency hearing on August 26, 2010, and found Spivey competent to participate in the post-conviction proceedings. ECF No. 19-15 at PageID #: 3108; ECF No. 20-8 at PageID #: 5597-5660. The trial court then ordered Dr. Gazley to evaluate Spivey for purposes of determining whether he was intellectually disabled under *Atkins* and *Lott*. ECF No. 20-8 at PageID #: 5658-59.

22

The court conducted an evidentiary hearing on Spivey's *Atkins* petition on April 28, 2011, and June 14, 2011. ECF No. 20-8 at PageID #: 5661-5886. At the hearing, Dr. Gazley rendered his opinion that Spivey was not intellectually disabled. ECF No. 20-8 at PageID #: 5826; ECF No. 20-9 at PageID #: 5878-86 (Gazley *Atkins* report). On March 19, 2012, the trial court denied the petition. ECF No. 19-16 at PageID #: 3136-49.

Spivey filed a notice of appeal in the Seventh District Court of Appeals of Ohio on April 16, 2012. ECF No. 19-16 at PageID #: 3206. He raised the following four assignments of error:

1.   The trial court erred in finding that Spivey's *Atkins* claim was not proved by a preponderance of the evidence.

2.   The trial court erred in failing to find that the 70 IQ presumption violates due process.

3.   The trial court erred in refusing to require the existence of mental retardation to be determined by a jury.

4.   The trial court erred in failing to find Spivey incompetent to participate in the proceedings and stay the proceedings until Spivey is competent.

ECF No. 19-16 at PageID #: 3250 (capitalization altered). The State filed an answer brief. ECF No. 19-16 at PageID #: 3291-3328.

On February 21, 2014, the state appellate court affirmed the trial court's denial of Spivey's successive post-conviction petition. ECF No. 19-16 at PageID #: 3333-48; *Spivey, 2014 WL 818640*.

Spivey, still represented by Attorney Juhasz, filed a timely notice of appeal to the Ohio Supreme Court. ECF No. 19-16 at PageID #: 3363-65. In his memorandum in support of

23

jurisdiction, he asserted the following four propositions of law:

1. The *Lott* presumption that a person with an IQ greater than 70 is presumed not to be mentally retarded is discarded. In its place, the test in Ohio for whether an individual who has been sentenced to death should be spared the death sentence due to mental retardation is proof of the existence of (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18.

2. The 70 presumption violates due process.

3. Because a death sentence is a greater punishment than the punish[ment] normally prescribed for aggravated murder, the existence of all facts to warrant or abrogate the death sentence must be determined by a jury.

4. When a person in incompetent to participate in the proceedings, post-convictions (sic) proceedings must be stayed until the person in competent to meaningfully participate.

ECF No. 19-16 at PageID #: 3367.

On October 28, 2015, the Ohio Supreme Court declined jurisdiction over the appeal.

ECF No. 19-17 at PageID #: 3447.

**B.   Federal Habeas Proceedings**

Spivey filed his petition for writ of habeas corpus on May 13, 2016, asserting nine grounds for relief. ECF No. 17. Respondent filed a Return of Writ on August 11, 2016. ECF No. 23.

On October 28, 2016, Spivey filed a motion seeking leave to amend his petition (ECF No. 27) with a proposed amended petition (ECF No. 27-2) attached. He sought to add new facts to his first and second grounds for relief, relating to his alleged incompetency and intellectual disability. ECF No. 27 at PageID #: 6033. He also sought to add four new claims: a claim

under existing ground seven, asserting trial counsel rendered ineffective assistance under

*Strickland v. Washington*, 466 U.S. 668 (1984), for failing to investigate and develop mitigating

evidence relating to his mental health; and entirely new grounds ten through twelve, alleging,

respectively, prosecutorial misconduct under *Brady v. Maryland*, 373 U.S. 83 (1963), for failing

to disclose exculpatory evidence, trial-court error under *Miranda v. Arizona*, 384 U.S. 436

(1966), in failing to suppress his involuntary statement to police, and ineffective assistance of

post-conviction *Atkins* counsel in failing to obtain an "appropriate" expert on intellectual

disability. ECF No. 27 at PageID #: 6033. Spivey argued that he is entitled leave to amend as

the amended petition was filed within the correct limitations period, and if it was not, equitable

tolling should apply or, in the alternative, the amendments relate back to claims asserted in the

original timely petition. *See* ECF No. 27 at PageID #: 6033-34. The State opposed the motion.

ECF No. 30. The Court found equitable tolling applied and granted Spivey's motion to amend.

Memorandum of Opinion and Order (ECF No. 36) at PageID #: 6271-73.

On December 27, 2016, Spivey filed a "Motion to Hold Petition for Writ of Habeas

Corpus in Abeyance Pending Exhaustion of Newly Discovered Evidence Being Presented to

State Court." ECF No. 32. He asked the Court to stay these habeas proceedings and hold his

Petition in abeyance while he returns to state court to present "newly discovered" evidence that

has "render[ed] . . . new claims factually unexhausted." ECF No. 32 at PageID #: 6208. The

"new claims" to which he refers were those raised in his proposed Amended Petition. ECF No.

32 at PageID #: 6211-15. The "new evidence" included expert reports from Dr. Stephen

Greenspan, who has concluded "there are strong indications that Mr. Spivey is intellectually

disabled" (ECF No. 32 at PageID #: 6211; *see also* ECF No. 17-9 (Greenspan report)), and Dr. Douglas Scambler, who agrees with Dr. Greenspan's opinion regarding Spivey's intellectual abilities and also has diagnosed Spivey with autism spectrum disorder (ECF No. 32 at PageID #: 6212; *see also* ECF No. 27-3 (Scrambler report)). It also included an affidavit from a special education teacher of Spivey's, Karen Thompson, regarding Spivey's education and her observations of his intellectual abilities. ECF No. 32 at PageID #: 6214; *see also* ECF No. 27-4 (Thompson affidavit). Finally, Spivey claimed he had just discovered an exculpatory police report inside a sealed envelope that was filed with the trial court but never disclosed to defense counsel at trial. ECF No. 32 at PageID #: 6215; *see also* ECF No. 27-5 (police report). He maintained the report shows there was no sign of forced entry into the victim's house, which contradicts a police detective's trial testimony that the door of the victim's home had been kicked open and had a footprint on it. ECF No. 32 at PageID #: 6215. The State opposed that motion as well. ECF No. 33.

The Court denied Spivey's stay-and-abeyance motion on the ground that the claims at issue were not unexhausted, but were procedurally defaulted and/or plainly meritless. Memorandum of Opinion and Order (ECF No. 36). Specifically, as to Spivey's request to exhaust "new facts" in support of his *Atkins* and competency claims, the Court found those claims already were exhausted (ECF No. 36 at PageID #: 6256); the alleged "new facts" were not in fact new, but were available to him throughout his state-court proceedings (ECF No. 36 at PageID #: 6257); and the stay-and-abeyance mechanism does not apply to "unexhausted evidence," including newly obtained expert reports (ECF No. 36 at PageID #: 6258-62). The

Court determined Spivey's ineffective-assistance claim for failing to investigate his mental health, and his *Miranda* and *Brady* claims also were not unexhausted, but were procedurally defaulted. ECF No. 36 at PageID #: 6262-65. Last, it concluded that Spivey was not entitled to a stay to exhaust his *Atkins* counsel ineffective-assistance claim because that claim is not cognizable on federal habeas review. ECF No. 36 at PageID #: 6265-66.

On March 31, 2017, Spivey filed his full amended habeas corpus petition. ECF No. 38. The State filed an amended return of writ on April 24, 2017. ECF No. 40. Spivey filed a traverse on June 8, 2017. ECF No. 46. And the State filed a sur-reply on June 22, 2017. ECF No. 47.

On July 14, 2017, Spivey filed a motion for discovery relating to the same claims as his motions to amend and to stay: namely, ineffective assistance of trial counsel for failing to investigate and develop mitigating evidence relating to his mental disabilities, including intellectual disability and autism spectrum disorder; prosecutorial misconduct for failing to disclose exculpatory evidence; trial-court error in failing to suppress his involuntary statement to police; and ineffective assistance of post-conviction counsel in failing to obtain an "appropriate" expert on intellectual disability. ECF No. 48. He seeks: (1) depositions of state post-conviction counsel to support his claim that the procedural default of certain of these claims was caused by the attorneys' ineffective assistance; (2) depositions of psychiatric experts to support his *Atkins* claims; (3) depositions of his trial counsel to support his ineffective-assistance claims, particularly with respect to their handling of intellectual disability, autism, and competency claims; (4) Mahoning County Prison Records to support his competency claim; and (5) records

27

of the Youngstown Police Department, Mahoning County Sheriff's Office, and Mahoning County Prosecutor's Office to support his *Brady* claim. ECF No. 48. The State opposes the motion. ECF No. 49. She argues that Spivey cannot establish good cause for his discovery requests. *See* ECF No. 49 at PageID # 6731. The Court will address Spivey's motion for discovery in the context of his full amended petition.

### III. PETITIONER'S GROUNDS FOR RELIEF

Spivey asserts twelve grounds for relief. They are:

1. Mr. Spivey's due process right to be competent when tried and sentenced to death was denied both procedurally and substantively in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

2. Warren Spivey's intellectual disability categorically excludes his execution under the Eighth Amendment.

3. The trial court's refusal to grant Warren Spivey's motion to withdraw his no contest plea prior to the sentencing phase deprived him of his Fifth, Sixth, Eighth and Fourteenth Amendment rights under the United States Constitution.

4. The prosecutor's violation of the plea agreement deprived Warren Spivey of his Fifth, Sixth, Eighth and Fourteenth Amendment rights under the United States Constitution.

5. Prosecutorial misconduct deprived Warren Spivey of his Fifth, Sixth, Eighth and Fourteenth Amendment rights under the United States Constitution.

6. The trial court's refusal to conduct matters in open court including the refusal to place the plea agreement on the record in open court deprived Mr. Spivey of his Fifth, Sixth, Eighth and Fourteenth Amendment rights under the United States Constitution.

7. Trial counsel were ineffective in their representation of Mr. Spivey. Their deficient performance prejudiced Mr. Spivey, from the pre-trial decisions through the mitigating hearing. Mr. Spivey's constitutional rights were violated by counsels' ineffectiveness.

8.      Appellate counsel who filed the first appeal to the Seventh District Court of Appeals were ineffective. Mr. Spivey's constitutional rights were violated by counsels' ineffectiveness.

9.      The death penalty on its face and as applied to Warren Spivey is arbitrary, cruel and unusual, and it violates due process. U.S. Const. amend. [V, VIII, and XIV].

10.     The prosecutor's failure to turn over a police report indicating there were "no signs of forced entry" in the victim's home deprived Mr. Spivey of his Fifth, Sixth, Eighth and Fourteenth Amendment rights under the United States Constitution.

11.     Mr. Spivey's statement to the police was not knowing and intelligent due to his mental limitations and therefore involuntary and should have been suppressed. The State of Ohio violated Mr. Spivey's Fifth, Sixth, Eighth and Fourteenth Amendment rights under the United States Constitution.

12.     Mr. Spivey's *Atkins* counsel was ineffective for not choosing an appropriate expert to evaluate and explain the impact of pervasive development disorder (PDD) on Mr. Spivey's cognative (sic) abilities and adaptive functioning. Mr. Spivey's constitutional rights were violated by counsels' ineffectiveness.

ECF No. 38 at PageID #: 6303, 6310, 6319, 6324, 6331, 6333, 6336, 6347, 6351, 6365, 6369, 6373 (capitalization altered).

## IV. STANDARDS OF REVIEW

### A.    AEDPA

Spivey's petition for writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as it was filed after the Act's 1996 effective date. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v. Ohio,* 551 F.3d 485, 493 (6th Cir. 2009). AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)

(4:16CV0384)

(quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  The Act "recognizes a foundational principle of our federal system:  State courts are adequate forums for the vindication of federal rights."  *Burt v. Titlow*, 134 S.Ct. 10, 15 (2013).  It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  *Id.*

One of AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in § 2254(d).  That provision forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" *unless* the state-court decision either:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis in original).  A state court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [Supreme Court] decisions." *White v. Woodall*, 134 S.Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 134 S.Ct. at 15; *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual

determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[7] The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Burt, 134 S.Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Harrington, 562 U.S. at 102; *see also* Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." Harrington, 562 U.S. at 102-03 (internal quotation marks omitted). Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103. This is a very

---

[7] Section 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

Nevertheless, the Supreme Court recognized in *Harrington* that AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Rather, "under AEDPA standards, a federal court can disagree with a state court's factual determination and 'conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.'" *Baird v. Davis*, 388 F.3d 1110, 1123 (7th Cir. 2004) (quoting *Miller-El*, 537 U.S. at 340) (Posner, J.).

Federal courts, therefore, retain statutory and constitutional authority, absent suspension of the writ,[8] to remedy detentions by state authorities that violate federal law, as long as AEDPA's limitations are observed. *Rice*, 660 F.3d at 251. Furthermore, the deference AEDPA demands is not required if those limitations do not apply. Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits. *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005). They likewise may review *de novo* claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions. *See Wiggins*, 539 U.S. at 534

---

[8] *See* U.S. Const. art. I, § 9 cl. 2 ("[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").

(4:16CV0384)

(performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong); *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) (holding that the unreasonable application of *Ford* under § 2254(d)(1) permitted a plenary review of the "underlying [] claim . . . unencumbered by the deference AEDPA normally requires.").

**B.      Exhaustion and Procedural Default**

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus.  28 U.S.C. § 2254(b) and (c); *see also* *Rose v. Lundy*, 455 U.S. 509 (1982).  This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n. 28 (1982).  It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  It occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to:  (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the

34

petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available.  *See, e.g.*, *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n. 28; *Williams*, 460 F.3d at 806.

Where a state court declines to address a prisoner's federal claims because the prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law.  *Id.* at 732-33.  To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied.  *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).[9]

---

[9]  In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established the now familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule.

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

A petitioner also may procedurally default a claim by failing to raise the claim in state court, and pursue the claim through the state's "ordinary appellate review procedures," if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp.2d 655, 661 (N.D. Ohio 2003) ("[i]ssues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("[w]here state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("[b]ecause the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . . it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'" *Id.* (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

36

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, the federal court looks to the last state court rendering a reasoned opinion on that claim. *Ylst,* 501 U.S. at 805. If the state court "clearly and expressly states that its judgment rests on a state procedural bar," then the claim is procedurally defaulted.[10] *Harris v. Reed,* 489 U.S. 255, 263 (1989). Conversely, if the last state court presented with the claim reaches its merits, then the procedural bar is removed and the federal habeas court may consider the merits of the claim in its review. *Ylst,* 501 U.S. at 801.

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman,* 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux,* 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady,* 456 U.S. 152, 170 (1982)). "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell,* 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier,* 477 U.S. 478, 496 (1986)).

---

[10] Where a later state decision rests upon a prohibition against *further* state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ." *Ylst,* 501 U.S. at 804 n. 3. In that case, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Id.* at 805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no bearing upon [a petitioner's] ability to raise the [federal] claim in federal court").

A fundamental miscarriage of justice in capital cases also means actually innocent of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992). In this sense, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law." *Id.* at 336. This "actual innocence" standard "must focus on those elements that render a defendant eligible for the death penalty." *Id.* at 347.

### C.    Cognizability

To the extent a claim asserted in a federal habeas petition alleges state-law violations, it is not cognizable on federal habeas review and should be dismissed on that basis. "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law"); *Engle v. Isaac*, 456 U.S. 107, 121 n. 21 (1982) ("[w]e have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But they must be "so egregious that [they] result in a denial of fundamental fairness."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Fundamental fairness under the Due Process Clause is compromised where "the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' . . . and which define 'the community's sense of fair play and decency.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal citations omitted). Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'"  *Id.* (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

## V.  ANALYSIS OF PETITIONER'S GROUNDS FOR RELIEF

### A.      First Ground for Relief:  *Competency to Stand Trial*

In his first ground for relief, Spivey claims that the trial court violated his procedural and substantive due process rights to be competent to stand trial.  ECF No. 38 at PageID #: 6303-10. Specifically, he contends the court should have conducted "more searching" inquiries, and even *sua sponte* hearings, to determine his competency to waive his right to a jury trial and enter pleas of no contest to all charges.  ECF No. 38 at PageID #: 6306; ECF No. 46 at PageID #: 6613-15. Spivey further alleges that he was in fact incompetent to waive his jury-trial rights and enter the no-contest pleas.  ECF No. 38 at PageID #: 6306-6309; ECF No. 46 at PageID #: 6615-18.

39

(4:16CV0384)

**1.      Procedural Posture**

The State argues Spivey's competency claims are procedurally defaulted because they were either waived at trial or were not fairly presented to state courts. ECF No. 40 at PageID #: 6513-14. Spivey counters that he presented the claims to state courts, where they were adjudicated on the merits and are therefore ripe for federal habeas review. ECF No. 46 at PageID #: 6612-13.

**a.      Procedural history**

*Trial court*. Spivey's mental condition and intellectual abilities moved to the forefront of his case within months of his indictment. The Ohio Supreme Court recounted:

> On September 19 or 20, appellant entered a plea of not guilty and not guilty by reason of insanity, moved for an order for psychological or psychiatric evaluation in connection with the insanity plea, and requested the appointment of Dr. A. James Giannini to evaluate appellant's mental condition at the time of the offenses. *See* former R.C. 2945.39. On September 20, the trial court ordered the Forensic Psychiatric Center of District Eleven, Inc. (not Giannini) to conduct the examination of appellant. On September 21, appellant moved for the appointment of an independent forensic examiner (*i.e.*, Giannini or some other psychiatrist chosen by the defense) to evaluate appellant's mental condition at the time of the offenses. See former R.C. 2945.39(C). . . .
>
> Prior to September 25, the Forensic Center issued a report by Dr. Stanley J. Palumbo, a psychologist, indicating that appellant was sane at the time of the offenses. . . . On September 26, the trial court, pursuant to former R.C. 2945.39, appointed Giannini to conduct a psychiatric evaluation of appellant for purposes of the insanity plea. Giannini's psychiatric evaluation of appellant was completed on September 29, and Giannini apparently found appellant to be sane at the time of the murder and found him competent to stand trial.
>
> On October 2, 1989, appellant waived his right to trial by jury and elected to be tried by a three-judge panel. Appellant's signed jury waiver form was filed in the cause and made part of the record thereof in accordance with the requirements of R.C. 2945.05. Thereafter, on October 3, the members of the three-judge panel . . . were duly designated, and trial was set to commence October 10. On October 6, appellant

moved for a continuance of the October 10 trial date pending the completion of the DNA testing.

On October 10, the parties appeared in chambers before Judges Economus and McNally. The chambers discussion involved, among other things, a plea agreement that had been reached between the state and the defense. The discussions indicated that appellant had agreed to plead no contest to the charges and specification set forth in the indictment. In exchange, the state agreed that, during the penalty phase, the prosecution would be limited to cross-examination of defense witnesses and would not introduce independent evidence during mitigation except to rebut false or perjured testimony. Additionally, the state agreed to refrain from making any recommendation concerning the death penalty. Following these discussions, appellant appeared before the three-judge panel, withdrew his pleas of not guilty and not guilty by reason of insanity, and entered a written plea of no contest to each count. Following an extensive Crim.R. 11 colloquy between the panel and appellant, the panel accepted appellant's pleas of no contest.

Spivey, 81 Ohio St.3d at 406-07.

After finding Spivey guilty of all charges, the panel conducted the penalty phase of Spivey's trial, at which Spivey presented as mitigating evidence two experts who testified about his mental health and intellectual abilities. Id. at 420-22. The Ohio Supreme Court summarized their testimony as follows:

Dr. Abrams, a developmental pediatrics specialist, testified that he had diagnosed appellant in 1983 as having XYY Syndrome, a genetic chromosome abnormality. According to Abrams, individuals with XYY Syndrome tend to be tall and thin, have less muscle development than an average person, tend to have learning problems, and have minor congenital abnormalities. Abrams testified that there is an increased risk of behavioral problems associated with XYY Syndrome. According to Abrams, XYY Syndrome does not itself result in mental disease, but "results in an increased risk for mental disease." Abrams testified further that appellant's chromosome abnormality placed him at risk for committing criminal acts, but that the syndrome itself did not cause him to be aggressive and to commit violent acts. Rather, Abrams indicated that family environment plays a vital role in whether a person with XYY syndrome is likely to engage in criminal behavior. In this regard, Abrams testified that appellant "did not have a fair shake either from mother nature or from the environment." Abrams concluded that "[t]he combination of the two factors, his genetics, the family, and failure of the environment to fulfill his needs leads to his

criminal behavior and violent behavior." Abrams also indicated that when he examined appellant in 1983, appellant was not aggressive and was capable of controlling his impulses. In addition to diagnosing XYY Syndrome, Abrams diagnosed appellant in 1983 as suffering from "[c]onduct disorder, unsocialized, nonaggressive," "[d]evelopmental language disorder, receptive type," and "[a]ttention deficit disorder without hyperactivity."

Dr. James R. Eisenberg, a court-appointed clinical and forensic psychologist, also testified in mitigation. Eisenberg first interviewed appellant in October 1989. Between that time and the time of the mitigation hearing, Eisenberg interviewed appellant on several occasions, performed psychological testing, reviewed appellant's extensive records, and, it seems, interviewed members of his family. Eisenberg testified that appellant has a full scale I.Q. of 74, which, according to Eisenberg, indicated that appellant was "in the borderline range of intelligence." Eisenberg also performed testing to determine appellant's adaptive level of functioning, and concluded that "[i]ntellectually we are looking at someone who is basically functioning much like a ten year old." Eisenberg reviewed appellant's prior hospital records and various other reports and information concerning appellant. Eisenberg testified that appellant's records showed or consistently showed the presence of XYY Syndrome, conduct disorder, developmental language disorder, attention deficit disorder, learning problems, temporal lobe seizures, minimal brain dysfunction, juvenile arthritis, and the possibility of latent schizophrenia.

Eisenberg diagnosed appellant as suffering from an attention deficit disorder, "alcohol and marijuana abuse, possible dependency," and a "borderline personality disorder with schizoid and anti-social features." Eisenberg testified that, in his opinion, "in a variety of settings, based on all the conditions that [appellant] carries with him, those conditions render him substantially impaired in specifically controlling impulse." . . .

_Id._ at 421-22.

The panel found the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt and sentenced Spivey to death. ECF No. 19-6 at Page ID #: 1182, 1212-21. It accorded little weight to Spivey's youth and low intelligence, as "Dr. Eisenberg stated that [Spivey] was able to function and reason and although of limited intelligence, he was able to understand the criminality of his conduct." ECF No. 19-6 at PageID #: 1217. The panel also

(4:16CV0384)

rejected Spivey's argument that he committed the offense because of a mental disease or defect, or lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. It concluded that while the experts agreed that Spivey had "personality problems[,] . . . the evidence is clear that his personality disorder is not the product of a mental illness or defect." ECF No. 19-6 at PageID #: 1218. It further noted that Dr. Eisenberg "concluded that [Spivey] understood the wrongfulness or criminality of his conduct . . . [and] knew that what he was doing was wrong, but could not conform his conduct to the requirements of the law[,]" and that the other experts who examined Spivey agreed. ECF No. 19-6 at PageID #: 1219.

*Direct appeal.* Spivey did not raise a competency claim to the state appellate court on direct appeal. *See* ECF No. 19-6 at PageID #: 1295; *see also* *Spivey*, 1997 WL 16196. But he did raise a claim on direct appeal to the Ohio Supreme Court asserting that the three-judge panel erred by accepting his no-contest pleas without a sufficient inquiry into his competency. ECF No. 19-7 at PageID #: 1465-72. The state's highest court found that Spivey waived this claim by failing to raise it at trial or on direct appeal to the appellate court. *Spivey*, 81 Ohio St.3d at 410. Nonetheless, the court thoroughly reviewed the claim for plain error and found none.[11] *Id.* at 410-11.

---

[11] A state court's review for plain error is "properly viewed as a court's right to overlook procedural defects to prevent manifest injustice. . . ." *Lundgren*, 440 F.3d at 765. *See* Ohio R. Crim. P. 52(B) ("[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *State v. Long*, 53 Ohio St.2d 91 (1978), para. three of the syllabus ("[n]otice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.").

*Post-conviction relief.* Spivey raised three competency claims in his petition for post-conviction relief in the state trial court. His first two claims asserted that he was not competent to waive a jury trial or enter a no-contest plea, and the trial court did not adequately protect his due process rights to competency with regard to both the jury waiver and no-contest pleas. *See* ECF No. 19-8 at PageID #: 1816-29 (post-conviction petition); ECF No. 19-11 at PageID #: 2158-67 (Spivey's 'Final Argument'). In his third claim, he more specifically challenged the trial court's failure to request, *sua sponte*, a competency evaluation before accepting his jury-trial waiver and no-contest pleas. *See* ECF No. 19-8 at PageID #: 1829-30; ECF No. 19-11 at PageID #: 2167-68.

The trial court denied a State motion for summary judgment and granted Spivey an evidentiary hearing. ECF No. 19-10 at PageID #: 2068, 2123; ECF No. 20-7 at PageID #: 5270-5460; *see also Spivey*, 2002 WL 418373, at *3. At the hearing, Spivey offered the testimony of Dr. Eisenberg, who had testified for the defense at the mitigation phase of his trial. *Id.* at *7. The psychologist opined that Spivey "'was not competent to waive a jury, to enter a plea of no contest and all the things that follow from that.'" *Id.* The trial court rejected Spivey's claims on the merits. ECF No. 19-11 at PageID #: 2209.

Spivey appealed to the state appellate court, which affirmed the trial court's judgment. ECF No. 19-12 at PageID #: 2427-42, 2443; *Spivey*, 2002 WL 418373, at *12. It explained that it would address Spivey's competency claims "collectively" because the legal standard for competency to stand trial and competency to enter a plea were the same. *Id.* at *4. The court then noted that "the issue of Spivey's competency was dealt with at length on direct appeal by

the Ohio Supreme Court" in addressing – and rejecting – his *procedural* claim regarding the trial court's efforts to determine his competency to enter the no-contest pleas. *Id.* "Still," it remarked, Spivey pressed the same claim regarding his competency to waive his jury-trial rights. *Id.* at *5. The court then stated that "[t]his is an issue that could have and in fact was addressed on direct appeal[,]" and Ohio's *res judicata* rule, therefore, "would be a proper basis for dismissing this claim."[12] *Id.* It proceeded to conclude that Spivey's claim regarding the trial court's failure to conduct a *sua sponte* competency hearing "[c]learly" was barred by *res judicata*, because it was addressed on direct appeal and Spivey had presented no evidence outside the record to overcome the default.[13] *Id.* at *5. The court then considered whether Spivey could "avoid dismissal" of his first two competency claims (presumably, the remaining substantive due process claims) by presenting sufficient evidence outside the record. *Id.* at *6-8. After examining the evidence Spivey had submitted, it determined the evidence either conflicted with the record or was weak. It decided it must defer to the trial court's judgment and concluded its analysis by finding Spivey's three competency claims "meritless." *Id.* at *8.

Spivey appealed the appellate court's decision, and the Ohio Supreme Court declined jurisdiction and dismissed the appeal. ECF No. 19-13 at PageID #: 2509.

---

[12] Ohio's *res judicata* rule bars a defendant from raising in post-conviction review a claim that was or could have been raised on direct appeal. *See State v. Perry*, 10 Ohio St.2d 175, 180 (1967).

[13] In Ohio, "the introduction in a [post-conviction] petition of evidence *dehors* [*i.e.*, outside] the record [to support a claim] is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of *res judicata*." *State v. Cole*, 2 Ohio St.3d 112, 114 (1982).

*Application to reopen direct appeal.*  Spivey also raised in an application to reopen his direct appeal in state appellate court[14] claims asserting his appellate counsel provided ineffective assistance by failing to raise competency claims relating to his jury-trial waiver and no-contest plea.  ECF No. 19-13 at PageID #: 2522-23.  The appellate court rejected the claims.  ECF No. 19-13 at PageID #: 2572.  And, the Ohio Supreme Court affirmed the court of appeals' denial of Spivey's reopening application.  ECF No. 19-13 at PageID #: 2584.

*Second post-conviction Atkins proceedings.*  In 2002, Spivey filed a second post-conviction petition in the trial court, raising a claim under the recent Supreme Court decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), which prohibited the execution of intellectually disabled prisoners.  *See Spivey*, 2014 WL 818640.  In 2004, Spivey retained Dr. Jeffrey Smalldon to serve as his expert on intellectual disability.  *Id.* at *2; ECF No. 19-13 at PageID #: 2742-43.  In 2008, at Spivey's request, the trial court stayed the proceedings to allow for a competency determination.  *Spivey*, 2014 WL 818640, at *2.  The trial court appointed Dr. Gazley, who determined that Spivey was competent to participate in the post-conviction proceedings.  *Id.*  The trial court denied the *Atkins* petition, *id.* at 3, which was affirmed on appeal, *id.* at *7; ECF No. 19-17 at PageID #: 3447.

---

[14]  At that time, Ohio Appellate Rule 26(B) permitted capital defendants to reopen their direct appeals to present claims of ineffective assistance of appellate counsel as long as the application, a so-called *"Murnahan* application," was filed in the appellate court within ninety days of its judgment.  *See State v. Murnahan*, 63 Ohio St.3d 60 (1992). The current formulation of this rule applicable to capital cases is found in Ohio S. Ct. Prac. R. 11.06(A).

**b.** **Procedural default**

*Procedural due process claim.* The State characterizes Spivey's procedural due process claim as challenging the trial court's failure to conduct a *sua sponte* inquiry into his competency before he entered the no-contest pleas. ECF No. 40 at PageID #: 6513. It argues the claim is defaulted because Spivey raised it on direct appeal only to the Ohio Supreme Court, which found it waived, engaged in a plain-error analysis, and alternatively denied the claim on its merits. ECF No. 40 at PageID #: 6513. He then raised an identical challenge in his post-conviction petition, it asserts, which the state appellate court found barred by *res judicata*, but also conducted an alternative merits review. ECF No. 40 at PageID #: 6513. The state courts, therefore, enforced the *res judicata* procedural bar, it concludes, and the claim is defaulted. ECF No. 40 at PageID #: 6513-14.

Spivey counters in his traverse that the claim is not procedurally defaulted. ECF No. 46 at PageID #: 6612-13. He argues that on direct appeal, the Ohio Supreme Court reviewed the procedural due process aspect of this claim "on the merits for plain error."[15] ECF No. 46 at PageID #: 6612. And in post-conviction proceedings, he asserts, the state appellate court found the Ohio high court conducted a merits review of the claim, and "then conducted its own analysis of the both the procedural and substantive competency claims[,]" apparently preserving them for federal habeas review. ECF No. 46 at PageID #: 6612-13.

---

[15] In his amended petition, Spivey states that "[t]he procedural due process aspect of the issue [of competency] was raised on direct appeal and addressed by the Ohio Supreme Court." ECF No. 38 at PageID #: 6303.

This claim is procedurally defaulted. The last state court to address Spivey's procedural due process competency claim was the state appellate court in post-conviction proceedings. *See Ylst*, 501 U.S. at 805 (federal habeas courts look to the last *explained* state-court judgment in determining procedural default).[16] The state court found the claim "[c]learly" barred on *res judicata* grounds, as "this issue" – presumably, the nature of the trial court's obligations given its awareness of Spivey's alleged incompetency – "was presented on direct review." *Spivey*, 2002 WL 418373, at *5. The state appellate court explained that the Ohio Supreme Court rejected this claim, and "nothing in the record . . . prove[d] otherwise." *Spivey, 2002 WL 418373, at *5*. "More importantly," it reasoned, "at this stage in the proceedings, Spivey fails to present any evidence outside the record that would lead this court to believe the trial court was placed on notice of Spivey's alleged incompetency." *Id.*

As previously stated, *see* n. 10 *supra*, when a "later state decision rests upon a prohibition against further state review," the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil. . . ." *Ylst*, 501 U.S. at 804 n. 3. In that case, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Id.* at 805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no bearing upon [a petitioner's] ability to raise the [federal] claim in federal court"). Here, the prior decision would be the Ohio Supreme Court's opinion on direct

---

[16] There, Spivey raised the same claim he raises here, challenging the trial court's failure to conduct a proper inquiry into his competency to waive a jury trial or enter no-contest pleas throughout the proceedings. This is a broader claim than the one Spivey raised on direct appeal to the Ohio Supreme Court, which focused just on his competency to enter the pleas.

appeal, in which it found the claim waived by defense counsel's failure to object at trial and Spivey's failure to raise the claim to the court of appeals on direct review. *Spivey*, 81 Ohio St.3d at 410. Both of these grounds are independent and adequate grounds upon which to find habeas claims procedurally defaulted. *See State v. Mason*, 82 Ohio St.3d 144, 162 (1998) (Ohio's contemporaneous objection rule requires that a party preserve an error for appeal by calling it to the attention of the trial court at a time when the error could have been avoided or corrected); *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006) (failure to adhere to the "firmly-established" contemporaneous objection rule is "an independent and adequate state ground" for procedural default); *Hruby v. Wilson*, 494 Fed.Appx. 514, 517 (6th Cir. 2012) ("[a] habeas petitioner's submission of a new claim to the state's highest court on discretionary review is not a fair presentation to the state's courts.").

The Court does not agree with the parties, however, that the state appellate court conducted an alternative merits review of this claim. Its brief analysis emphasized Spivey's failure to produce evidence *dehors* the record sufficient to overcome the *res judicata* bar, rather than reaching the merits. But, even if the court did analyze the merits of this claim, the existence of an alternative merits analysis does not excuse procedural default when a state court clearly and expressly relies on a procedural bar. *See Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state

49

court also relies on federal law.") (emphasis in original); *Scott v. Mitchell*, 209 F.3d 854, 865 (6th Cir. 2000) ("*Harris* does not preclude a finding that the state procedural rule was actually enforced where the state court decision also relies on an alternative ground.").  As stated above, this claim is procedurally defaulted.

Spivey argues this default should be excused by his appellate counsel's failure to raise it to the court of appeals on direct appeal.  ECF No. 46 at PageID #: 6612.  But claims of ineffective assistance of counsel cannot provide cause for the procedural default of another claim if the ineffective-assistance claim itself is procedurally defaulted.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).  Spivey never raised a claim in state court that appellate counsel was ineffective for failing to raise a claim that trial counsel should have objected to the trial court's inquiries into his competency.  *See* ECF No. 19-3 at PageID #: 2522-23.  He no longer can do so under Ohio's rules.  *See* Ohio R. App. P. 26(B)(1) (requiring reopening applications be filed within ninety days from journalization of the appellate judgment absent a showing of good cause); *see also Goldberg v. Maloney*, 692 F.3d 534, 538 (6th Cir. 2012) (finding habeas petitioner procedurally defaulted appellate counsel ineffective-assistance claim by failing to file a Rule 26(B) application and offering no cause for failing to file a delayed application, even though he had raised the claim in a jurisdictional appeal to the Ohio Supreme Court); *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002) (holding that failure to establish good cause to excuse an untimely Rule 26(B) application is an adequate state procedural ground to bar federal habeas review); *Sowards v. Attorney General of Ohio*, No. 2:11CV954, 2012 WL 4051238, at *7 (S.D. Ohio Sept. 13, 2012) (finding that, while petitioner "fail[ed] to exhaust the state remedy of

seeking to reopen his appeal, because any such attempt to file a Rule 26(B) motion at this point would be procedurally barred under Ohio law, he has procedurally defaulted his ineffective assistance of appellate counsel claim for purposes of habeas relief"). Thus, Spivey has presented no cause to excuse the default of his procedural due process competency claim.[17]

*Substantive due process claim.* The State argues this claim also is procedurally defaulted because the state appellate court found it barred by *res judicata* on post-conviction review. ECF No. 40 at PageID #: 6513. Spivey contends this claim is not defaulted because he "raised [it] on post conviction, [when] the state court held a full hearing, and addressed the issues on the merits." ECF No. 46 at PageID #: 6612.

Spivey is correct that the state *trial* court considered the merits of this claim on post-conviction review. *See* ECF No. 19-11 at PageID #: 2209. But, again, federal habeas courts

---

[17] Spivey's request for records from the Mahoning County Jail and Sheriff's Office to support this claim, therefore, are denied. *See* ECF No. 48 at PageID #: 6708-6709. A federal habeas petitioner, "unlike the usual civil litigant, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Discovery in habeas cases is governed by Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts, which permits petitioners to initiate discovery available under the federal civil rules "if, and to the extent that, the judge in the exercise of [her] discretion and for good cause shown grants leave to do so, but not otherwise." Habeas R. 6(a). "Good cause" for discovery under Rule 6 exists only "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief. . . .'" *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). Discovery on a habeas claim that is procedurally defaulted, and for which the petitioner has not shown cause or prejudice to overcome that bar, would be futile and there would be no good cause to pursue it. *See, e.g.*, *Williams v. Bagley*, 380 F.3d 932, 974-76 (6th Cir. 2004) (holding that district court did not abuse its discretion in denying discovery requests because the habeas petitioner had procedurally defaulted the claim).

look to the last explained state-court judgment in determining procedural default. *Ylst*, 501 U.S. at 805. The last state-court decision on Spivey's substantive competency claim was from the state appellate court in post-conviction proceedings. *See Spivey*, 2002 WL 418373, at *4-8.

Unfortunately, however, the state appellate court's ruling on the procedural posture of Spivey's substantive due process competency claims is unclear. Procedural default precludes consideration of a claim on federal habeas review only if the last state court rendering a reasoned opinion on the claim "clearly and expressly states that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263. As explained above, the state appellate court found Spivey's procedural due process competency claim "[c]learly" barred by the *res judicata* rule because the Ohio Supreme Court had addressed it on direct appeal. The court then turned to Spivey's substantive due process claims, stating: "However, Spivey attempts to avoid dismissal of his first two assignments of error by presenting evidence *de hors* the record that he was not competent to waive his right to a jury trial or to plead no contest." *Spivey*, 2002 WL 418373, at *5-6. The court seems to refer to *res judicata* here, but does not provide a basis for applying that rule to this claim, such as Spivey's failure to raise the claim on direct appeal. The court then examined the extra-record evidence Spivey presented, discounting the evidence as conflicting with the record and unpersuasive. *Id.* at *6-8. But the court never stated that the evidence was insufficient to overcome the *res judicata* bar. Rather, it concluded its analysis by stating, "We will not now substitute our judgment for that of the trial court as there is competent credible evidence to support this finding. Namely, the reports of three doctors stating that Spivey was in fact competent." *Id.* at *8. It ruled the claim was "meritless." *Id.*

The state appellate court, therefore, did not "clearly and expressly" state that its judgment denying Spivey's substantive due process competency claim rested on *res judicata* grounds, and its ruling is not sufficiently clear to preclude federal habeas review. The Court finds this claim was adjudicated on the merits, and is preserved for federal habeas review.

Accordingly, Spivey's procedural due process competency claim is procedurally defaulted, while his substantive due process competency claim is ripe for review.

**2. Merits**

**a. Substantive due process claim**

Spivey claims he was in fact incompetent to stand trial, including when he waived his right to a jury trial and entered pleas of no contest. "A criminal defendant may not be tried unless he is competent." *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966)); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("[i]t has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."). He may not enter a guilty plea unless he does so "competently and intelligently." *See Godinez*, 509 U.S. at 396; *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938); *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 275 (1942).

To be found competent, the defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior

medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient." *Drope*, 420 U.S. at 180.

The standard for determining competency to stand trial and competency to enter a plea are the same. *Godinez*, 509 U.S. at 399. But the issue of a defendant's *competency* to waive his jury-trial rights or enter a no-contest plea is different from the issue of whether the defendant's waiver or plea was *knowing and voluntary*. The Supreme Court has explained:

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. . . . The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced.

*Id.* at 401 n.12 (emphasis in original).

"A determination of competence is a factual finding, to which deference must be paid." *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006) (citing *Thompson v. Keohane*, 516 U.S. 99, 110-11 (1995)). Therefore, assuming that the state court's legal standard for determining whether a defendant is competent is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, the court's competency determination is treated as a question of fact under 28 U.S.C. § 2254(d)(2). *Id.* at 859. Moreover, it is presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. *Id.* (citing § 2254(e)(1)). Therefore, "'regardless of whether [a habeas court] would reach a different conclusion were [it] reviewing the case de novo, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary.'" *Id.* at 858

(quoting *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001)). In addition, the Court's review is limited to "the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[18]

The last state court to address Spivey's substantive due process competency claim was the state appellate court on post-conviction review. The court began by correctly summarizing the controlling federal law:

> The United States Supreme Court held in *Godinez v. Moran* (1993), 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321, that the standard for determining the competency to stand trial and the competency to enter a plea were the same: whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rationale as well as factual understanding of the proceedings against him." *Id.* at syllabus. Therefore, it is appropriate for us to address Spivey's issues of competence collectively.

*Spivey*, 2002 WL 418373, at *4.

It then reasoned:

> . . . Spivey attempts to avoid dismissal of his first two assignments of error by presenting evidence *de hors* the record that he was not competent to waive his right to a jury trial or to plead no contest. First, Spivey offers an affidavit of trial counsel Attorney Tom Zena stating, "Mr. Krichbaum and I advised the Defendant, Warren Spivey, to plead no contest, as the test results were still not available when the day for trial before a three judge panel came."
>
> The following colloquy, which was referenced by the Ohio Supreme Court in Spivey's direct appeal, occurred on the record:
>
>> "Judge Economus then stated, 'I would—and I want the record to be clear on this—this Court would use every effort, and I [previously] indicated this in concert with the prosecution and the defense counsel, to have that evidence [the DNA test results] available before the actual trial of this case.'

---

[18] Spivey, therefore, also is not entitled to discovery on this claim, including records from the Mahoning County Jail and Sheriff's Office. *See* ECF No. 48 at PageID #: 6708-6709.

Defense counsel replied that the defense had not abandoned the DNA testing and that counsel was simply attempting to reiterate, at every possible point, the need for the DNA test results.

Judge Economus then stated, 'I don't want it to appear that the only reason you are pleading this afternoon is because the Court denied your request for a continuance because you haven't received the pertinent evidence for the defense of your case.'

In response, one of appellant's defense attorneys, stated:
'Your Honor, last Monday [October 2, 1989], we were to begin once again—and that's when we were going to go forward [with voir dire], and that's when we waived the jury trial. We didn't do that to buy time, we did that because we thought that was the right thing to do. So, the Court's statement o[f] concern, that that's the only reason that we are pleading, because we don't have this [the DNA test results], that is not the only reason. It is a consideration, however. * * *

'Your Honor, Mr. Zena [co-counsel] just mentioned to me, and we had discussed this earlier, that the main reason we are going [sic, doing] this is because of the Rule 11 negotiations. And, of course, we're considering this other situation in making the decision that we made.'" *Spivey* at 414, 692 N.E.2d 151.

It appears the evidence presented by Spivey de hors the record conflicts with counsel's representations made to the trial court on the record as Spivey now claims he pleaded guilty based on counsel's advice that they try to buy time. Similarly, the defendant in *State v. Bays* (1999), 87 Ohio St.3d 15, 716 N.E.2d 1126 informed the trial judge he was waiving because "[m]y counsel feels it's best," and that he did not "know which way [he] want[ed] to go." The Ohio Supreme Court held, "If anything, having the advice of counsel would enhance the voluntariness of his decision." *Id.* at 87, 716 N.E.2d 1126.
. . .

The *Bays* court explained;

"A waiver is the intentional relinquishment of a known right or privilege. *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466. Hence, a defendant must have some knowledge of the nature of the jury trial right to make a valid waiver. *Martin, supra*, 704 F.2d at 273. However, a defendant need not have a complete or technical understanding of the jury trial right

56

in order to knowingly and intelligently waive it. *Id.* For instance, the United States Court of Appeals for the Sixth Circuit has said: 'A defendant is sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of 12 members of the community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and * * * a judge alone will decide guilt or innocence should he waive his jury trial right.' *Id., 704 F.2d at 273*. Indeed, that may be more than the Constitution requires to render a waiver knowing and intelligent. See *United States v. Sammons, supra*, 918 F.2d at 597." *Id.* at 19.

Following the logic of the *Bays* court, we conclude Spivey derived benefit from counsel's advice regarding strategy. The Ohio Supreme Court has already determined from the record that Spivey voluntarily and knowingly pleaded guilty. Counsel's advice would only serve to bolster the voluntariness of the plea.

Next, we will address Spivey's contention that regardless of what may be ascertained from the record, he was not competent to either waive his right to a jury trial or to plead no contest. He maintains that he is now and has always been incompetent. As additional evidence de hors the record, Spivey presents testimony from Dr. Eisenberg. When asked whether he had an opinion regarding Spivey's competency at the post-conviction hearing, Dr. Eisenberg stated, "My opinion is he was not competent to waive a jury, to enter a plea of no contest and all the things that follow from that."

Interestingly, Dr. Eisenberg never revealed this discovery to trial counsel and now maintains he was hired only to present evidence at the mitigation stage of the proceedings. He explained that he was not retained to present evidence on competency. Therefore, when he discovered Spivey's alleged incompetency, he did not reveal this discovery as he had no ethical duty to do so. Moreover, if he had been hired for the purpose of assessing competency, Dr. Eisenberg would have conducted further testing. Eisenberg further testified that he discussed Spivey's intellectual capacity with trial counsel. However, he did not recall having a discussion regarding the specific issues on competency.

Despite this testimony, we are precluded from substituting our judgment for that of the trial court where the record contains competent and credible evidence supporting the findings of fact and conclusions of law rendered by a trial court judge. . . .

As previously noted, the trial court overruled the state's motion for summary judgment and granted a hearing. Consequently the trial court was afforded the opportunity to weigh evidence and evaluate the credibility of the witnesses. After

hearing all the evidence, the trial court stated in its conclusions of law that both Dr. Palumbo and Dr. Giannini found Spivey to be sane at the time of the murder and competent to stand trial. Notably, Dr. Palumbo, in addition to his own independent evaluation of Spivey, partially relied upon yet another competency report completed two months before Spivey's sentencing by the Forensic Psychiatric Center of District Eleven, Inc. in relation to previous charges.

After reviewing these various opinions, the trial court further expounded on what the Ohio Supreme Court had already addressed,

> " * * * Mr. Spivey had been examined by Dr. Huntsman in 1988 in connection with an unrelated criminal case, and that report indicated that Mr. Spivey was not only competent to stand trial, but that he understood the notion of plea bargaining. Moreover, Mr. Spivey's trial counsel testified in their depositions that they were satisfied that Mr. Spivey was competent.
>
> Mr. Spivey relies on the recent affidavit and October 22, 1999 testimony of Dr. Eisenberg in which he stated that Mr. Spivey was not competent to waive a jury or enter a plea of no contest. However, Dr. Eisenberg admitted that he did not do a competency evaluation of Mr. Spivey and, if he had, it would have included much more extensive testing and follow up questioning. Furthermore, Dr. Eisenberg admitted he never raised the competency issue with trial counsel."

The only evidence Spivey provided the trial court to counter the evidence presented to the three-judge panel was the testimony of Dr. Eisenberg. The trial court however chose to discredit Dr. Eisenberg's testimony as it was "insufficient to override the overwhelming evidence that Mr.Spivey was competent to waive a jury trial and enter a plea of no contest." We will not now substitute our judgment for that of the trial court as there is competent credible evidence to support this finding. Namely, the reports of three doctors stating that Spivey was in fact competent. Consequently, we find Spivey's first three assignments of error to be meritless.

*Id.* at *6-8 (state-court citations omitted).

Spivey does not contend the state court misstated or misapplied Supreme Court precedent. Rather, he challenges the state court's factual determination that he was competent to stand trial, waive his jury-trial rights, and enter the no-contest pleas. To support his claim, he

points to his own testimony at the post-conviction hearing, as well as testimony of Dr. Eisenberg,

mitigation specialist Lisa Roth, his trial counsel, and his mother.  *See* ECF No. 38 at PageID #:

6306-6308; ECF No. 46 at PageID #: 6615-17.[19]

Spivey cites his testimony at the hearing that he did not understand the significance of his

no-contest pleas or the death penalty.  ECF No. 38 at PageID #: 6307 (citing ECF No. 20-8 at

PageID #: 5433, 5442-43); ECF No. 46 at PageID #: 6616-17 (citing ECF No. 20-8 at PageID #:

5427-29, 5434).  He points to Dr. Eisenberg's testimony that in his opinion, Spivey "was not

competent to waive a jury, to enter a plea of no contest and all the things that follow from that."

ECF No. 38 at PageID #: 6307 (citing ECF No. 20-7 at PageID #: 5339).  The expert also

testified that he had concerns about Spivey's competency, but did not remember Spivey's

counsel asking him about it.  ECF No. 46 at PageID #: 6615 (citing ECF No. 20-7 at PageID #:

5353).  And he opined that Spivey functioned intellectually like a ten-year-old child.  ECF No.

38 at PageID #: 6307 (citing ECF No. 20-7 at PageID #: 5340).  Dr. Eisenberg also distinguished

Dr. Huntsman's report because it was prepared for a less serious, simpler case that required less

understanding.  ECF No. 46 at PageID #: 6616 (citing ECF No. 20-7 at PageID #: 5358, 5361).

Spivey points out that Ms. Roth testified that at the time of the mitigation hearing, she believed

he did not understand the mitigation proceeding.  ECF No. 38 at PageID #: 6307-6308 (citing

ECF No. 20-7 at PageID #: 5392-93, 5412-13).  Spivey further cites his trial counsel's testimony

---

[19]  Spivey also submits in support of this claim a recent evaluation of his
competency conducted by Dr. Douglas Scambler.  *See* ECF No. 38 at PageID #: 6308-10.
As already noted, this Court's review under § 2254(d)(2), however, is limited to evidence
from the state-court record.  *See* 28 U.S.C. § 2254(d)(2).

regarding Spivey's low intelligence, and Attorney Zena's testimony that he recalled discussing Spivey's competency with his co-counsel.  ECF No. 38 at PageID #: 6308 (citing ECF No. 20-8 at PageID #: 5471, 5555, 5557).  Finally, Spivey notes that his mother testified about his auditory and visual perception problems and his confusion after he was arrested.  ECF No. 46 at PageID #: 6616 (citing ECF No. 20-7 at PageID #: 5291, 5295-96).

This evidence, however, does not show that the state court's judgment was unreasonable, and it is insufficient to overcome the presumption that the state appellate court's factual findings were correct.  As the State argues, demonstrating low intellectual ability does not prove incompetence to stand trial.  The Supreme Court has observed that "mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial." *Atkins*, 536 U.S. at 318.  *See also Garner v. Mitchell*, 557 F.3d 257, 263-66 (6th Cir. 2009) (holding habeas petitioner who presented expert assessments that he had "diminished mental capacity, a troubled upbringing and a poor education" as well as an IQ of 76 and borderline intelligence, was nonetheless competent to waive his *Miranda* rights); *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000) ("neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial"); *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir. 1984) ("[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges."); *Hastings v. Yukins*, 194 F. Supp.2d 659, 671 (E.D. Mich. 2002) ("[n]ot every manifestation of mental illness demonstrates incompetency to stand trial.").

Moreover, the state appellate court was reasonable in refusing to substitute its judgment for that of the trial court – which conducted a hearing, weighed the evidence, and evaluated the credibility of the witnesses – when there was "competent credible evidence" to support the trial court's finding in the form of three expert opinions that Spivey was in fact competent. *Spivey*, 2002 WL 418373, at *7, 8. Indeed, the Supreme Court has explained that the competency issue

> encompass[es] more than 'basic, primary, or historical facts,' [its] resolution depends heavily on the trial court's appraisal of witness credibility and demeanor. . . . [A] trial court is better positioned to make decisions of this genre, and [the Court] has therefore accorded the judgment of the jurist-observer 'presumptive weight.'

*Thompson*, 516 U.S. at 111 (citations omitted).

Spivey contends that it was unreasonable for the state court to give the previous experts' reports more credibility than the live testimony at the post-conviction hearing. ECF No. 46 at PageID #: 6617-18. As Drs. Palumbo, Giannini, and Hunstman did not testify, he argues, they were not cross-examined about their evaluations, testing, or the records upon which they relied. ECF No. 46 at PageID #: 6618. In fact, he asserts, Drs. Palumbo's and Giannini's reports were not admitted, and they were not even mentioned at the hearing. ECF No. 46 at PageID #: 6618.

However, Spivey has not "shown that the trial court was *clearly* wrong in believing" the prior three experts. *Franklin v. Bradshaw*, 695 F.3d 439, 449 (6th Cir. 2012) (emphasis in original) (rejecting habeas petitioner's competency claim). As the Sixth Circuit has observed:

> For better or worse, as a habeas court, we are not in a position to pick and choose which evidence we think is best so long as the presumption of correctness remains unrebutted. . . . With expert testimony split, as it often is, the state court chose to credit [the two experts] over [petitioner's expert], and we cannot say from this vantage that it was unreasonable to do so.

(4:16CV0384)

*O'Neal v. Bagley*, 743 F.3d 1010, 1022-23 (6th Cir. 2013). *See also Hall*, 134 S.Ct. at 1993 (emphasizing the critical role the medical community and its clinical standards play in defining and determining intellectual disability when considering eligibility for the death penalty).

Indeed, it is difficult to find unreasonable the state court's reliance on the opinions of *three* experts who evaluated Spivey at the time of his trial proceedings over the opinion of an expert who had evaluated Spivey at that time for mitigation purposes, but did not express to trial counsel or the court any reservations about Spivey's competency or conduct a competency evaluation at that time. Psychiatric opinions offered years after a habeas petitioner's trial are "not nearly as relevant as those issued at the time of trial." *Black v. Bell*, 664 F.3d 81, 102 (6th Cir. 2011) (citing *Harries v. Bell*, 417 F.3d 631, 636 (6th Cir. 2005)).

Thus, after carefully reviewing the record, the Court concludes that the Ohio court of appeals' judgment that Spivey was competent during the trial-court proceedings – including when he waived his right to a jury trial and entered the no-contest pleas – did not unreasonably determine the facts in evidence, and Spivey has not rebutted the court's factual findings by clear and convincing evidence. *See* 28 U.S.C. §§ 2254(d)(2), (e)(1).

**b.      Procedural due process claim**

Spivey also claims the trial court's failure to conduct a proper inquiry into his competency to waive his right to a jury trial and enter the no-contest pleas violated his procedural due process rights. He claims the court was aware that he "did not have the mental capacity to fully understand the proceedings and the rights that he was waiving," but did not

62

"stop[] to question him more thoroughly" at hearings or conduct *sua sponte* hearings.  ECF No. 38 at PageID #: 6303.

A trial court's failure to observe procedures that will protect a defendant's right to competency to stand trial deprives him of his due process right to a fair trial.  *Pate,* 383 U.S. at 385.  This due process right is violated when a court fails to hold a proper competency hearing when there is sufficient evidence that a defendant is incompetent.  *Id.*  "Where the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial," a trial judge has the duty to order a hearing *sua sponte.  Id.*  "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181.

"Due process in a competency hearing requires 'that only the most basic procedural safeguards be observed.'"  *Black*, 664 F.3d at 103 (quoting *Medina v. California*, 505 U.S. 437, 453 (1992) (internal quotation marks omitted)).  And the Supreme Court has never "prescribe[d] a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure" for determining competency.  *Drope*, 420 U.S. at 172.  Nevertheless, it has explained that

> evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient.  There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.  That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

*Id.* at 180. Ultimately, the habeas court must determine "'whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'" *Filiaggi*, 445 F.3d at 858 (quoting *Williams v. Bordenkircher*, 696 F.2d 464, 467 (6th Cir. 1983)).

The State argues the Ohio Supreme Court conducted an alternative ruling on the merits of Spivey's procedural due process competency claim, which is owed AEDPA deference. ECF No. 40 at PageID #: 6516. The Court does not agree. After finding Spivey "waived all but plain error with respect to" his claim that the trial court failed to inquire into his competency before accepting his no-contest pleas, Ohio's high court carefully examined Spivey's legal and factual arguments. *Spivey*, 81 Ohio St.3d at 410. It found Spivey did "not point to anything in the record indicating that he was incompetent at the time he entered the pleas of no contest, and [the court's] review of the record has revealed no indicia of incompetency that would have required a hearing on that matter." *Id.* And the court concluded it was "absolutely convinced that the panel did not err by accepting [Spivey's] pleas of no contest" and the claim was "not persuasive." *Id.* at 411. But the court did not signal its intention to conduct an alternative merits review in any respect, and there is insufficient basis upon which to find one. *See Frazier v. Huffman*, 343 F.3d 780, 800 (6th Cir. 2003) (finding "no express statement" by the state court that its conclusion on the merits was an alternative holding).

Furthermore, there appears to be an intra-circuit split regarding whether a state court's plain-error review constitutes an adjudication on the merits entitled to AEDPA deference. *Compare Lundgren*, 440 F.3d at 765 ("[p]lain error analysis is more properly viewed as a court's

right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits."), *and Frazier v. Jenkins*, 770 F.3d 485, 496 n. 5 (6th Cir. 2014) ("[w]e have repeatedly held that plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference."), *with Fleming v. Metrish*, 556 F.3d 520, 530-32 (6th Cir. 2009) (distinguishing prior precedent on this point and concluding that AEDPA deference applied to state court's decision on plain-error review because of the statutory interests in comity, finality, and federalism); *see also Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 851 (6th Cir. 2017) (acknowledging the circuit court's "ambiguity" on this issue). Nonetheless, even if the Court applies the more lenient *de novo* standard in reviewing this claim, Spivey still cannot prevail.

Spivey argues that the trial judge was aware of his "deficiencies," as he had a pending rape case before the same judge at the time of his indictment for aggravated murder in which his counsel had filed a motion for a competency evaluation.  ECF No. 38 at PageID #: 6306-6307. He argues the trial court was "well aware" of his inability to rationally understand the proceedings and assist counsel because there was another criminal case pending against him on the court's docket.  ECF No. 46 at PageID #: 6614.  He also points out that a police detective who questioned him shortly after the offense testified at the suppression hearing that he responded to their initial questions with "blank stares."  ECF No. 46 at PageID #: 6614 (citing ECF No. 20-1 at PageID #: 3720).  He further claims, with no support, the prosecutor "acknowledged that Mr. Spivey was a man of limited mental abilities."  ECF No. 46 at PageID #: 6614.

Nevertheless, he contends, the trial court failed to conduct sufficient inquiries into his competence to waive his jury-trial right and enter the no-contest pleas. *See, e.g.*, ECF No. 38 at PageID #: 6304. He claims the judge warned trial counsel not to file a competency motion after he waived his jury-trial rights and conducted a "rote colloquy" before accepting his no-contest pleas. ECF No. 38 at PageID #: 6306. He also asserts the three-judge panel should have "halted the [mitigation] proceedings" and inquired into his competence after Dr. Eisenberg testified that he was functioning at the level of a second grader. ECF No. 38 at PageID #: 6308.

Spivey presents no persuasive evidence that the trial court had or should have had a "'bona fide doubt' as to [his] competence to stand trial," and should have ordered a hearing *sua sponte* on his competency. *Pate,* 383 U.S. at 385. The Ohio Supreme Court observed,

> [A]ppellant never specifically requested a hearing on the issue of competency. Nevertheless, appellant apparently argues that the trial court should have sua sponte conducted a hearing on the issue prior to accepting the pleas of no contest. However, appellant does not point to anything in the record indicating that he was incompetent at the time he entered the pleas of no contest, and our review of the record has revealed no indicia of incompetency that would have required a hearing on that matter.

*Spivey,* 81 Ohio St.3d at 410. As explained above, low intellectual ability does not necessarily signal incompetence to stand trial. There also is no indication in the record that Spivey exhibited the type of irrational behavior and troubling demeanor at trial envisioned by the Supreme Court in *Drope* that would trigger a trial court to conduct a competency hearing.

In fact, the record makes clear that the trial court had sound reason to believe Spivey was competent to stand trial throughout his trial-court proceedings. Most significantly, the trial court was aware of several evaluations of Spivey's mental health – including one that specifically

addressed his competency to stand trial – and not one examiner concluded that Spivey was

seriously mentally ill, intellectually disabled, or incompetent to stand trial.

> As the Ohio Supreme Court found,
>
> The record does reflect that when an issue concerning appellant's sanity arose while the case was pending before Judge Economus, defense counsel made appropriate motions for sanity evaluations and the appropriate examinations were conducted. A report of one of the examinations specifically included a finding that appellant was competent to stand trial. Further, appellant had previously been examined by a psychologist in 1988 in connection with an unrelated criminal case, and the report of that examination indicated that appellant was not only competent to stand trial, but that he understood the notion of plea bargaining. We have no doubt whatsoever that if appellant's trial attorneys in the case at bar had any reason to believe that appellant was legally incompetent, they would have filed an appropriate motion to request a hearing on the issue of appellant's competency.

*Spivey*, 81 Ohio St.3d at 410.

Spivey's trial counsel also testified in post-conviction proceedings that they did not

believe Spivey was incompetent during his trial-court proceedings. Both attorneys stated that

while Spivey was not very intelligent, there was no concern that he was not competent to stand

trial. *See, e.g.,* ECF No. 20-8 at PageID #: 5555 (Zena deposition) ("I did not believe he didn't

understand what we were talking about, but I did not believe he was a very intelligent fellow.");

ECF No. 20-8 at PageID #: 5500 (Krichbaum deposition) ("I don't know that I ever felt that was

an issue. . . ."), 5512 ("[a]nd I believe he knew what was up, and why we were doing what we

were doing."). And they both also testified that they would have filed a motion for a competency

evaluation if they had been concerned about his competency. *See* ECF No. 20-8 at PageID #:

5589 (Zena deposition) (". . . I would have done something, if I was of the belief he had no idea

what he was doing."); ECF No. 20-8 at PageID #: 5502 (Krichbaum deposition) (". . . if I felt

that competency was the right way to go, I would have gone that way. I don't care if he would

have liked it or not.").

Furthermore, Spivey does not specify what exactly the trial judge should have asked him

at the jury-waiver and change-of-plea hearings that would have convinced him that he was not

competent. He offers only conclusory assertions that the hearings were inadequate. Indeed, the

Ohio Supreme Court made it abundantly clear that the trial court's inquiries were sufficient. As

to the court's hearing regarding the validity of Spivey's waiver of jury-trial rights, the high court

stated,

> First, we note that the trial court strictly adhered to the requirements of R.C. 2945.05
> and, thus, fully satisfied its duties with respect to appellant's jury waiver. Second,
> not only did the trial court fully comply with R.C. 2945.05 in accepting the jury
> waiver, but the court also questioned appellant concerning the written waiver even
> though no such questioning was required. . . . At the time of the waiver, the trial
> court asked appellant in open court whether appellant understood that by waiving the
> right to trial by jury he would be tried by a three-judge panel. The trial court
> questioned appellant as to whether appellant understood that his guilt would have to
> be proven beyond a reasonable doubt. The trial court asked appellant whether
> appellant understood that the death sentence would be imposed if a three-judge panel
> unanimously found appellant guilty of aggravated murder and the attendant
> death-penalty specification and if the panel also unanimously found that the
> aggravating circumstance outweighed the mitigating factors beyond a reasonable
> doubt. Appellant responded affirmatively to each question asked of him, indicating
> that he fully understood the consequences of the waiver. Additionally, the jury
> waiver form itself apprised appellant of the nature and consequences of his decision
> to waive a jury trial.
>
> Therefore, the record is clear that the trial judge at the time appellant waived the
> right to trial by jury strictly adhered to the requirements of R.C. 2945.05 and, in fact,
> went beyond the scope of the statute to ensure that appellant understood the nature
> and consequences of the waiver. The trial judge also specifically found, and we
> agree, that appellant's waiver of the right to trial by jury was "voluntarily made with
> full knowledge of the consequences thereof." Contrary to appellant's assertions,
> nothing more was required to have effectuated a valid waiver of the right to trial by
> jury.

(4:16CV0384)

*Id.* at 409 (citations omitted).  The state court also dismissed Spivey's allegation that, after the

jury-waiver hearing, the trial court warned his counsel not to file a competency motion, stating,

> Appellant has provided us with no citation to the record where defense counsel was allegedly told not to request a hearing regarding competency.  Additionally, we have independently reviewed the entire record and find that no such comment was made.  Moreover, even if the comment had been made, it was still the responsibility of counsel to raise the issue of competency if counsel truly believed that competency was an issue.

*Id.* at 410.  And regarding the trial court's colloquy with Spivey about his change of pleas to no

contest, the Ohio Supreme Court explained,

> The record is clear that appellant manifestly understood the consequences of entering his pleas of no contest.  Indeed, when appellant submitted his written plea to each count to the panel, defense counsel informed the panel that he (counsel) had "gone over it [the written plea] in its entirety and read it to my client."  Counsel also stated that appellant "questioned me about various parts about it and I answered his questions."  The panel then proceeded to address appellant personally as required by Crim.R. 11, and the panel adhered meticulously to all relevant requirements of that rule.  See Crim.R. 11(C)(2) and (3).  In this regard, we are absolutely convinced that the panel did not err by accepting appellant's pleas of no contest.  The Crim.R. 11 dialogue between the panel and this appellant was more than adequate to ensure that he knew the consequences of his pleas (including the consequences relating to a waiver of a jury trial) and that the pleas were knowingly, intelligently, and voluntarily made.

*Id.*

Considering this evidence, the Court cannot find that a reasonable judge, given the

evidence that was before him, "should have experienced doubt with respect to

[Spivey's]competency to stand trial."  *Filiaggi*, 445 F.3d at 858 (internal quotation marks and

citation omitted).  In addition, the trial court observed the "'basic procedural safeguards'"

necessary to protect Spivey's right to competency throughout the court proceedings and did not

violate Spivey's due process rights by not inquiring further into his competency or conducting a

69

(4:16CV0384)

*sua sponte* hearing on the matter. *Black*, 664 F.3d at 103 (quoting *Medina,* 505 U.S. at 453 (internal quotation marks omitted)). Accordingly, Spivey's procedural due process competency claim also fails.

**B.      Second and Twelfth Grounds for Relief:** *Atkins Claim and Ineffective Assistance of Atkins Counsel*

Spivey's second ground for relief alleges that he is intellectually disabled pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), and therefore ineligible for execution. ECF No. 38 at PageID #: 6310-19. Spivey raised this claim in state courts on post-conviction review, where it was adjudicated on the merits. *See* ECF No. 19-16 at PageID #: 3136-49, 3333-48; ECF No. 19-17 at PageID #: 3347. This claim is therefore preserved for federal habeas review.

**1.      Legal Standards:** *Atkins* **and** *Lott*

In *Atkins v. Virginia*, the Supreme Court held that in light of "our evolving standards of decency," executing an intellectually disabled offender violates the Eighth Amendment ban on cruel and unusual punishment. 536 U.S. at 321. The Court recognized a national consensus that intellectually disabled persons are "categorically less culpable than the average criminal," *id.* at 316, because of their diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others," *id.* at 318. The Court also found intellectually disabled offenders at "special risk of wrongful execution" due to the possibility of false confessions; the defendant's difficulty in persuasively showing mitigation, providing meaningful assistance to counsel, and testifying; and his or her demeanor, which may create an unwarranted impression of lack of remorse. *Id.* at 320-21. The Court concluded that

70

given the impairments of intellectually disabled individuals, executing them would not "measurably advance the deterrent or the retributive purpose of the death penalty." *Id.* at 321.

The Court acknowledged in *Atkins* the difficulties inherent in defining intellectual disability, stating,

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. . . .   Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.

*Id.* at 317.  But it did not define the condition.  Instead, as it did in the context of insanity, the Court entrusted the states with "'the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id.* (quoting *Ford v. Wainwright,* 477 U.S. 399, 416-17 (1986)).

The Court did, however, cite to the clinical definitions of intellectual disability promulgated by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA"). *Id.* at 308 n. 3.  It explained that those criteria "require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318. And it noted that "[existing state] statutory definitions of mental retardation are not identical, but generally conform to [those] clinical definitions. . . ." *Id.* at 317 n. 22.  Indeed, the Supreme Court recently reaffirmed that "[t]he clinical definitions of intellectual disability . . . were a fundamental premise of *Atkins*." *Hall*, 134 S.Ct. at 1999.

 Soon after *Atkins* was decided, the Ohio Supreme Court established the "substantive standards and procedural guidelines" for Eighth Amendment intellectual disability claims in

(4:16CV0384)

Ohio in *Lott*, 97 Ohio St.3d at 305. The court adhered to the clinical definitions cited with

approval in *Atkins*, holding that to prevail on an *Atkins* claim, the defendant must prove that he

or she: (1) suffers from "significantly subaverage intellectual functioning," (2) experienced

"significant limitations in two or more adaptive skills, such as communication, self-care, and

self-direction," and (3) manifested "onset before the age of 18." *Id.* The court noted, however,

that "[w]hile IQ tests are one of the many factors that need to be considered, they alone are not

sufficient to make a final determination on this issue." *Id.* It therefore held that "there is a

rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70."

*Id.*

Because Lott's trial occurred before *Atkins* was decided, the Ohio Supreme Court

determined that his *Atkins* hearing would be conducted before the trial court pursuant to Ohio's

post-conviction procedures. *Id.* It further held that the trial court should conduct a *de novo*

review of the evidence, "rely[ing] on professional evaluations of Lott's mental status, and

consider[ing] expert testimony, appointing experts if necessary, in deciding this matter." *Id.* at

306. The court also held that the trial court, not a jury, would decide if a petitioner is

intellectually disabled, and the petitioner bears the burden of proving his or her intellectual

disability by a preponderance-of-the-evidence standard. *Id.*

2.    **Merits**

In Spivey's case, the last state court to address this claim was the state appellate court in

post-conviction proceedings. *Spivey*, 2014 WL 818640. After correctly stating the standards for

demonstrating intellectual disability set forth in *Atkins* and *Lott*, the court reasoned:

> {¶ 20} In this case, there are reports from two different doctors as to whether Spivey qualifies for a diagnosis of "mental retardation" under the *Lott* decision. The first doctor, Dr. Smalldon, concluded in 2004 that Spivey would not qualify for a "mental retardation" diagnosis. Dr. Smalldon indicated that Spivey's full scale IQ on the Wechsler Adult Intelligence Scale—Third Edition, was 82, which falls within the range that is typically referred to as "low average." He further concluded:
>
>> [A]lthough [Spivey] has a long history of learning/behavioral problems, as well as some striking cognitive limitations, he is not mentally retarded as that term is defined in either the Diagnostic and Statistical Manual of Mental Disorders–IV–Test Revision (DSM–IV–TR) or the American Association of Mental Retardation's Mental Retardation Manual.
>>
>> His IQ scores are simply too high. * * * Although it's possible, for a variety of different reasons, for a test subject to obtain IQ estimates that underestimate his/her actual intellectual potential, it's not possible—at least under any scenario that I can imagine—for him/her to obtain scores that overestimate his/her intellectual capabilities.
>
> Dr. Smalldon Report pgs. 15-16.
>
> {¶ 21} Dr. Gazley's testing and diagnosis that occurred in September 2010 reached a similar conclusion. Dr. Gazley administered two IQ tests; Spivey's full scale IQ results were 84 and 87. He indicated that these scores are "well beyond the range which would be considered necessary for a diagnosis of mental retardation or developmental disability." Dr. Gazley *Atkins/Lott* Report pg. 8. Akin to Dr. Smalldon's opinion, Dr. Gazley also indicated that the scores on the IQ test are too high to support a diagnosis of "mental retardation." Dr. Gazley *Atkins/Lott* Report pg. 9.
>
> {¶ 22} The results of the IQ tests administered by Drs. Smalldon and Gazley were consistent with previous IQ determinations that were administered on Spivey when he was younger. At the death penalty mitigation hearing in 1989, Mary Stewart, who was Spivey's probation officer, testified that Spivey's mental intelligence was borderline. Mitigation Hrg. Tr. 936. Dr. Eisenberg testified that Spivey's full scale IQ result was 74, which placed him in the borderline range of intelligence. Mitigation Hrg. Tr. 1072-1073; 1163-1164. He further explained that the highest Spivey ever scored was 89 and the lowest he scored was in the high 50s. Mitigation Hrg. Tr. 1073. Dr. Eisenberg's ultimate opinion was that in 1989, when Spivey was

20 years old, he was functioning like a ten year old. Mitigation Hrg. Tr. 1073. There is no indication in any of the evidence that was submitted at the mitigation hearing that Spivey was ever diagnosed as being "mentally retarded."

{¶ 23} The IQ scores establish a presumption that Spivey is not "mentally retarded" as defined by *Lott*. That said, it is acknowledged that the record is replete with evidence that Spivey has had cognitive limitations during his entire life. Dr. Smalldon explained:

Despite the fact that Mr. Spivey's IQ estimates do not fall within the range that is usually associated with mental retardation, still certain of his responses speak clearly to his cognitive limitations, for example his limited fund of general information, his poor skills at abstract concept formation, and his relatively impoverished vocabulary.

Dr. Smalldon Report pg. 12.

{¶ 24} There was testimony at the mitigation hearing and at the *Atkins/Lott* hearing that Spivey started having convulsions/seizures when he was one and that continued through his teenage years. He was in and out of hospitals because of this. There was also testimony from his mother and family members that intellectually he developed more slowly than other kids, that he had learning problems, and that he went to a school for children with learning and behavioral problems. He was described as "childlike" by one cousin. It was also stated that his hygiene skills were not good, he could not keep a job, that he could not make change (in fact they would not send him to the store because he would not come back with change and would not get everything he was told to get), and although he was given chores, he would not always complete them. All of this testimony discussed behaviors prior to the age of 18.

{¶ 25} The testimony from his mother, family members, and the above statement from Dr. Smalldon tends to show limitations in adaptive skills, such as communication, self-care, and self-direction that were apparent before the age of 18. These limitations, however, may not be classified as significant, as is required by *Lott* to meet the definition of "mentally retarded." For instance, the testimony from the family members concerning hygiene was that he would wear the same pants over and over again. Having a favorite pair of pants is not a hygiene issue and it was explained that he would change the pants when he was instructed to do so. Furthermore, Dr. Gazley offered the opinion that although adaptive skills could not be tested in the death row prison setting, that Spivey probably did not have significant limitations in his adaptive skills. He explained that in meeting with Spivey, he showed an interest in current events, utilized humor, demonstrated an

ability to maintain focus and concentration on task, and showed an ability to read. Dr. Gazley *Atkins/Lott* Report pg. 9.

{¶ 26} Regardless, even if the above testimony did amount to significant limitations of adaptive skills, the problem is that even with that testimony the trial court's conclusion that Spivey could not overcome the presumption that he was not "mentally retarded" because of his IQ scores was not an abuse of discretion. As aforementioned, both Dr. Smalldon and Dr. Gazley concluded that Spivey's IQ scores were simply too high to ever qualify for a "mentally retarded" diagnosis. Dr. Gazley explained this best during his testimony at the *Atkins/Lott* hearing. He stated that there is no specific number beyond a score of 70 which automatically disqualified a person from a diagnosis of mental retardation, but as the scores go up, "as defined by the Diagnostic and Statistical Manual, you fall well above what they consider a cutoff." *Atkins/Lott* Hrg. Tr. 172-174. He explained that when a score approaches 80 or is in the 80s, that is a different categorization of intelligence. *Atkins/Lott* Hrg. Tr. 173. He also explained that IQ scores do not typically go up in later life:

> But it seems difficult for me to imagine a person scoring low enough to qualify for a mental retardation diagnosis prior to the age of 18 and then later in life being evaluated and getting scores in the low average range. That seems unlikely because intelligence is such a stable construct given the lack of other, you know, injury, illness, trauma, those kinds of things.

*Atkins/Lott* Hrg. Tr. 177.

{¶ 27} The conclusion that Spivey's IQ scores are too high to be ever be considered "mentally retarded" as defined by *Lott*, is not inapposite to the language used in *Lott*. It is logical to conclude that at some point a score will be too high to qualify the person for a mental retardation diagnosis, even though the person may show significant limitations in adaptive skills that were apparent before the age of 18. Doctors are in the best position to make this determination.

{¶ 28} Spivey cites this court to a 2006 First Appellate District case, *State v. Gumm*, to support its position that the evidence submitted at the *Atkins/Lott* hearing overcame the presumption that he was not "mentally retarded" and that the trial court abused its discretion in not granting the postconviction petition. *Gumm*, however, is distinguishable from the case at hand.

{¶ 29} In *Gumm*, the testimony established that before the age of 18 Gumm would use grunts and not words to communicate, that he could not read or write and did not

learn to tie his shoes until he was a teenager.  *State v. Gumm*, 169 Ohio App.3d 650, 2006–Ohio–6451, 864 N.E.2d 133, ¶ 6 (1st Dist.).  There also was testimony from multiple people that Gumm exhibited poor hygiene skills.  *Id.*  He likewise did not drive and could not keep a job. Based on the poor adaptive skills and the fact that they occurred before 18 years of age, the doctor concluded that even though Gumm scored 70, 71, 73 and 79 on IQ tests, he was "mentally retarded."  *Id.* at ¶ 9.

{¶ 30} In the case at hand, there is testimony that Spivey communicated through talking, although he did not begin to talk as early as his siblings.  Also, there is evidence that he can read and write minimally.  As to the hygiene skills, as discussed above, there is no indication other than continuing to wear the same clothing that as a child he failed to clean himself, would not brush his teeth, or take care of himself.  As to driving, while Spivey may not have had a driver's license, we know that he drove a car because the victim's car was stolen and driven to a bar by Spivey.  Although there was testimony that Spivey could not keep a job, testimony established that he did work for six months at a corner store.  10/18/99 First Postconviction Relief Hrg. pg. 39.  Moreover, the doctor in *Gumm* concluded that Gumm is "mentally retarded."  Here, two doctors concluded that Spivey is not "mentally retarded."  It is difficult to conclude that the trial court abused its discretion when it agreed with the opinion of two doctors that Spivey's scores were too high to ever qualify him for a "mentally retarded" diagnosis.

{¶ 31} Considering all the above, we cannot find that the trial court's decision was an abuse of discretion.  This assignment of error is meritless.

*Spivey*, 2014 WL 818640, at *4-7.

Spivey does not address the AEDPA standard of review for his *Atkins* claim, but challenges only the Ohio appellate court's factual basis for its decision denying his *Atkins* claim.  *See* ECF No. 38 at PageID #: 6313.  The Court, therefore, must determine whether the state court's adjudication of the claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under 28 U.S.C. § 2254(d)(2).  As noted above, the Court's review is limited to "the evidence presented in the State court

proceeding."[20]  28 U.S.C. § 2254(d)(2).  Spivey bears the burden of rebutting the state court's

factual findings "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Burt*, 134

S.Ct. 10, 15 (2013); *Rice*, 660 F.3d at 250.  "[I]t is not enough for [Spivey] to show some

unreasonable determination of fact; rather, [he] must show that the resulting state court decision

was 'based on' that unreasonable determination."  *Rice*, 660 F.3d at 250.  Ultimately, Spivey

must show that the decision as a whole was unreasonable.  *Miller-El*, 537 U.S. at 341; *see also*

*Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011).  And "a state-court factual determination is

not unreasonable merely because the federal habeas court would have reached a different

conclusion in the first instance."  *Wood v. Allen,* 558 U.S. 290, 301 (2010).

In his petition, Spivey argues that the state-court record "paint[s] a picture of a man who

has experienced significant limitations in two or more areas of adaptive functioning, such as

communication, self-care, and self-direction, throughout the span of his life."  ECF No. 38 at

Page ID #: 6313.  He points to the following evidence, with no citations to the record, in support

of his claim:

> As Dr. Eisenberg testified at the time of the mitigation hearing, Mr. Spivey
> functioned as a ten year old child, and he read at a second grade level.  The records
> are consistent that his thinking is very concrete and that he cannot grasp abstract
> concepts.  As a child, he did not play with other children in a normal fashion because
> he was unable to understand the rules.  Mr. Spivey never lived independently and he
> could not cook for himself.  In fact, his family testified it would have been dangerous
> to have him cook any food.  Mr. Spivey has had issues with his hygiene as a child

---

[20]  The Court will not consider, therefore, the numerous exhibits Spivey has
submitted in support of his *Atkins* claim that are not contained in the state-court record.
*See* ECF No. 38 at PageID #: 6314-19; Exs. E, G-K.  It also denies Spivey's requests to
depose Drs. Smalldon and Gazley for information relating to this claim on the same
ground.  *See* ECF No. 48 at PageID #: 6705.

and even on death row.  He has to be reminded even now to change his clothes, to bathe, and to clean his cell.

ECF No. 38 at Page ID #: 6313.

The State maintains the state court's decision was not unreasonable, especially as it was supported by both Spivey's expert and the expert appointed by the trial court.[21]  ECF No. 40 at PageID #: 6521-22.  It first notes, however, that the state court found that Spivey met *Lott* test's second and third prongs, namely, limitations in adaptive skills and onset of disability before age 18.  ECF No. 40 at PageID #: 6522.  True, the state court found that "[t]he testimony from [Spivey's] mother, family members, and the above statement from Dr. Smalldon tends to show limitations in adaptive skills, such as communication, self-care, and self-direction that were apparent before the age of 18."  *Spivey*, 2014 WL 818640, at *5.  But, it concluded that "[t]hese limitations . . . may not be classified as significant, as is required by *Lott* to meet the definition of 'mentally retarded[,]'" and that "even if [the evidence] did amount to significant limitations of adaptive skills, . . . the trial court's conclusion that Spivey could not overcome the presumption that he was not "mentally retarded' because of his IQ scores was not an abuse of discretion."  *Id.* Ultimately, the court rested its decision on the "opinion of two doctors that Spivey's scores were too high to ever qualify him for a 'mentally retarded' diagnosis."  *Id.* at *7.

Nevertheless, the Court agrees with the State that the state appellate court was reasonable in relying on the experts' determination that "at some point a score will be too high to qualify the

---

[21]  The State also does not directly address the AEDPA standard of review for this claim.  Respondent mentions § 2254(d)(1), but only in the context of what evidence this Court may consider in reviewing the claim.  *See* ECF No. 40 at PageID #: 6520.

person for a mental retardation diagnosis, even though the person may show significant

limitations in adaptive skills that were apparent before the age of 18." *Id.* at *6. As the court

noted, "Doctors are in the best position to make this determination." *Id.*

Indeed, both the United States and Ohio supreme courts have emphasized the critical role

the medical community and its clinical standards play in defining and determining intellectual

disability when considering eligibility for the death penalty. The Supreme Court explained in its

recent decision in *Hall v. Florida,* 134 S.Ct. 1986 (2014):

> That this Court, state courts, and state legislatures consult and are informed by the
> work of medical experts in determining intellectual disability is unsurprising. Those
> professionals use their learning and skills to study and consider the consequences of
> the classification schemes they devise in the diagnosis of persons with mental or
> psychiatric disorders or disabilities. Society relies upon medical and professional
> expertise to define and explain how to diagnose the mental condition at issue. And
> the definition of intellectual disability by skilled professionals has implications far
> beyond the confines of the death penalty: for it is relevant to education, access to
> social programs, and medical treatment plans. In determining who qualifies as
> intellectually disabled, it is proper to consult the medical community's opinions.

*Id.* at 1993. Moreover, in *Lott*, the Ohio Supreme Court expressly advised courts to "rely on

professional evaluations of [a defendant's] mental status, and consider expert testimony,

appointing experts if necessary, in deciding this matter." *Lott*, 97 Ohio St.3d at 306.

The AAMR also emphasizes the importance of the practitioner's critical judgment in

assessing intellectual disability. It states, "Judgments made by conscientious, capable, and

objective individuals can be an invaluable aid in the assessment process." AAMR 2002 Manual,

94 (internal quotation marks and citations omitted). It defines clinical judgment as "a special

type of judgment that emerges directly from extensive data and is rooted in a high level of

clinical expertise and experience. . . . [I]ts use enhances the precision, accuracy, and integrity of

the clinician's decisions and recommendations." AAIDD User's Guide, 23. And notes that "it is crucial that clinicians conduct a thorough social history and align data and data collection to the critical question(s) at hand." *Id.*

Federal habeas courts, therefore, must defer to state-court determinations of the credibility of expert witnesses in determining intellectual disability under *Atkins*. The Sixth Circuit, in denying a habeas petitioner's *Atkins* claim, recently concluded that two expert opinions

> provided a basis for the state court to reasonably determine that O'Neal does not suffer from significantly subaverage intellectual functioning. And without clear and convincing evidence undermining the credibility of [those experts], we are not persuaded by O'Neal's attempts to emphasize solely the portions of [his expert's] testimony that support his claim. For better or worse, as a habeas court, we are not in a position to pick and choose which evidence we think is best so long as the presumption of correctness remains unrebutted. *See* 28 U.S.C. § 2254(e)(1).

*O'Neal v. Bagley*, 743 F.3d 1010, 1022 (6th Cir. 2013). The court stressed, "With expert testimony split, as it often is, the state court chose to credit [the two experts] over [petitioner's expert], and we cannot say from this vantage that it was unreasonable to do so." *Id.* at 1023.

Like the petitioner in *O'Neal*, Spivey has not presented clear and convincing evidence undermining the credibility of the two expert witnesses who opined that his IQ was too high for him to qualify as intellectually disabled. He argues the experts, both forensic psychologists, lacked specific training in intellectual disability. ECF No. 46 at PageID #: 6619. Dr. Gazley, he notes (again, with no citation to the record), had only conducted three evaluations of death-row inmates for *Atkins* purposes before assisting him. ECF No. 46 at PageID #: 6619. Spivey also claims Dr. Gazley did not test him for adaptive functioning or interview his family, and found

the school records "'limited . . . and difficult to read.'" ECF No. 46 at PageID #: 6619 (quoting

ECF No. 20-9 at PageID #: 5809-10, 5817, 5840 (*Atkins* hearing transcript)).

Dr. Gazley testified at the *Atkins* hearing, however, that he had conducted "hundreds of

evaluations" for intellectual disability, including "hundreds" of prisoners. ECF No. 20-9 at

PageID #: 5810. For his evaluation of Spivey, he reviewed past psychological reports he and

others had written regarding Spivey and supporting materials, as well as records of past

proceedings. ECF No. 20-9 at PageID #: 5811-12; *see also* ECF No. 20-9 at PageID #: 5879

(Gazley *Atkins* report). In fact, he testified, "[t]he record is rather enormous." ECF No. 20-9 at

PageID #: 5812. Dr. Gazley further testified that he did not "perform any formal test to measure

Mr. Spivey's adaptive behavior[,]' but that was because "there is no known formal test of

adaptive behavior available to the population of inmates on death row." ECF No. 20-9 at

PageID #: 5817-18. He explained, "[I]n a restricted prison setting you can get an idea about a

person's adaptive behavior there, but it wouldn't be scientifically sound to use that measure on

population on a death row." ECF No. 20-9 at PageID #: 5818. This is a commonly recognized

challenge in evaluating death-row inmates for *Atkins* claims. Indeed, the AAMR prohibits the

assessment of adaptive skills in atypical environments like prison. Its 2002 Manual instructs,

"Limitations in present functioning must be considered within the context of community

environments typical of the individual's age peers and culture." AAMR 2002 Manual, 13. It

explains, "This means that the standards against which the individual's functioning must be

measured are typical community-based environments, not environments that are isolated or

segregated by ability." *Id*. at 8. Federal courts also have recognized that evidence of behavior

on the segregated, highly structured and regulated environment of death row is an unreliable measurement of adaptive functioning. *See, e.g.*, *Holladay v. Allen*, 555 F.3d 1346, 1358 n. 16 (11th Cir. 2009) ("[b]oth experts agreed that Holladay's adaptive functioning cannot be accurately assessed now because he has spent over 17 years in prison, a highly restricted and restrictive environment."); *Thomas v. Allen,* 614 F. Supp.2d 1257, 1284 n. 67 (N.D. Ala. 2009) ("[t]he constraints of a maximum-security prison environment also limit the diagnostician's ability to assess the subject's adaptive skills consistently within the AAMR definition."); *Rodriguez v. Quarterman*, No. Civ. SA-05-CA-659-RF, 2006 WL 1900630, at *11 (W.D. Tex. July 11, 2006) ("there is considerable debate within the professional literature over whether it is even possible to perform an adaptive skills deficit evaluation in a prison setting"). Nevertheless, Dr. Gazley testified that despite not having "a solid measure of adaptive behavior" or "specific test," he was able to make certain observations about Spivey's adaptive skills while meeting with him. ECF No. 20-9 at PageID #: 5818-19. Spivey's attacks on Dr. Gazley's credibility as an expert witness, therefore, are unavailing.

Spivey acknowledges that his own expert, Dr. Smalldon, "was a very experienced psychologist that most criminal defense attorneys have relied upon for any mental health evaluation of a capital client." ECF No. 46 at PageID #: 6619. Nevertheless, he argues, Smalldon "has no specific training or expertise in intellectual disability evaluations" and "has admitted such shortcomings in other cases." ECF No. 46 at PageID #: 6619-20 (citing *Waddy v. Robinson*, No. 3:98-cv-084 (S.D. Ohio filed Feb. 26, 1998)). A review of Dr. Smalldon's credentials and testimony at Spivey's *Atkins* hearings, however, demonstrates that he was a

highly qualified and experienced forensic psychologist, with "[e]xtensive experience in providing consultation in capital murder cases (state and federal)." ECF No. 19-14 at PageID #: 2878-81 (Smalldon CV). *See also Frazier v. Bobby*, No. 3:09CV1208, 2011 WL 5086443, at *28 ( N.D. Ohio Oct. 25, 2011) (Gaughan, J.) (noting Dr. Smalldon's strong qualifications and experience for capital habeas petitioner's *Atkins* evaluation). Spivey, therefore, also has failed to undermine the credibility of his own expert.

Indeed, in the final analysis, as Spivey himself concedes, "[i]t is difficult to argue that the state court decision was an unreasonable determination of the facts in light of the fact that even the defense expert, Dr. Smalldon, concluded that [he] was not intellectually disabled." ECF No. 46 at PageID #: 6619. Spivey has not demonstrated that the Ohio court of appeals' decision denying his *Atkins* claim was an unreasonable determination of the facts in light of the evidence presented to the state trial court, and that the state-court's findings were clearly erroneous. This claim, therefore, lacks merits.

### 3. Ineffective Assistance of *Atkins* Counsel

For his twelfth ground for relief, Spivey claims that his post-conviction *Atkins* counsel was constitutionally ineffective in failing to obtain an "appropriate" expert to evaluate and explain the impact of his pervasive development disorder ("PPD") on his intellectual abilities and adaptive functioning. ECF No. 38 at PageID #: 6373-75. The State correctly argues this claim is not cognizable on federal habeas review. ECF No. 40 at PageID #: 6566.

AEDPA's § 2254(i) provides: "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a

proceeding arising under section 2254." 28 U.S.C. § 2254(i). This provision is grounded in the well-settled rule that the constitutional right to appointed counsel extends to the first appeal of right and no further. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Accordingly, there is no constitutional right to appointed counsel in habeas cases, *McCleskey v. Zant*, 499 U.S. 467, 494 (1991), or during state post-conviction collateral review, *Coleman*, 501 U.S. at 752-53. And, as there is no constitutional right to an attorney in post-conviction proceedings, a habeas petitioner cannot claim unconstitutional deprivation of effective assistance of counsel in such proceedings. *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 425 (6th Cir. 2003) (citing *Coleman*, 501 U.S. at 752-53).

Spivey argues that his *Atkins* hearing was a post-conviction procedure "'only in the strict chronological sense,'" because *Atkins* was decided several years after his conviction and sentencing, and his first opportunity to raise an *Atkins* claim in state court was in post-conviction proceedings as opposed to trial. ECF No. 46 at PageID #: 6623 (quoting *Hooks v. Workman*, 689 F.3d 1148, 1183 (10th Cir. 2012)). He claims that precluding his *Atkins* ineffective-assistance claim, therefore, violates his due process and equal protection rights. ECF No. 46 at PageID #: 6620-24. However, Spivey has cited no precedent from the Supreme Court or Sixth Circuit creating an exception from § 2254(i) for these claims, and the Court can find none.

Spivey's twelfth ground for relief is not cognizable of federal habeas review and is dismissed.[22]

_____

[22] Because this claim is not cognizable, Spivey is not entitled to depose his state *Atkins* counsel, Attorney Juhasz, or Drs. Smalldon and Gazley for information relating to

(continued...)

**C.     Third, Fourth, and Sixth Grounds for Relief:** *Plea-Related Claims*

Spivey's third, fourth, and sixth grounds for relief relate to his pleas of no contest.  In his third ground, he claims the trial court erred in refusing to grant his presentence motion to withdraw his no-contest pleas.  ECF. No. 38 at PageID #: 6319-24.  His fourth ground asserts the trial court erred by "refusing" to place the plea agreement on the record in open court.[23]  ECF. No. 38 at PageID #: 6324-31.  And in his sixth ground, he contends the prosecutor breached the plea agreement in violation of his constitutional rights by recommending the death penalty in his closing argument.  ECF No. 38 at PageID #: 6324-31.

**1.     Procedural Posture**

**a.     Procedural history**

The Ohio Supreme Court provided this detailed account of the circumstances surrounding Spivey's pleas of no contest in considering his claim challenging the trial court's denial of his motion to withdraw the pleas:

> During the January 1989 search of appellant's home, police seized, among other things, two bloodstained articles of clothing, *i.e.*, a red sweatshirt and a black-and-white vest.  The bloodstained clothing was sent to the Ohio Bureau of Criminal Identification and Investigation ("BCI") for testing.  In January 1989, BCI performed scientific testing procedures (but not DNA testing) with respect to the bloodstains.  The testing by BCI indicated that the blood on the clothing was consistent with the blood of the victim but was not consistent with appellant's blood.

---

[22](...continued)
this claim.  *See* ECF No. 48 at PageID #: 6704-6705.

[23]  Spivey claims more broadly that "a number of crucial events were not conducted on the record."  ECF No. 38 at PageID #: 6334.  But the only example he cites is the trial court's omission relating to the plea agreement.  To the extent Spivey complains of any failure of the trial court to conduct proceedings in open court other than placing the plea agreement on the record in open court, that claim is waived.

On May 17, 1989, during a pretrial status conference, Assistant Prosecutor Kenneth Bailey asked defense counsel, "Is there a request for DNA Testing at this time?" The question apparently arose in connection with the articles of clothing found in appellant's residence. In response, defense counsel stated, "No, we are not asking for anything, but that this hearing be reconvened once we get a chance to discuss the matters which [Mr. Bailey] is aware of by us putting this on the record."

Over two months later, during a July 19 motions hearing, defense counsel stated that he had discussed DNA testing with Bailey (who at that point was no longer involved in the case) and that Bailey had apparently indicated that the state intended to conduct DNA testing. During the hearing, defense counsel asked Assistant Prosecutor Gessner whether the state had conducted or was planning to conduct DNA testing with respect to the bloodstained articles of clothing. In response, Gessner stated that no DNA testing had been conducted by the state and that the state had no intention to conduct any DNA testing. At that point, Judge Economus stated, "I think we ought to settle this once and for all. A written response would be the appropriate way to handle it."

On August 15, 1989, three weeks before the case was scheduled to proceed to a jury trial on September 6, appellant filed a motion to allow a defense expert to conduct DNA testing of the bloodstains found on the sweatshirt and the vest that had been seized from appellant's residence. On August 21, Judge Economus conducted a hearing on the motion. During the hearing, defense counsel argued that the DNA testing was "critical" to the defense. Defense counsel also requested a continuance of the September 6 trial date and explained to the court, during an *ex parte* hearing, why the defense had delayed filing its motion for scientific testing. The record reveals that the defense had delayed filing the motion until the state, on August 2, 1989, specifically committed in writing that no DNA testing had been conducted in the case. Additionally, defense counsel informed the court that counsel had only recently become aware that DNA testing was imperative to appellant's defense.

The trial judge granted the motion for DNA testing and stated, during the August 21 hearing, that "[o]bviously, we can't proceed with the trial until the results are completed * * * and returned to defense counsel, and the prosecution is entitled to an opportunity to review the tests." On August 21, the trial judge ordered a continuance of the September 6 trial date and rescheduled trial for September 25. The trial judge also ordered that no further continuances would be granted. Following the August 21 hearing, the bloodstained articles of clothing, along with blood samples from the victim, were sent to Cellmark Diagnostics Laboratory, an expert chosen by the defense, for DNA analysis.

On August 31, 1989, appellant moved for a continuance of the September 25 trial date pending the results of the DNA testing. In support of the motion, appellant argued that the DNA test results were "critical from the point of voir dire on to the conclusion of said trial." On September 1, appellant objected to the drawing of the special venire, since the defense had received no further information concerning the DNA testing. The trial court noted the objection but proceeded with the drawing of the venire. On September 21, appellant filed another motion for a continuance of the September 25 trial date. On September 22, appellant filed a supplemental motion for continuance of the jury selection process that was scheduled to commence September 25, claiming that "[i]t is impossible for the Defendant to voir dire a jury without knowledge as to the results [of the DNA testing procedures]."

On September 25, defense counsel argued during a pretrial hearing that the defense should not be required to proceed to voir dire without knowing the results of the DNA testing. At that time, defense counsel also indicated that the defense would consider waiving the right to trial by jury if the DNA test results showed that the blood on the articles of clothing found in appellant's residence was consistent with the blood of the victim. The trial court denied appellant's request for a continuance of the jury selection process, finding that the DNA test results were not critical for purposes of voir dire. The trial judge then proceeded to address the venire and began questioning prospective jurors who had expressed a desire to be excused from service. During a break, defense counsel informed the court that there was a problem with the DNA testing because Cellmark had not been provided with the correct vial of the victim's blood. When court adjourned for the day, the parties' attorneys apparently conducted a conference call with Cellmark to determine precisely what it needed to complete the DNA testing.

On October 2, 1989, court convened in chambers and a discussion was had relative to the terms of the plea agreement entered into between the state and the defense. Defense counsel informed the court that appellant would waive his right to trial by jury and, once a three-judge panel was designated, that appellant would enter either a guilty or no contest plea. Defense counsel also informed the court that, in exchange for the pleas, the state had agreed not to make any recommendation concerning the death penalty and had also agreed to refrain from offering any rebuttal witnesses during the penalty phase unless rebuttal was necessary to counteract false or perjured testimony by defense witnesses. Following the discussion, appellant appeared in open court and waived his right to trial by jury. The members of the panel were thereafter designated and trial was set to commence October 10.

On October 6, appellant moved for a continuance of the October 10 trial date, since DNA testing was being conducted by Cellmark but the results were not yet available.

On October 10, the parties appeared in chambers before two members of the panel (Judges Economus and McNally) and the terms of the plea agreement were once again stated on the record. During the hearing, Judge Economus questioned defense counsel regarding the October 6 motion for a continuance. Specifically, Judge Economus indicated that he was perplexed by the motion, since a decision had been made by appellant to waive a jury trial and to enter pleas of no contest. Judge Economus stated that he had assumed that the issue concerning DNA testing had been "abandoned." Judge Economus also stated, "I would-and I want the record to be clear on this-this Court would use every effort, and I [previously] indicated this in concert with the prosecution and the defense counsel, to have that evidence [the DNA test results] available before the actual trial of this case." Defense counsel replied that the defense had not abandoned the DNA testing and that counsel was simply attempting to reiterate, at every possible point, the need for the DNA test results. Judge Economus then stated, "I don't want it to appear that the only reason you are pleading this afternoon is because the Court denied your request for a continuance because you haven't received the pertinent evidence for the defense of your case." In response, one of appellant's defense attorneys, stated:

"Your Honor, last Monday [October 2, 1989], we were to begin once again-and that's when we were going to go forward [with voir dire], and that's when we waived the jury trial. We didn't do that to buy time, we did that because we thought that was the right thing to do. So, the Court's statement o[f] concern, that that's the only reason that we are pleading, because we don't have this [the DNA test results], that is not the only reason. It is a consideration, however. * * *

"Your Honor, Mr. Zena [co-counsel] just mentioned to me, and we had discussed this earlier, that the main reason we are going [sic, doing] this is because of the Rule 11 negotiations. And, of course, we're considering this other situation in making the decision that we made."

During further discussions concerning DNA testing, Judge Economus emphasized that although he had refused to delay the voir dire proceedings on September 25, he would not have forced the defense to begin the presentation of evidence without the DNA test results.

Following the October 10 discussions in chambers, appellant appeared in open court and voluntarily entered his pleas of no contest. Thereafter, the panel conducted an evidentiary hearing to determine the factual and evidentiary basis of the charges and specification alleged in the indictment. During the evidentiary hearing, the state presented, among other things, the testimony of BCI trace evidence expert Kenneth Ross. Ross testified that the bloodstains found on the sweatshirt and the vest were

consistent with the victim's blood. Following the presentation of additional evidence, the panel found appellant guilty as charged in the indictment.

On October 24, after the panel had entered its findings but prior to the commencement of the penalty phase, appellant filed a motion to withdraw his pleas of no contest and requested that the panel "reinstate a jury trial." The basis for the motion was what appellant described as "newly discovered evidence," *i.e.*, the DNA analysis from Cellmark, which indicated that the bloodstains on the sweatshirt and the vest could not have originated from the victim. Apparently, the DNA analysis had been received by the defense on October 21, 1989. On October 26, the panel conducted a hearing on appellant's motion. On October 27, the motion was denied.

*Spivey*, 81 Ohio St.3d at 411-15.

### b. Cognizability (Motion to withdraw the no-contest pleas)

The State argues that Spivey's claim challenging the trial court's denial of his motion to withdraw his no-contest pleas is not cognizable on federal habeas review. ECF No. 40 at PageID #: 6524-25. The Court agrees.

"It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law"); *Engle v. Isaac*, 456 U.S. 107, 121 n. 21 (1982) ("[w]e have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)). This claim is based solely on Ohio Rule of Criminal Procedure 32.1, governing motions to withdraw pleas of guilty or no contest, and state case law interpreting that rule. Indeed, as Spivey concedes, there is no federal

constitutional right to withdraw a plea. *See, e.g.*, *Hynes v. Birkett*, 526 Fed.Appx. 515, 521 (6th Cir. 2013) (stating petitioner "has no federal due process right to seek to withdraw his guilty plea").

Spivey argues, however, that the state courts' rulings denying his claim regarding his motion to withdraw his pleas violated due process principles of fundamental fairness. ECF No. 46 at PageID # 6625-27. After setting forth the applicable Ohio law and quoting the trial court's decision denying Spivey's motion to withdraw his pleas, the Ohio Supreme Court reasoned:

> . . . [T]he panel's decision denying appellant's presentence motion to withdraw the pleas of no contest will not be disturbed absent an abuse of discretion. We find no abuse of discretion here. In its October 27, 1989 judgment entry denying appellant's motion to withdraw the pleas and to reinstate a jury trial, the panel stated:

> "Defense counsel argue that these results [the DNA test results] are newly discovered evidence which could not have been discovered prior to trial and that said evidence is sufficient to rebut a critical piece of identifying evidence used by the prosecution. Further, Defense counsel argue that the previously submitted BCI Lab Test result was the sole direct identifying evidence in the case upon which the Defendant's conviction is based, and now, under DNA Testing, is negated and instead tends to exculpate the Defendant.

> "Regarding the first assertion, the record does not support this contention. The existence or commencement of the testing was admittedly known and initiated by the Defense at the time the trial was called [for trial on September 25, 1989]. In fact the record clearly reflects the Court's intention not to proceed with testimony [at the scheduled jury trial] until the test results were completed. Counsel were aware of the Court's position, and with the option of proceeding with trial available to them, the Defense opted to withdraw their demand for a Jury Trial and proceed with a trial before [a three-judge panel]. Additionally the Defense chose to withdraw the plea of Not Guilty and to then enter the plea of No Contest. Counsel stated that the lack of DNA Testing results were [*sic*] only one factor in their decision to proceed upon a plea of No Contest and that their main reason for entering the plea of No Contest was to preserve and protect the Criminal Rule 11 negotiations entered into between the Defense counsel and the prosecution.

90

"The possibility for the submission of the DNA results remained and existed, but the lack thereof was not the overriding decision to proceed with the plea of No Contest. As a result it would be incorrect to classify this evidence as newly discovered.

"Further considering the sufficiency of the DNA Test results, the Court does not find that [that] is sufficient to rebut the identifying evidence offered by the prosecutor, nor is it the sole identifying piece of evidence linking the Defendant to the crimes convicted. * * * [E]ven if the Court would consider the existence of the DNA test results, the evidence previously considered by the Court overwhelmingly establishes the Defendant's guilt of all charges beyond a reasonable doubt.

" * * *

"Prior to the acceptance of the plea, the Court made an extensive and detailed inquiry of the Defendant to assure the Court that the plea was knowingly, intelligently, and voluntarily made. Therefore, the Court finds that the Defendant's plea was unequivocally and unconditionally made with full knowledge of its effect and consequence."

Appellant contends, and we agree, that a presentence motion to withdraw a plea of no contest should be freely and liberally granted. However, the determination whether to grant or deny such a motion is a matter committed to the sound discretion of the trial court. Here, the panel found that the circumstances of this case did not warrant granting appellant's motion to withdraw his pleas of no contest. Based on a review of the record and a careful consideration of the arguments advanced by appellant, we find that the panel did not abuse its discretion in denying appellant's motion to withdraw his pleas and to reinstate a jury trial.

At the time appellant waived his right to a jury trial, and at the time he entered his pleas of no contest, appellant was manifestly aware of the existence of the DNA testing and that the results of the testing were not yet available. Appellant was also clearly aware at the time of the jury waiver, and at the time he entered his pleas, that there was a chance the DNA test results would be favorable to the defense. However, despite this knowledge, and with the option of proceeding to trial, appellant chose to waive his right to a jury trial and entered his pleas of no contest. The panel found that defense counsel was aware, at all relevant times, that the DNA test results would have been available to appellant prior to any witness testimony if appellant had elected to proceed to trial. Additionally, the record reveals that the main reason appellant entered the pleas of no contest was to take advantage of plea bargaining negotiations. Thus, the absence of the DNA test results was not the overriding reason appellant proceeded upon the pleas of no contest. Moreover, as the panel found, the evidence supporting appellant's convictions was overwhelming

regardless of the DNA test results. Appellant's jury waiver and his pleas of no contest were knowingly, voluntarily, and intelligently made with full knowledge of the consequences, and the panel's decision to deny appellant's motion was not unreasonable, arbitrary, or unconscionable.

*Spivey,* 81 Ohio St.3d at 415-17.

For these same reasons, this Court does not find the Ohio courts' denial of Spivey's motion to withdraw his no-contest pleas "so egregious that [they] result in a denial of fundamental fairness." *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003). The record fully supports the trial court's determination that Spivey entered the no-contest pleas to secure negotiations with the prosecution despite knowing that the DNA testing was not yet complete, and the state appellate courts' decisions deferring to that judgment.

Thus, the state-court rulings denying this claim were not fundamentally unfair, and this claim is not cognizable on federal habeas review.

### c. Procedural default

*State violation of plea agreement.* The State argues Spivey's claim that the prosecutor breached the plea agreement also is procedurally defaulted because he did not fairly present this identical claim in state court. ECF No. 40 at PageID #: 6526-29. Spivey contends "each and

every aspect of this argument was constructively presented to the Ohio courts." ECF No. 46 at PageID #: 6628. He cites to two cases as support for this proposition: *Beam v. Paskett*, 3 F.3d 1301, 1306 (9th Cir. 1993), *overruled on other grounds by Lambright v. Stewart*, 191 F.3d 1181, 1187 (9th Cir. 1999) (en banc), and *Bronshtein v. Horn*, No. CIV. A. 99-2186, 2001 WL 767593, at *10 n. 19 (E.D. Pa. July 5, 2001), *aff'd in part, rev'd in part, and remanded*, 404 F.3d 700 (2005). ECF No. 46 at PageID #: 6628, 6634. Neither the Supreme Court nor the Sixth Circuit has recognized such a legal theory, however, and this Court will not either.

Spivey raised a claim on direct appeal to the state appellate court alleging that the "trial court abused its discretion by failing to grant [his] motion for relief from judgment when the State has violated the Rule 11 agreement which was the basis for the plea." ECF No. 19-6 at PageID #: 1295. The court addressed the claim as asserting both prosecutorial misconduct and violation of the plea agreement, and rejected it on both grounds. *Spivey*, 1997 WL 16196, at *5-6. Spivey then raised the following claim on direct appeal to the Ohio Supreme Court, again framing the claim as a trial-court error based on the alleged breach of the plea agreement: "When the State violates the Ohio Crim R. 11 plea agreement, the court must permit the opportunity for the withdrawal of the plea." ECF No. 19-7 at PageID #: 1437-38. The Ohio Supreme Court addressed the merits of the claim, which it characterized as "whether the state complied with the terms of the negotiated plea agreement. . . ." *Spivey*, 81 Ohio St.3d at 418-19 n. 1.

In post-conviction proceedings, Spivey presented a claim to the trial court that the prosecutor was politically motived and made racially disparaging comments about him. *See*

ECF No. 19-8 at PageID #: 1870-72.  In his "Final Argument" submitted to the trial court,

however, he further argued that "the government violated its plea agreement by arguing "an eye

for an eye."  ECF No. 19-11 at PageID #: 2170.  The trial court rejected the claims, finding "the

Supreme Court has denied [the] allegation" regarding the plea-agreement violation.  ECF No.

19-11 at PageID #: 2211.  Spivey appealed the claim to the state appellate court, including the

allegations regarding the prosecutor's political motivation, racist comments, and breach of the

plea agreement.  ECF No. 19-12 at PageID #: 2363-65.  The court did not review the claim,

stating it "[had] already addressed the issue regarding violation of the plea agreement in Spivey's

direct appeal."  *Spivey*, 2002 WL 418373, at *11.  Spivey did not appeal that ruling to the Ohio

Supreme Court.  *See* ECF No. 19-12 at PageID #: 2457.

As the State argues, the procedural history of this claim presents several obstacles to

federal habeas review.  First, the claim Spivey asserted on direct appeal in state court differs

from the claim he raised in state post-conviction proceedings and here because it alleged trial-

court error rather than prosecutorial misconduct.  And his post-conviction claim was

procedurally defaulted because Spivey never presented it to the Ohio Supreme Court and the

state appellate court found the claim had already been adjudicated on direct appeal.  It could be

argued that Spivey fairly presented the substance of his breach-of-plea-agreement claim to state

courts on direct appeal, whether couched in terms of a trial-court error or prosecutorial

misconduct.  As the Sixth Circuit has explained, determining when a claim has been "fairly

presented" because of variations in legal theory or factual allegations "is contextual and

individual to each case."  *Houston v. Waller*, 420 Fed.Appx. 501, 509 (6th Cir. 2011).  And in

some instances, "'the ultimate question for disposition will be the same despite variations in the legal theory or factual allegations urged in its support.'" *Id.* (quoting *Picard v. Connor*, 404 U.S. 270, 277 (1971)* (internal quotations and citations omitted)). Indeed, "[t]o present a claim fairly, it is sufficient if the substance of the claim was presented to the state courts, such that the ultimate question would have been the same despite variations in the legal theory or factual allegations urged in its support." *Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir. 2008).

Furthermore, even if this Court were to find that Spivey fairly presented this claim to state courts on direct appeal, he presented it to the state courts at that stage as an issue arising under state law. Federal habeas courts review a petitioner's state-court briefs to determine whether he or she fairly presented a claim as a federal constitutional claim, examining the petitioner's: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law). *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). In his briefs to state courts, Spivey did not cite to any federal cases, couch his argument in terms of constitutional law, or allege a denial of a constitutional right. In his brief to the state appellate court, he did rely on one state case that employed federal constitutional analysis, *State v. Mathews*, 8 Ohio App.3d 145, 146 (1982), which in turn relied on the controlling Supreme Court case on the constitutional issues regarding enforcing plea agreements, *Santobello v. New York*, 404 U.S. 257 (1971). And the state appellate court also relied on Ohio cases that cited federal cases applying constitutional law. *See*

(4:16CV0384)

*Spivey*, 1997 WL 16196, at *6.  But in his brief to the Ohio Supreme Court, Spivey did not cite

to any provision of the United States Constitution or any federal or state-court case applying

federal constitutional law to support it.  Nor did he couch his legal argument in constitutional

terms, or otherwise employ language that might have indicated the assertion of federal

constitutional claims.

Given the difficulty of these procedural issues, the Court will proceed to the merits of the

claim, which are "easily resolvable" against Spivey.  *Lambrix v. Singletary*, 520 U.S. 518, 525

(1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable

against the habeas petitioner"); *see also* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted

habeas petitions on the merits).

### d.     Open-Court requirement

The State argues Spivey's claim that the trial court erred by refusing to place the plea

agreement on the record in open court also is procedurally defaulted because he did not fairly

present it to state courts.  ECF No. 40 at PageID #: 6539-41.  Again, the Court agrees.

Spivey raised a claim on direct appeal to the Ohio appellate court that "[t]he State failed

to comply with [Ohio Criminal Procedure] Rule 11(F) requiring the State to place the underlying

agreement on the record in open court."  ECF No. 19-6 at PageID #: 1306 (capitalization

altered).  This was a state-law claim.  In his appellate brief, Spivey did not cite any supporting

federal constitutional provision or case applying federal constitutional law, or use language

indicating the assertion of a federal constitutional claim.  Moreover, he abandoned that claim on

appeal to the Ohio Supreme Court.  *See* ECF No. 19-17 at PageID #: 1418-38.

(4:16CV0384)

Spivey argues he "constructively" presented this claim to Ohio courts. ECF No. 46 at PageID #: 6634. But, as explained above, this Court rejects that theory. Spivey further contends he raised this claim to the Ohio Supreme Court on direct appeal as the underlying basis of a claim of ineffective assistance of trial counsel, and as a federal constitutional claim on post-conviction. ECF No. 46 at PageID #: 6634. It is well-settled, however, that ineffective-assistance claims do not preserve the underlying claims for federal habeas review. *See, e.g.*, *Wogenstahl v. Mitchell*, 668 F.3d 307, 343 (6th Cir. 2012) ("[e]xhaustion of this [trial counsel ineffective-assistance] claim does not similarly exhaust the underlying substantive claim . . . .") (citing *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) ("bringing an ineffective assistance claim in state court based on counsel's failure to raise an underlying claim does not preserve the underlying claim for federal habeas review because the two claims are analytically distinct.") (internal quotation marks and citation omitted)). Moreover, in post-conviction proceedings, he abandoned the claim in the trial court (*see* ECF No. 19-11 at PageID #: 2155, 2208) and did not raise it on appeal (*see* ECF No. 19-12 at PageID #: 2297-99, 2457).

Spivey did not fairly present this claim to the state courts, therefore, and it is procedurally defaulted. Spivey also makes no showing regarding either the cause for, or prejudice resulting from, his procedural default, and does not argue that he is actually innocent such that the default is excused.

### 2. Merits

#### a. Violation of plea agreement

As explained above, it is unclear whether Spivey's claim that the prosecutor violated the plea agreement by recommending the death penalty in his closing argument was adjudicated on the merits in state court and the AEDPA deferential standard applies, or it was not, and the Court should review the claim *de novo*. Regardless, even applying a *de novo* standard, the claim is meritless.

The Ohio appellate court provided this account of the facts underlying this claim:

The plea agreement, which had been struck between the prosecution and the defendant-appellant, was placed before the trial judge. Counsel for the defendant-appellant set forth the agreement:

"It is our understanding that an accommodation has been reached between the Prosecutor's Office and defense counsel as follows:
"That the defense counsel will, when this case is set, advise the Court -- or we're advising the Court now -- that there will be no formal trial of the facts of this case. There will either be a guilty or no contest plea.

"In return for that, the Prosecuting Attorney's Office has stated that in the presentation of our mitigation hearing the only thing they will do, number one, cross examine witnesses offered by the Defendant. Two, offer witness testimony only on perjurious statements or lies by any defense witness on the stand which are determined to be lies or perjurious. They will offer rebuttal evidence to that. And in the alternative, the issue of final arguments has not yet gone resolved, but at any time during the mitigation hearing, be it in the presentation of testimony of cross examining witnesses or in giving a final argument, the Prosecuting Attorney will not state they have a recommendation or recommend that the death sentence be imposed, as long as, of course, the situation is such as we have explained, along the parameter of the mitigation hearing."

It is the appellant's contention that the prosecutor violated the R. 11 agreement during closing arguments following the mitigation phase of the case when the prosecutor stated to the three judge panel:

"Gentlemen, I'm not going to stand here and read to you 2929.03 and .04. And I don't envy the position that you are now in. But I say to you that in a motion before the Court, defense counsel has asked the Court to consider mercy. And the Court, obviousl'y (sic), gave the right response and said, we would automatically consider mercy. But I think we as human beings realize that mercy is forgiveness. And forgiveness is not justice. Justice is not forgetting; justice is not forgetting a Mrs. Vesper struggling to her last breath. Justice is not forgetting how Mrs. Vesper suffered at the murderous hand of Warren Spivey. The Vesper family struggling through their tears expect justice, not mercy.

"MR. KRICHBAUM: Your honor, I object.

"THE COURT: Sustained.

"MR. KRICHBAUM: I ask that be stricken from the record and disregarded.

"THE COURT: The remarks will be stricken from the record and the panel will disregard it.

"MR. PHILOMENA: Your honor, over two thousand years ago, in a book, a great literary book, word (sic) were written by a man named John. And they were written in a book of hope, and he had a book of warning and he had a book of despair. And those words were very simply, 'If one taketh another captive, then to captivity he must be taken.'

"MR. KRICHBAUM: Object. I don't believe it's proper to quote from the Bible, your honor. I also elude that any statement that the prosecutor may have to make that can be inferred or interpreted as a recommendation is improper.

"THE COURT: I would like the prosecutor to conform its argument to find mitigating factors that were raised by the defense in your agrument (sic). You are confined to that." (Tr. 1222-1224).

The appellant argues that the foregoing statements by the prosecutor were attempts on his part to recommend the death sentence.

It must be noted that the prosecutor did not make a specific statement recommending the death penalty and his closing remarks implied only that he was seeking punishment for the offense. It is also important to note that the prosecutor's comments came during the closing arguments in the mitigation phase of the proceedings.

*Spivey*, 1997 WL 16196, at *5-6.

Spivey argues that the prosecutor violated the plea agreement by advocating death over mercy and by using a "universally condemned" "eye for an eye" argument. ECF No. 46 at PageID #: 6629-30 (citing *Sandoval v. Calderon*, 241 F.3d 765, 777 (9th Cir. 2000)). He also contends the fact that the court sustained the defense's objection to the use of biblical language underscores the State's violation of the plea agreement, rather than excusing the breach. ECF No. 46 at PageID #: 6631. He further asserts the Court should examine facts outside the record in support of this claim, such as the prosecutor's "political aspirations," subsequent alleged "corrupt activities," and certain racial comments he allegedly made during the course of Spivey's trial. *See* ECF No. 38 at PageID #: 6325-28; ECF No. 46 at PageID #: 6631.

The Ohio Supreme Court concluded that "[t]he state complied with the terms of the negotiated plea," stating:

> The question whether the state complied with the terms of the negotiated plea agreement is the subject of appellant's tenth proposition of law. In that proposition, appellant claims that the state repeatedly violated the plea agreement during closing arguments in the penalty phase. For instance, appellant claims that "[d]uring his closing argument to the [panel], the state argued that the court ought not to consider mercy in this case," and that "[l]ater the prosecution argued, 'an eye for an eye.' " Appellant then claims that "[i]t is extremely difficult to understand how these arguments do not constitute a recommendation for the death penalty." However, a review of the record reveals that the prosecutor never actually made the arguments appellant has attributed to him. The prosecutor did not argue that the panel "ought not to consider mercy," but did argue that mercy was forgiveness, and forgiveness was not justice, and that the victim's family expected justice, not mercy. Defense counsel objected to this statement and the panel indicated that it would disregard the prosecutor's comments. The prosecutor also never uttered the phrase "an eye for an eye," but instead stated, "[i]f one taketh another captive, then to captivity he must be taken." (Emphasis added.) The defense objected to the prosecutor's comment in this regard, and the panel admonished the prosecutor for having made the comment. In any event, the fact remains that the prosecutor never specifically recommended

> imposition of the death sentence in this case and thereby adhered to the terms of the plea agreement. Furthermore, even assuming, *arguendo*, that the comments made by the prosecutor did somehow violate the terms of the plea agreement, there is absolutely no indication in the record that the panel was influenced by or considered these comments in arriving at its sentencing decision.

*Spivey*, 81 Ohio St.3d at 418-19 n. 1.

The state court's reasoning is sound. In *Santobello*, the Supreme Court held that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello, 404 U.S. at 262*. In that case, the defendant, who originally was charged with two felony gambling offenses, agreed to plead guilty to a single, lesser-included offense. *Id. at 258*. The State, in return, agreed to make no sentencing recommendation. *Id.* At the sentencing hearing, however, the prosecutor (who had been assigned to the case after the plea agreement was reached) recommended that the defendant receive the maximum one-year sentence, which the judge then imposed. *Id. at 259-60*. The Court found the prosecutor violated the plea agreement and vacated the defendant's sentence. *Id. at 262*. It concluded that "the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises made in the negotiation of pleas of guilty" would be best served by remanding the case to the state courts to decide whether there should be specific performance of the agreement and resentencing by a different judge, or the petitioner should be granted his requested relief, the opportunity to withdraw his guilty plea. *Id. at 262-63*.

In addition, "a plea bargain itself is contractual in nature and subject to contract-law standards." *Baker v. United States, 781 F.2d 85, 90 (6th Cir. 1986)* (internal quotation marks

and citation omitted). The State, therefore, is bound to the literal terms of a plea agreement.

*Smith v. Stegall*, 385 F.3d 993, 999 (6th Cir. 2004). And, "[u]nless expressed in some way in the writing, the actual intent of the parties is ineffective, except when it can be made the basis for the reformation of the writing." *Id.* (quoting 11 Williston on Contracts § 31:4 (4th ed. 2000)).

Spivey has not shown that the prosecutor failed to honor his promise not to recommend the death penalty to the three-judge panel. Unlike the prosecutor in *Santobello*, the prosecutor here never expressly advocated for the capital punishment in his closing argument. And to the extent his comments came close to implying such a recommendation, the Court presumes the judges on the panel were aware that those comments risked violating the plea agreement and disregarded them. As the state appellate court aptly observed, "We have every right to presume that the panel of judges were well aware of the plea agreement and that even if the remarks of the prosecutor were beyond the borders of that agreement, the three trial judges well knew and well accepted the fact that those remarks were not to be considered by them." *Spivey*, 1997 WL 16196, at *6. Finally, the prosecutor's alleged motivations, subsequent criminal activities, and bigotry have no bearing on the issue presented by this claim: did the State violate the plea agreement by recommending the death penalty in his closing argument? It did not.

Spivey's fourth ground for relief, therefore, is meritless.

### b.  Open-court claim

Even if Spivey's open-court claim were not procedurally defaulted, it too would fail on the merits. The Ohio Supreme Court recounted the trial court's treatment of the plea agreement

102

in addressing – and rejecting – Spivey's ineffective-assistance claim based on this issue:

> In this proposition, appellant also contends that the terms of the plea agreement were never discussed in open court, in violation of Crim.R. 11(F), and that "[c]ounsel was ineffective for failing to ever raise an objection as to the manner in which the negotiated plea was placed before the trial court." We agree that the manner in which the negotiated plea agreement was placed before the panel violated Crim.R. 11(F), which requires that, in felony cases, "the underlying agreement upon which the plea is based shall be stated on the record in *open court*." (Emphasis added.) Here, the plea agreement was not discussed in open court. However, the terms of the plea agreement were stated on the record during an October 2, 1989 chambers conference attended by the parties and Judge Economus prior to appellant's jury waiver, and Judge Economus subsequently served as the presiding member of the three-judge panel. On October 10, 1989, the plea agreement was also discussed in chambers before two members of the panel (Judges Economus and McNally), with all parties present, and the terms of the agreement were placed on the record. Therefore, although Crim.R. 11(F) was technically violated, since the terms of the plea were stated on the record in chambers, rather than being stated on the record in open court, we fail to see how appellant was prejudiced by the technical violation of the rule. All parties and the court were aware of the agreement, and the agreement was adhered to by the parties.

*Spivey*, 81 Ohio St.3d at 418.

Spivey contends that the trial court's failure to place his plea agreement on the record in open court violated his Sixth Amendment right to a public trial. ECF No. 38 at PageID #: 6334. He claims the Supreme Court recognized this constitutional right in *Santobello*, 404 U.S. at 261-62, in which it stated: "[T]he sentencing judge must develop, on the record, the factual basis for the plea. . . . [I]f [the plea] was induced by promises, the essence of those promises must in some way be made known." ECF No. 38 at PageID #: 6334. He also explains that in *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006), the Court classified the denial of the right to "public trial" as a "structural defect" that "def[ies] analysis by 'harmless-error' standards" because they "affec[t] the framework withing which the trial proceeds," and are not

"simply an error in the trial process itself." ECF No. 46 at PageID #: 6635. Finally, Spivey cites Sixth Circuit precedent cautioning against "backroom, off-the-record, shadow compacts between prosecutor and defense counsel. . . ." ECF No. 38 at PageID #: 6335 (quoting *Smith v. Anderson*, 632 F.3d 277, 283-84 (6th Cir. 2011), and citing *Baker*, 781 F.2d at 90).

However, as the State argues, Spivey has not cited one case in which the Supreme Court has recognized a Sixth Amendment right to having a plea agreement placed on the record in open court. The language Spivey quotes from *Santobello* concerned Fed. R. Crim. P. 11's requirement of placing the terms of plea agreements on the record. *See Santobello*, 404 U.S. at 261-62 ("Fed. Rule Crim. Proc. 11, governing pleas in federal courts, now makes clear that the sentencing judge must develop, on the record, the factual basis for the plea. . . ."). As explained above, the issue in *Santobello* was whether due process required the trial court to enforce a term of an off-the-record plea agreement, not the Sixth Amendment's public-trial guarantee. *Id.* at 257. The Court focused on the fairness and reliability of the plea bargaining process, "an essential component of the administration of justice." *Id.* at 260. And it noted Rule 11's public-record requirement among other "safeguards to insure the defendant what is reasonably due in the circumstances[,]" such as counseling the defendant and the trial court's discretion to reject a plea. *Id.*

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), also does not directly apply. In that case, the Court cited *Waller v. Georgia*, 467 U.S. 39, 49 n. 9 (1984), as an example of a trial court error having been found "structural." *Gonzalez-Lopez*, 548 U.S. at 149. *Waller* concerned a trial court's closure of a suppression hearing over the defendant's objection, not a plea

agreement.  *Waller*, 467 U.S. at 40-41.  Similarly, the Sixth Circuit cases Spivey cites concern

the enforcement of plea agreements, not whether, or the manner in which, the trial court recorded

them.  *Baker*, 781 F.2d at 88; *Smith*, 632 F.3d at 280-81.

It is, therefore, unclear whether Spivey asserts a federal constitutional claim here.  But, to

the extent the Sixth Amendment may be implicated here, the Court finds no error in the trial

court's omission.  The trial court and parties were fully aware of the terms of the agreement.

Spivey's change of plea was conducted on the record in open court, and the terms of the plea

agreement were stated on the record in chambers *twice*.  *See* ECF No. 20-3 at PageID #: 4123-

24; 4135-41; 4165-82 (transcripts of October 2 and 10, 1989, hearings).  The Court agrees with

the state court that, although the trial court may have technically violated the state criminal

procedural rule by not placing the terms of the plea agreement on the record in open court rather

than in chambers, Spivey suffered no prejudice as a result.  Spivey's sixth ground for relief is

meritless.

**D.      Fifth Ground for Relief:  *Prosecutorial Misconduct***

Spivey's fifth ground for relief alleges several instances of prosecutorial misconduct in

addition to the alleged violation of the plea agreement (Ground Four) and withholding

exculpatory evidence (Ground Ten).  ECF No. 38 at PageID #: 6331-33.  They are:  racist

comments; political motivations; "bull[ying]" the three-judge panel; attacking defense counsel;

and making improper remarks during the mitigation phase of trial.  ECF No. 38 at PageID #:

6332.

(4:16CV0384)

1.    **Procedural Posture**

The State argues this claim is procedurally defaulted because Spivey never raised it in state court as a violation of his federal constitutional rights. ECF No. 40 at PageID #: 6535-36. Spivey asserts he raised this claim in state court on post-conviction review. ECF No. 38 at PageID #: 6332.

Spivey raised a claim to the trial court in state post-conviction proceedings alleging that the prosecutor's political motivations and racist and derogatory comments violated his federal constitutional rights, including his right to due process. *See* ECF No. 19-8 at PageID #: 1870-72. The trial court rejected the claim regarding the racist comments on its merits. ECF No. 19-11 at PageID #: 2211. Spivey appealed the claim to the state appellate court, including the allegations regarding the prosecutor's political motivation and improper comments. ECF No. 19-12 at PageID #: 2363-65. The court addressed the merits of these claims, relying on federal constitutional law, and rejected them. *Spivey*, 2002 WL 418373, at *10-11. However, Spivey did not appeal that ruling to the Ohio Supreme Court. *See* ECF No. 19-12 at PageID #: 2457. Thus, Spivey did not fairly present his claim regarding the prosecutor's political motivations and improper comments to the Ohio Supreme Court, leaving him with no available state-court remedy. *See, e.g.*, *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (to preserve claims for federal habeas review, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims"); S. Ct. Prac. R. 7.01(A) (notice of appeals in Ohio Supreme Court must be filed within forty-five days from entry of judgment being appealed); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("if an

106

unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review").

Moreover, Spivey never raised in state court a claim regarding the prosecutor's "bull[ying]" the three-judge panel and making improper remarks during the mitigation phase of trial. This claim arises out of the record of proceedings in the trial court, and therefore could have been raised on direct appeal. Petitioner failed to do so, however, and, under Ohio law, *res judicata* now prohibits him from raising the issues in any state post-conviction proceeding. *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) ("[u]nder Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."); *Perry*, 10 Ohio St.2d at 180-82 (holding that *res judicata* bars a criminal defendant from raising in post-conviction proceedings those claims that could have been raised on direct appeal). With no state-court remedies still available to him, Spivey has defaulted these claims. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("[b]ecause [the exhaustion] requirement . . . 'refers only to remedies still available at the time of the federal petition,' it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" (internal citations omitted)); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("if an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review.").

Spivey's fifth ground for relief, therefore, is procedurally defaulted.

### 2.    Merits

This claim would fail on the merits even if it were ripe for federal habeas review.  Spivey first argues that the prosecutor was "corrupt" and "politically motivated."  ECF No. 38 at PageID #: 6332.  He explains in arguing his plea-agreement claim that the prosecutor was convicted of federal and state charges, including bribery.  ECF No. 38 at PageID #: 6325-26.  But, he offers no evidence linking the conduct alleged in those cases to his conduct in Spivey's case.  Spivey also alleges the prosecutor sought the death penalty in his case for political purposes, as he was running for Ohio Attorney General.  ECF No. 38 at PageID #: 6327.  But, he presents no evidence supporting this allegation.

Spivey additionally complains that the prosecutor made numerous improper remarks.  He argues the prosecutor "bullied" the three-judge panel by stating, "I remind you of your duty." ECF No. 38 at PageID #: 6332 (quoting ECF No. 20-6 at PageID #: 4954).  He alleges the prosecutor "attacked defense counsel" in an exchange about a defense witness.  ECF No. 38 at PageID #: 6332 (quoting ECF No. 20-6 at PageID #: 4954).  He complains the prosecutor made unspecified "improper closing arguments during the mitigation phase."  ECF No. 38 at PageID #: 6332.  And Spivey notes the prosecutor called him a "coon."  ECF No. 38 at PageID #: 6332. He points to the testimony of defense mitigation expert, Lisa Roth, that the prosecutor "was very objectionable," did things to "intimidate," and "became a nightmare."  ECF No. 38 at PageID #: 6332 (citing ECF No. 20-7 at PageID #: 5384).  The defense's other mitigation expert, Dr. Eisenberg, testified that the prosecutor "was outrageous.  I've testified in many, many cases.  I

108

(4:16CV0384)

felt his behavior was off the wall." ECF No. 38 at PageID #: 6332 (quoting ECF No. 20-7 at PageID #: 5344). Dr. Eisenberg further stated that the prosecutor "came up to me and Miss Roth and his first utterance was, I could care less about this coon; it's those two cocksuckers I want to get." ECF No. 46 at PageID #: 6632 (quoting ECF No. 20-7 at PageID #: 5343). Ms. Roth corroborated that account of the prosecutor's remarks. ECF No. 38 at PageID #: 6327 (citing ECF No. 20-7 at PageID #: 5396-97).

In *Darden v. Wainwright*, 477 U.S. 168 (1986), the Supreme Court held that to prevail on prosecutorial-misconduct claims, "it is not enough that the prosecutors' [conduct was] undesirable or even universally condemned." *Id.* at 181 (internal quotation marks and citation omitted). Rather, "'[t]he relevant question is whether the prosecutors' [conduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)); *see also United States v. Young*, 470 U.S. 1, 11 (1985) ("[n]evertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

Spivey claims the cumulative effect of the prosecutor's conduct, including his violation of the plea agreement and withholding exculpatory evidence, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ECF No. 38 at PageID #: 6332 (quoting *Darden*, 477 U.S. at 181 (internal quotation marks and citation omitted)). The

(4:16CV0384)

Court does not agree.  As the state appellate court aptly concluded,

> Although the prosecutor's statements were both racist and offensive, Spivey fails to establish that he was prosecuted due to his race or, in the alternative, that others similarly situated were not prosecuted. Moreover, Spivey's contention that the prosecutor was politically motivated also remains unsubstantiated.  Spivey has offered no proof that Philomena prosecuted him solely to win the race for Ohio Attorney General.  Spivey's final assignment of error is also meritless as he has failed to offer adequate proof in support of his allegations.

*Spivey*, 2002 WL 418373, at *11.

This claim is meritless.

## E.    Seventh Ground for Relief:  *Ineffective Assistance of Trial Counsel*

In his seventh ground for relief, Spivey claims his trial counsel provided constitutionally ineffective assistance.  ECF No. 38 at PageID #: 6636-47.  Specifically, he complains that counsel:

    a.    failed to raise the issue of his competency to stand trial;

    b.    improperly advised him to waive his right to a jury trial;

    c.    improperly advised him to enter no-contest pleas before receiving DNA test results;

    d.    improperly advised him to enter pleas of no contest in chambers with only two empaneled judges present;

    e.    failed to object to the plea agreement not being read in open court;

    f.    failed to investigate and prepare mitigating evidence regarding his childhood;

    g.    failed to investigate and develop expert testimony for mitigation hearing regarding his Pervasive Development Disorder ("PPD"); and,

    h.    were inexperienced at conducting mitigation hearings.

ECF No. 38 at PageID #: 6636-47.

(4:16CV0384)

### 1. Procedural Posture

The State argues that sub-claims (a), (c), and (d) of Ground 7, as listed above, are procedurally defaulted because Spivey did not raise them on direct appeal to the state appellate court, but only raised on them in an application to reopen his direct appeal. ECF No. 40 at PageID #: 6544. It contends sub-claims (f), (g), and (h) also are procedurally defaulted because they were never fairly presented to state courts. ECF No. 40 at PageID #: 6545-46. Spivey denies the defaults, with no argumentation whatsoever, but asserts that "in so far as" the Court finds them to be procedurally defaulted, there is cause and prejudice to excuse them. ECF No. 46 at PageID #: 6636, 6638-39, 6640, 6641, 6645, 6646.

### a. Procedural history

*Direct appeal*. Spivey did not raise any ineffective-assistance claims to the state appellate court on direct appeal. *See* ECF No. 19-6 at PageID #: 1295. He raised five ineffective-assistance claims to the Ohio Supreme Court, *see* ECF No. 19-7 at PageID #: 1460-64, which relate to sub-claims (a) through (f) asserted here.[24] Ohio's high court stated that it

---

[24] Spivey's ineffective-assistance claims have morphed over time, complicating the Court's procedural-default analysis. The claims changed slightly from state court to state court, and from state courts to this Court. Determining when a claim has been "fairly presented" because of variations in legal theory or factual allegations "is contextual and individual to each case." *Waller*, 420 Fed.Appx. at 509. "In some instances, simply presenting the facts, without also presenting 'the constitutional claim . . . inherent in those facts' is insufficient. . . . In others, however, 'the ultimate question for disposition will be the same despite variations in the legal theory or factual allegations urged in its support.'" *Id.* (quoting *Picard v. Connor,* 404 U.S. 270, 277 (1971) (internal quotations and citations omitted)). Indeed, "[t]o present a claim fairly, it is sufficient if the substance of the claim was presented to the state courts, such that the ultimate question would have been the same despite variations in the legal theory or

(continued...)

111

"considered each and every instance of alleged ineffective assistance of trial counsel raised by appellant" but found them meritless, and would "discuss, in detail, only those instances of alleged ineffective assistance of counsel that warrant[ed] further analysis." *Spivey*, 81 Ohio St.3d at 417. The court then addressed three of the claims presented (relating to sub-claims (c), (d), (e)), and rejected them on their merits. *Id.* at 417-19.

*First post-conviction proceedings.* Spivey then raised six ineffective-assistance claims to the trial court in his first post-conviction proceeding, five of which he presents here (sub-claims (a), (b), (c), (d), (f)). ECF No. 19-8 at PageID #: 1835-37; ECF No. 19-9 at PageID #: 1863-65; ECF No. 19-11 at PageID #: 2168. The trial court addressed only three of those claims (sub-claims (b), (c), (f)), denying them on the merits on May 1, 2000. ECF No. 19-11 at PageID #: 2209-11. Spivey appealed the trial court's judgment on two of those three claims – (b) and (f). ECF No. 19-12 at PageID #: 2358-62. The court addressed both claims on the merits and

---

[24](...continued)
factual allegations urged in its support." *Jells*, 538 F.3d at 504. After carefully reviewing Spivey's state-court pleadings, the Court concludes that Spivey raised the substance, or the fundamental legal and factual bases, of sub-claims (a) through (f) to the Ohio Supreme Court on direct appeal, and sub-claims (a) through (e) again as the basis for appellate counsel ineffective-assistance claims in his application to reopen his direct appeal. In state court, Spivey alleged a more general claim challenging counsel's advice to waive a jury trial, based on Spivey's "lack of mental abilities" and the consequences of such a waiver. Here, Spivey splits that claim into two: in sub-claim (a), he alleges counsel should have determined his competency to stand trial, while in sub-claim (b), he challenges their advice to waive his right to a jury trial given his intellectual limitations. Similarly, Spivey splits his state-court claim regarding the manner in which the plea agreement was placed before the trial court into two claims: in sub-claim (d), he complains that the agreement was discussed in chambers before only two of the three empaneled judges, while in sub-claim (e), he faults counsel for failing to object when the trial court did not announce the plea agreement on the record in open court. *See* ECF No. 38 at PageID #: 6341-42.

rejected them on March 15, 2002. *Spivey*, 2002 WL 418373, at *9-10; ECF No. 19-12 at PageID #: 2438-40. Spivey did not appeal either of those claims to the Ohio Supreme Court; instead, he raised another ineffective-assistance claim, which he had presented only to the trial court on post-conviction and which the trial court did not address (sub-claim (a)). *See* ECF No. 19-12 at PageID #: 2470-71. The Ohio Supreme Court summarily declined jurisdiction and dismissed the appeal on July 3, 2002. ECF No. 19-13 at PageID #: 2509.

*Application to reopen direct appeal.* Spivey also presented several trial counsel ineffective-assistance claims as underlying claims for appellate counsel ineffective-assistance claims in an application to reopen his direct appeal before the state appellate court, five of which he asserts here (sub-claims (a) - (e)). ECF No. 19-13 at PageID #: 2522-23. That court, on February 11, 1998, denied the claims as meritless. ECF No. 19-13 at PageID #: 2573-76. Spivey appealed that decision to the Ohio Supreme Court. ECF No. 19-13 at PageID #: 2594-96. Ohio's high court affirmed the decision on November 25, 1998, holding:

> Spivey raised both of these issues [ineffective assistance of trial counsel and competency] before this court in his direct appeal, and we addressed these issues in our decision, and found they lack merit. See *Spivey*, 81 Ohio St.3d at 417-419, 409-411, 692 N.E.2d at 162-163, 157-158. Therefore, these issues cannot now provide a basis for finding that appellate counsel was ineffective for not raising them in the court of appeals. Spivey has failed to show that had the issues been presented in the court of appeals, there was a reasonable probability that he would have been successful.

*Spivey*, 84 Ohio St.3d at 24; ECF No. 19-13 at PageID #: 2645.

## b.    Procedural default

*Sub-claims (a) through (e).* Spivey presented sub-claims (a) through (e) on direct appeal to the Ohio Supreme Court. The court stated that it considered the merits of each claim and

found them meritless.  It proceeded to address the merits of three of the claims, which Spivey

presents here in sub-claims (c), (d), and (e).  Although the court did not expressly address claims

(a) and (b), the claims were adjudicated on the merits for purposes of AEDPA review.  *See*

*Harrington*, 562 U.S. at 99 ("[w]hen a federal claim has been presented to a state court and the

state court has denied relief, it may be presumed that the state court adjudicated the claim on the

merits in the absence of any indication or state-law procedural principles to the contrary.").

Moreover, sub-claims (a) through (e) are preserved for federal habeas review even though they

were not presented to the state appellate court.  These claims, therefore, are preserved for federal

habeas review, even though they were not presented to the state appellate court.  If a state's

highest court reaches the merits of a particular federal claim, it removes any procedural bar to

federal habeas review of that claim.  *Ylst,* 501 U.S. at 801.

The State further contends that Spivey adds arguments to this claim here that he never

presented to any state court – namely, that trial counsel failed to explain the circumstances

surrounding the pending DNA tests results and consequences of his no-contest plea, and failed to

reserve the right to "withdraw or void" the plea pending those test results in the plea

negotiations.  ECF No. 40 at PageID #: 6545.  Spivey's allegedly "new" claims relate to key

considerations factoring into the no-contest plea and do not alter the "ultimate question" of

whether counsel improperly advised Spivey regarding the plea.  *See Jells*, 538 F.3d at 504.

However, to the extent Spivey asserts "new" and unexhausted claims in this claim, as will be

explained below, the Court denies them as meritless.

(4:16CV0384)

*Sub-claim (f)*.  The State contends this claim is procedurally defaulted because it is substantially different from the mitigation ineffective-assistance claim he raised in state post-conviction proceedings and therefore was not fairly presented to state courts.  ECF No. 40 at PageID #: 6545.  It argues that in state court, Spivey complained that his trial counsel's performance during the mitigation phase of his trial was deficient because they mistakenly believed the three-judge panel would not impose the death penalty when, under the plea agreement, the prosecutor could not present evidence of aggravating circumstances.  ECF No. 40 at PageID #: 6545 (citing ECF No. 19-9 at PageID #: 1863 (post-conviction petition)).  Whereas here, it states, Spivey claims counsel should have begun its mitigation investigation earlier.  ECF No. 40 at PageID #: 6545 (citing ECF No. 38 at PageID #: 6343-44).  Spivey denies the claim is procedurally defaulted in his traverse.  ECF No. 46 at PageID #: 6641.[25]

Spivey's federal habeas ineffective-assistance claim relating to mitigation is fundamentally the same as the claim he raised in state court.  He argues here, as he did in state court, that counsel improperly "relied" on their "theory" that the panel would not sentence Spivey to death given the prosecutor's inability to present evidence of aggravating circumstances under the plea agreement.  *See* ECF No. 19-11 at PageID #: 2168-69; ECF No. 38 at PageID #: 6344.  And, as in state court, he faults counsel for their "last-minute" and inadequate preparation.  *See* ECF No. 19-11 at PageID #: 2168-69 (the "mitigation team was not hired until about a month before" the hearing); ECF No. 38 at PageID #: 6344 ("last-minute, slipshod method of

_____

[25]  In his motion for discovery, however, he concedes it is defaulted.  ECF No. 48 at PageID #: 6704.

115

putting together a mitigation defense").  Spivey presented this ineffective-assistance claim to the state appellate court on post-conviction review, where it was adjudicated on the merits.  *See Spivey*, 2002 WL 418373, at *9-10.  However, he did not appeal that ruling to the Ohio Supreme Court.  The claim, therefore, is procedurally defaulted.

*Sub-claim s(g) and (h).*  The State is correct that sub-claims (g) and (h) also are procedurally defaulted because Spivey never presented them to state court and now is foreclosed from doing so due to Ohio's filing deadlines, post-conviction procedures, and *res judicata* rules.

Accordingly, sub-claims (a) through (e) are preserved for federal habeas review, and Spivey has procedurally defaulted his ineffective-assistance claims asserted in sub-claims (f), (g), and (h).

### c.  Cause and prejudice

Spivey does not clearly state the basis for his assertion of cause and prejudice to excuse the default of his ineffective-assistance claims, other than generally arguing the defaults were caused by the ineffective assistance of appellate and post-conviction counsel.  *See* ECF No. 38 at PageID #: 6350 ("[a]ny procedural barrier placed on any of these claims by the Ohio Supreme Court can be overcome through this claim by appellate counsel's ineffective assistance."); ECF No. 40 at PageID #: 6606-12 (arguing generally that "[p]ost-conviction counsel's ineffective performance precludes the application of procedural barriers to federal habeas review for Mr. Spivey's claims.").  The closest he comes is in his traverse, when he states that "post-conviction

116

counsel failed to raise . . . substantial issues that could have warranted relief in state court, i.e. claims 7(F), (G), and (H). . . ." ECF No. 46 at PageID #: 6608.[26]

Spivey argues that the defaults of sub-claim's (f), (g), and (h) should be excused by the ineffectiveness of his post-conviction counsel under the Supreme Court decisions in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thalor*, 569 U.S. 413, 133 S.Ct. 1911 (2013). ECF No. 46 at PageID #: 6608. In other words, he asserts counsel should have raised on post-conviction review claims of ineffective assistance of trial counsel in failing to present sufficient evidence of his childhood and PPD at the mitigation phase of trial, and in not having the requisite experience to conduct such a hearing.

In *Martinez*, the Court held that the "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. This holding represents a "limited qualification" to its prior decision in *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). *Id.* at 15. In that case, the Court held that prisoners have no constitutional right to an attorney in state post-conviction proceedings, and, therefore, an attorney's negligence in those proceedings cannot establish cause

---

[26] Although he denied his ineffective-assistance claims were defaulted, Spivey suggests that appellate counsel is at fault for the default of the rest of his ineffective-assistance claims in his analysis of his appellate counsel ineffective-assistance claim. He states in his petition's analysis of Ground Eight that appellate counsel was ineffective for failing to raise a trial counsel ineffective-assistance claim, *see* ECF No. 38 at PageID #: 6350, and specifically identifies in his traverse sub-claims (a) through (e) as ineffective-assistance claims that should have been raised, *see* ECF No. 46 at PageID #: 6651.

117

to excuse a habeas petitioner's procedural default of claims in state court. *Coleman*, 501 U.S. at 756-57. The *Martinez* Court explained that it created this exception to *Coleman* to acknowledge "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." 566 U.S. at 14. It was careful to note the holding's limitations, however, emphasizing that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here." *Id.* at 16.

In *Trevino*, the Court elaborated on and expanded the *Martinez* exception. It explained that under *Martinez,* federal habeas courts may find cause to excuse a petitioner's procedural default where:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

133 S.Ct. at 1918 (emphasis in original). But the Court modified the fourth requirement so that *Martinez* would apply in Texas, even though Texas criminal procedure "on its face appears to permit (but does not require) the defendant to raise the claim [of ineffective assistance of trial counsel] on *direct appeal*." *Id.* (emphasis in original).

The Sixth Circuit has applied *Trevino* to Tennessee and Kentucky ineffective-assistance-of-trial-counsel claims. *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014) (Tennessee); *Woolbright v. Crews*, 791 F.3d 628, 636 (6th Cir. 2015) (Kentucky). But it has not resolved

whether or to what extent *Trevino* applies to Ohio's procedural framework for claims of ineffective assistance of counsel.  *See Henness v. Bagley*, 766 F.3d 550, 557 (6th Cir. 2014); *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013) (observing that *Trevino's* application to Ohio cases is neither "obvious nor inevitable").

Even assuming *Martinez* applies here, this argument fails.  As more fully explained below, Spivey's ineffective-assistance claims regarding counsel's performance at the mitigation phase of his trial are not "substantial."  In particular, he has not presented any argument or evidence showing that he would not have been sentenced to death if his trial counsel had presented more evidence of his childhood at the mitigation phase of his trial, evidence of his PPD, or had more experience in conducting such hearings, or that their allegedly deficient performance deprived him of a fair trial.[27]

### 2.     Merits

The Supreme Court long has recognized that the Sixth Amendment right to the effective assistance of counsel at trial "is a bedrock principle in our justice system."  *Martinez v. Ryan*, 132 S.Ct. 1309, 1317 (2012).  *See also* Gideon v. Wainwright, 372 U.S. 335, 342-44 (1963). The Court announced a two-prong test for claims of ineffective assistance of counsel in *Strickland*.  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

---

[27]  Spivey, therefore, cannot show good cause to depose state post-conviction counsel Attorneys Juhasz and Millhof to obtain information to support his *Miranda* claim that the default of his claims of ineffective assistance of trial counsel relating to mitigation (sub-claims (f) and (g)) should be excused by the ineffectiveness of post-conviction counsel.  ECF No. 48 at PageID #: 6704.

Amendment." 466 U.S. at 687. To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation fell "below an objective standard of reasonableness." *Id.* at 688. It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Second, the petitioner must show that he or she was prejudiced by counsel's errors. To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* at 693 (citation omitted). Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail. *Id.* Ineffective-assistance claims are mixed questions of law and fact. *Id.* at 698. The Supreme Court has emphasized that "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356. 371 (2010)). It has explained,

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.

*Id.* (internal quotation marks and citations omitted). Thus, "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the

distorting effects of hindsight. . . ." *Strickland*, 466 U.S. at 689. "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "'the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions.'" *Cullen*, 563 U.S. at 195-96 (quoting *Strickland*, 466 U.S. at 689-90).

The Court has observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal quotation marks and citations omitted). It has cautioned:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.*

As noted above, Spivey raised sub-claims (a) through (e) of his ineffective-assistance claim to the Ohio Supreme Court on direct appeal. The state court explained that it considered each claim and found each one meritless, but decided to address only three (sub-claims (c) and (e) among them). *Spivey*, 81 Ohio St.3d at 417. Because ineffective-assistance claims are mixed questions of law and fact, federal habeas courts review them under AEDPA's "unreasonable application" prong, § 2254(d)(1). *See, e.g., Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003). And, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court

to deny relief." *Harrington*, 562 U.S. at 98.[28]  Spivey's remaining ineffective-assistance claims

(sub-claims (f), (g) and (h)), which were never presented to state court, will be reviewed *de novo*.

*See, e.g.*, *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) (federal habeas courts may review

*de novo* an exhausted federal claim that was not adjudicated on the merits in state court).

### a.   Failure to raise the issue of Spivey's competency to stand trial (Ground 7(a))

Spivey first alleges that his trial counsel were ineffective for failing to raise the issue of

his competency to stand trial despite their awareness of his intellectual limitations.  ECF No. 38

at PageID #: 6338.

In addressing Spivey's substantive due process competency claim, the Ohio Supreme

Court found in the record "no indicia of incompetency that would have required a hearing on that

matter."  *Spivey*, 81 Ohio St.3d at 410.  As explained above, low intellectual ability is not

equivalent to incompetence to stand trial.  In fact, the court noted, two psychologists found

Spivey competent to stand trial.  *Id.* at 410-11.  It observed that defense counsel had requested

evaluations of Spivey's sanity and concluded, "We have no doubt whatsoever that if appellant's

trial attorneys in the case at bar had any reason to believe that appellant was legally incompetent,

---

[28]  Spivey's request to depose his trial counsel, Attorneys Zena and Krichbaum, to discover information to support these claims, *see* ECF No. 48 at PageID #: 6706-08, is therefore precluded under *Cullen*, which held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181.  *See, e.g.*, *Blevins v. Warden, Ross Corr. Inst.*, No. 1:05-cv-038, 2011 WL 6141062, at *4 (S.D. Ohio Dec. 9, 2011) ("*Pinholster* is not irrelevant to discovery in federal habeas. . . .  There cannot be good cause to collect evidence which cannot be presented.").

they would have filed an appropriate motion to request a hearing on the issue of appellant's competency." *Id.*

Spivey offers no compelling evidence from the record or argument showing there was no reasonable basis for the Ohio Supreme Court to find trial counsel did not perform deficiently by failing to request a competency evaluation. This claim is meritless.

### b. Improperly advising Spivey to waive his right to a jury trial (Ground 7(b))

Spivey also faults his trial counsel for advising him to waive his right to a jury trial given his limited intellectual abilities and the consequences of such a waiver. ECF No. 38 at PageID #: 6338-39. He contends counsel did not discuss the matter with him. ECF No. 38 at PageID #: 6338-39. The Ohio Supreme Court held, however, that the trial court "strictly adhered" to, and even "went beyond the scope" of, the requirements under Ohio law to ensure that Spivey fully understood the nature and consequences of his written waiver, and found the waiver was knowing, intelligent and voluntary. *Spivey*, 81 Ohio St.3d at 409. It follows that if Spivey was confused, uncertain, or misled about the waiver in any respect because his counsel had failed to sufficiently advise him, Spivey would have informed the judge at that time. Instead, he told the judge on the record that he understood the waiver and its consequences. Spivey has not demonstrated there was no reasonable basis for the state court to deny this claim.

### c. Improperly advising Spivey to enter no-contest pleas (Ground 7(c))

Spivey further alleges that trial counsel improperly advised him to enter the pleas of no contest: before obtaining the results of the potentially exculpatory DNA tests; without explaining the tests, its exculpatory potential, and the fact he would waive his opportunity to use

the evidence; and without preserving his opportunity to use the test results should they be

exculpatory when negotiating the plea.  ECF No. 38 at PageID #: 6339-41.

> In rejecting this claim, the Ohio Supreme Court reasoned,

> Appellant also contends that "to permit a capital defendant to plead no contest when
> no benefit is received for the plea is prima facie evidence of ineffective assistance."
> In this regard, appellant implies that the plea agreement was essentially one-sided,
> favoring only the prosecution, and that appellant did not receive anything in return
> for his pleas.  However, we find that appellant did receive what he bargained for in
> exchange for the pleas, *i.e.*, the state agreed not to make any recommendation
> concerning appellant's sentence and agreed not to vigorously challenge defense
> witnesses during the penalty phase unless the witnesses perjured themselves.  The
> state complied with the terms of the negotiated plea.  Additionally, defense counsel
> knew that if the panel accepted the pleas of no contest, the panel could dismiss the
> R.C. 2929.04(A)(7) death penalty specification pursuant to Crim.R. 11(C)(3).
> Therefore, the no contest pleas provided appellant with a chance to avoid the death
> sentence, and defense counsel specifically requested a dismissal of the specification
> after the panel had accepted the pleas.  Defense counsel also knew that if the case
> had proceeded to trial on the issue of guilt or innocence, the finder of fact would
> have heard a detailed account of all the facts and circumstances surrounding the
> crimes, including the disturbing details regarding the killing and the manner of the
> victim's death.  In contrast, the pleas of no contest essentially permitted appellant to
> proceed to mitigation on a relatively brief, cold, and sanitized record of the events.
> The decision not to contest the charges was a tactical decision that, in our judgment,
> was both reasonable and practical in light of the evidence of appellant's guilt.
> Appellant's suggestion that the plea agreement was one-sided and that he did not
> receive anything in return for the pleas is simply not supported by the record.

*Spivey*, 81 Ohio St.3d at 418-19 (footnote omitted).

> Spivey does not refute the state court's findings or show that its decision rejecting the

claim was unreasonable.  As the court reasoned, defense counsel's strategy behind the no-contest

pleas was "reasonable and practical in light of the evidence of Spivey's guilt" aside from the

DNA evidence, including his admission that he was present at the victim's home near the time of

the murder and unsubstantiated account of his involvement, his possession of the victim's car

and other belongings, and his flight from police and attempt to harm himself when apprehended.

Indeed, "strategic choices made after thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable . . . ." *Strickland*, 466 U.S. at 690.

Spivey, therefore, has not shown that the Ohio Supreme Court's decision was contrary to,

or an unreasonable application of, *Strickland*.  This claim also fails.

> **d.**      **Improperly advising him to enter pleas of no contest in chambers with only two empaneled judges present and failing to object to the plea agreement not being read in open court (Grounds 7 (d) and (e))**

Spivey also contends his counsel's performance in allowing him to enter the no-contest

pleas in chambers with only two of the three judges present and without objecting to the plea

agreement not being placed on the record in open court.  ECF No. 38 at PageID #: 6341-42.

The Ohio Supreme Court addressed this claim, stating:

> In this proposition, appellant also contends that the terms of the plea agreement were never discussed in open court, in violation of Crim.R. 11(F), and that "[c]ounsel was ineffective for failing to ever raise an objection as to the manner in which the negotiated plea was placed before the trial court."  We agree that the manner in which the negotiated plea agreement was placed before the panel violated Crim.R. 11(F), which requires that, in felony cases, "the underlying agreement upon which the plea is based *shall* be stated on the record in *open court*." (Emphasis added.) Here, the plea agreement was not discussed in open court.  However, the terms of the plea agreement were stated on the record during an October 2, 1989 chambers conference attended by the parties and Judge Economus prior to appellant's jury waiver, and Judge Economus subsequently served as the presiding member of the three-judge panel.  On October 10, 1989, the plea agreement was also discussed in chambers before two members of the panel (Judges Economus and McNally), with all parties present, and the terms of the agreement were placed on the record. Therefore, although Crim.R. 11(F) was technically violated, since the terms of the plea were stated on the record *in chambers*, rather than being stated on the record *in open court*, we fail to see how appellant was prejudiced by the technical violation of

the rule. All parties and the court were aware of the agreement, and the agreement was adhered to by the parties.

*Spivey*, 81 Ohio St.3d at 418 (emphasis in original).

The state court reasonably concluded that even if counsel were deficient for failing to ensure the plea agreement was placed on the record in open court before all three judges, Spivey was not prejudiced by that omission. The court and all parties were fully aware of the terms of the plea agreement, and Spivey's ability to enforce the agreement was protected.

The state court's decision was neither contrary to, nor an unreasonable application of, *Strickland*, and this claim is meritless.

### e. Failure to investigate and prepare mitigating evidence regarding Spivey's childhood and PPD diagnosis (Grounds 7(f) and (g))

Spivey also faults his trial counsel for failing to investigate and prepare mitigating evidence regarding his childhood and PPD diagnosis. ECF No. 38 at PageID #: 6641-46.

The Supreme Court repeatedly has held that counsel in capital cases have an "obligation to conduct a thorough investigation of the defendant's background" for mitigation purposes. *Williams v. Taylor*, 529 U.S. 362, 396 (2000). In *Strickland*, the Court noted that a capital sentencing proceeding "is sufficiently like a trial in its adversarial format and in the existence of standards for decision" that counsel's role in the two proceedings is comparable: "to ensure that the adversarial testing process works to produce a just result under the standards governing decision." 466 U.S. at 686.

Accordingly, the Supreme Court and Sixth Circuit have found ineffective assistance of counsel in capital cases where trial counsel failed to adequately investigate or present mitigating

evidence at sentencing. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 389-93 (2005) (counsel ineffective where he failed to examine court file of defendant's prior conviction which contained a range of vital mitigation leads regarding defendant's childhood and mental health problems); *Wiggins v. Smith*, 539 U.S. 510, 526, 534, 537 (2003) (counsel ineffective where they failed to discover and present "powerful" evidence of petitioner's "excruciating life history" and instead "put on a halfhearted mitigation case"); *Frazier v. Huffman*, 343 F.3d 780, 795-99 (6th Cir. 2003) (counsel ineffective where he failed to introduce any mitigating evidence in either guilt or penalty phases of trial and he was aware of petitioner's brain injury).

Nevertheless, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383. *See, e.g.*, *Wiggins*, 539 U.S. at 525 (further investigation excusable where counsel has evidence suggesting it would be fruitless); *Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"); *Burger v. Kemp*, 483 U.S. 776 (1987) (finding limited investigation reasonable because all witnesses brought to counsel's attention provided predominantly harmful information).

The record belies Spivey's claim that his trial counsel presented insufficient evidence of his childhood at the mitigation phase of his trial. The Ohio Supreme Court, in conducting its independent review of the appropriateness and proportionality of Spivey's sentence, provided a lengthy summary of the mitigation evidence presented at trial. *Spivey*, 81 Ohio St.3d at 419-29.

It heard the testimony of family members, Spivey's probation officer and social worker, a developmental pediatrics specialist, and Dr. Eisenberg. *Id.* Based on that evidence, it observed,

> . . . [I]t is clear to us that appellant had a very difficult and troubled childhood. He was plagued by physical and mental problems or deficiencies, had difficulties in school, suffered parental rejection at an early age, was raised in an unsupportive family environment, was treated as an outcast by certain family members, was physically and verbally abused by his parents, and was sexually abused on at least one occasion. We find that appellant's troubled childhood, history, and family background are entitled to some weight in mitigation.

*Id.* at 424.

Indeed, Dr. Eisenberg testified at the mitigation hearing that he "[had] never seen in a criminal case that I have had, and I would thing the Court would share this opinion, more data, more evidence covering a long period of time that's absolutely, totally consistent." ECF No. 20-6 at PageID #: 4931.  He testified at the state post-conviction hearing that "there was a great deal of information brought out in the case.  I don't know of anything that we should have brought out that we didn't at that time." ECF No. 20-7 at PageID #: 5362.  When asked if there was anything he could think of the lawyers should have done for mitigation that they did not do, he said he could not.  ECF No. 20-7 at PageID #: 5364.  He conceded he did not have as much time to prepare for the hearing as he normally does, but explained the lawyers already had gathered the exessary documents and information, Spivey's family was in town, and the understood the prosecution was not going to oppose the witnesses' testimony.  ECF No, 20-7 at PageID # 5379-80.  He could identify only one document, a file from the Child Service Bureau, that he did not have that would have been helpful.  ECF No. 20-7 at PageID #: 5385, 5408.

In addition, defense counsel presented – and the court carefully considered – significant evidence regarding Spivey's intellectual and psychological disorders, including the presence of XYY Syndrome, conduct disorder, developmental disorder, attention deficit disorder, learning problems, temporal lobe seizures, minimal brain dysfunction, juvenile arthritis, and the possibility of latent schizophrenia. *See Spivey*, 81 Ohio St.3d at 422. Given this evidence, it is unlikely that additional evidence of this type, such as Spivey's PPD diagnosis, would have altered the outcome of Spivey's sentencing. This claims fails.

### f. Counsel's lack of experience with mitigation hearings (Ground 7(h))

Spivey claims that one of his trial counsel, Attorney Krichbaum, was constitutionally deficient in his performance at the mitigation phase of his trial because it was his first such hearing in a capital case and he had never even worked with mitigation expert before then. ECF No. 38 at PageID #: 6345-46.

Both of his trial attorneys, Krichbaum and Zena, testified at depositions taken during state post-conviction proceedings about their certification and experience in defending capital cases generally. ECF No. 20-8 at PageID #: 5466-68 (Krichbaum deposition), 5553-54 (Zena deposition). Zena testified that he had represented numerous capital defendants and Spivey was not the first. ECF No. 20-8 at PageID #: 5554. Krichbaum acknowledged that although he had tried two death-penalty cases before representing Spivey, he "[n]ever got to the mitigation phase before Spivey. That was the first case that ever went that far that I was involved in." ECF No. 20-8 at PageID #: 5466-67.

Nonetheless, Krichbaum stated that he was confident of the mitigation team he and Zena

hired and the evidence they presented. He testified:

> . . . I felt I was pretty well experienced and had done this, and, you know, sat as a
> bailiff watching this and all that kind of stuff. And the mitigation team had been
> involved in dozes of these mitigation hearings.

ECF No. 20-8 at PageID #: 5492. Krichbaum also recounted:

> . . . [W]e did have a good mitigation in the case. This is a kid who was dealt a bad
> card at birth and had no control over the XY chromosome. All of these things that
> were so predictable. I think Eisenberg did a marvelous job of presenting that and
> showing that panel that what this kid did was horrible, but this isn't the classic
> vicious destructive no conscious type of a person.

ECF No. 20-8 at PageID #: 5499-500. And he explained the work that was done to prepare for

the mitigation hearing, stating:

> I remember a lot of meetings over in [Zena's] office at the legal arts center. Reading,
> studying, this XYY chromosomal thing. We got records of [Spivey's] from St.
> Elizabeth Hospital or Northside Hospital. Was hospitalized several times. Had a
> fascinating background. By fascinating, I mean, as much as the prosecutor licked his
> chops about this being a great case to prosecute, I thought we had a great case to
> mitigate. And I thought all that information was there. It certainly was if they want
> to hang their hat on it. It's something that you could rely on. . . . [I]n our opinion,
> . . . the aggravating circumstances did not outweigh the mitigating factors.

ECF No. 20-8 at PageID #: 5514. Zena affirmed at his deposition this work, stating he recalled

"meeting with [Eisenberg and Krichbaum], going over things with the family, talking to Spivey,

going over everything we could find[,]" and collecting school and medical records. ECF No. 20-

8 at PageID #: 5588.

Spivey has not shown that Krichbaum's representation during the mitigation hearing fell

"below an objective standard of reasonableness" due his lack of experience, such that there is a

"reasonable probability" that, if Krichbaum had been more experienced, Spivey would not have

130

been sentenced to death.  *Strickland,* 466 U.S. at 687-88.  He has offered no evidence other than Krichbaum's statement regarding his mitigation experience that his inexperience rendered his performance deficient or caused his prejudice.  This claim is also meritless.

**F.**     **Eighth Ground for Relief:** *Ineffective Assistance of Appellate Counsel*

In his eighth ground for relief, Spivey asserts that he received ineffective assistance of appellate counsel.  ECF No. 38 at PageID #: 6347-50.  He specifically alleges counsel were ineffective for failing to raise the following claims in the state appellate court on direct appeal: 1) he was not competent to waive his jury-trial rights and enter pleas of no contest; and 2) trial counsel were ineffective for failing to raise the issue of  his competency, advising him to waive his jury-trial rights, improperly advising him to enter pleas of no contest before receiving DNA test result and doing so in chambers, and failing to object to the plea agreement not being read in open court.  ECF No. 38 at PageID #: 6350; ECF No. 46 at PageID #: 6651.[29]

**1.**     **Procedural Posture**

In an application to reopen his direct appeal, Spivey raised appellate counsel ineffective-

---

[29]  Spivey further states that "encompassed in this claim for relief" are "issues presented in this habeas petition that should have been, but were not, raised" in the state appellate court.  ECF No. 38 at PageID #: 6350.  He continues, "Any procedural barrier placed on any of these claims by the Ohio Supreme Court can be overcome through this claim by appellate counsel's ineffective assistance."  ECF No. 38 at PageID #: 6350.  As The State argues, this manner of pleading does not meet the specificity requirements of Rule 2(c) of the Rules Governing Section 2254 Cases.  And this Court will not identify and develop Spivey's claims for him based on its findings of procedural default.  The Court will address the appellate counsel ineffective-assistance claims Spivey properly asserts – one relating to his competency and the other relating to ineffective assistance of trial counsel as identified in his state application for reopening.

assistance claims based on counsel's failure to raise his competency claims. *See* ECF No. 19-13 at PageID #: 2522. Spivey also raised appellate counsel ineffective-assistance claims based on counsel's failure to raise the following three claims of ineffective assistance of trial counsel that relate to ineffective-assistance claims he raises here: 1) counsel failed to determine if appellant was competent (Grounds 7(a), (b)); 2) counsel advised appellant to enter a no-contest plea in chambers (Grounds 7(d), (e)); and 3) counsel allowed appellant to enter a no contest plea prior to the receipt of the serology results (Ground 7(c)). ECF No. 19-13 at PageID #: 2523.

The state appellate court denied these claims on its merits. ECF No. 19-13 at PageID #: 2564-76. Spivey appealed that judgment to the Ohio Supreme Court, which affirmed the decision. *Spivey*, 84 Ohio St.3d at 24. These appellate counsel ineffective-assistance claims, therefore, are ripe for review.

### 2. Merits

The Supreme Court has held that a defendant is entitled to effective assistance of counsel in his first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The two-part test enunciated in *Strickland* is applicable to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Thus, Spivey must demonstrate that appellate counsel's performance was deficient, and that the deficient performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable. *Strickland*, 466 U.S. at 687. An appellant has no constitutional right, however, to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues to

raise on appeal are properly left to the sound professional judgment of counsel, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "[O]nly when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

Here, the last state court to consider the two claims at issue was the Ohio Supreme Court. It held,

> Spivey raised both of these issues before this court in his direct appeal, and we addressed these issues in our decision, and found they lack merit. See *Spivey*, 81 Ohio St.3d at 417-419, 409-411, 692 N.E.2d at 162-163, 157-158. Therefore, these issues cannot now provide a basis for finding that appellate counsel was ineffective for not raising them in the court of appeals. Spivey has failed to show that had the issues been presented in the court of appeals, there was a reasonable probability that he would have been successful.

*Spivey*, 84 Ohio St.3d at 25.

The Ohio Supreme Court determined that appellate counsel did in fact raise the issues Spivey now asserts they did not. Spivey does not contest this finding. As explained above, Spivey's claims were stated differently in his brief to the Ohio Supreme Court both on direct appeal and in his reopening application, but Spivey presented the substance of sub-claims (a) through (e) to the state court in both proceedings. On direct appeal, the court stated it considered each claim and found them without merit. *Spivey*, 81 Ohio St.3d at 417. And on the reopening application review, the court consistently found appellate counsel was not ineffective for failing to raise claims they did in fact raise. *Spivey*, 84 Ohio St.3d at 25. The state court's decision,

therefore, was not contrary to, nor an unreasonable application of, Supreme Court precedent, and this claim fails.

### G.     Ninth Ground for Relief:  *Constitutionality of Ohio's Death Penalty Scheme*

Spivey's ninth ground for relief challenges Ohio's death-penalty scheme as violating the Fifth, Eighth, and Fourteenth Amendments.  ECF No. 38 at PageID #: 6351-65.  He argues it:

1.     imposes arbitrary and unequal punishment;

2.     provides unreliable sentencing procedures;

3.     fails to genuinely narrow the class of individuals eligible;

4.     refers to the "nature and circumstances" of the offense in considering both mitigating and aggravating circumstances, making it unconstitutionally vague; and

5.     is mandatory and fails to require an appropriateness analysis.

ECF No. 38 at PageID #: 6351-65.

#### 1.     Procedural Posture

Spivey did not raise these claims on direct appeal to the Ohio court of appeals.  *See* ECF No. 19-6 at PageID #: 1295.  He raised a claim challenging Ohio's death-penalty scheme, including numerous grounds, to the Ohio Supreme Court.  *See* ECF No. 19-7 at PageID #: 1422-34.  The court declined to address the claim without specifying whether the basis for its ruling was procedural, merits-based, or both.  It stated:

> We have held, in cases too numerous to cite, that this court is not required to address and discuss, in opinion form, each and every proposition of law raised by the parties in a death penalty appeal.  We continue to adhere to that position today. Here, appellant raises a number of issues that have previously been addressed and rejected by this court under analogous circumstances in some of our prior cases.  In addition, most of the arguments raised by appellant have been waived.  Further, many of

134

> appellant's arguments merit no discussion given the events at trial and the governing law. Upon a review of the record and the arguments advanced by appellant, we fail to detect any errors requiring reversal of appellant's convictions and death sentence. We address and discuss, in detail, only those issues that merit further discussion.

*Spivey*, 81 Ohio St.3d at 408.

Nevertheless, the State asserts the Ohio Supreme Court rejected Spivey's death-penalty claims on the merits except for his third sub-claim, which it argues is procedurally defaulted because there is no available state remedy.[30] ECF No. 40 at PageID #: 6560-61. Spivey contends this claim is properly before the Court. ECF No. 46 at PageID #: 6652.

The Court will not engage in a procedural-default analysis of this claim, however, because it finds these claims meritless.

## 2. Merits

As the Supreme Court recently observed in *Glossip v. Gross*, 135 S.Ct. 2726 (2015), "it is settled that capital punishment is constitutional. . . ." *Id.* at 2732. Moreover, the Sixth Circuit repeatedly has upheld the constitutionality of Ohio's death-penalty scheme in particular, rejecting many of the claims Spivey asserts here. *See, e.g., Beuke v. Houk*, 537 F.3d 618, 652-53 (6th Cir. 2008); *Buell v. Mitchell*, 274 F.3d 337, 367-70 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 538-39 (6th Cir. 2000).

---

[30] The State argues Spivey presented a sixth sub-claim (indicated by a separate sub-section of the analysis of this claim in the petition) that also is procedurally defaulted for the same reason. As Spivey explains in his traverse, that section merely provides authority for his claims; it does not assert a separate claim. *See* ECF No. 38 at PageID #: 6363-65.

(4:16CV0384)

### a.    Imposing arbitrary and unequal punishment

Spivey claims Ohio's death-penalty scheme violates the Fourteenth Amendment's guarantee of equal protection because it allows the death penalty to be imposed in an arbitrary and discriminatory manner, and of due process because it lacks a legitimate and compelling state interest.  ECF No. 38 at PageID #: 6352-55.  The Sixth Circuit repeatedly has rejected this argument.  *See, e.g.*, *Buell*, 274 F.3d at 367; *Byrd*, 209 F.3d at 539.

In *Buell*, the circuit court explained:

> We note that the Ohio death penalty statute includes a number of capital sentencing procedures that the United States Supreme Court held in *Gregg v. Georgia*, 428 U.S. 153, 188-95, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), specifically to reduce the likelihood of arbitrary and capricious imposition of the death penalty. These procedures include: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review.  In *Gregg*, the Court stated that the concerns expressed in *Furman* could be met by "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195, 96 S.Ct. 2909.  By complying with this requirement, the Ohio death penalty statute significantly reduces the likelihood of arbitrary and capricious imposition of the death penalty and does not run afoul of the Constitution.

274 F.3d at 367.  This claim fails.

### b.    Providing unreliable sentencing procedures

Spivey argues Ohio's death-penalty statute further violates the Equal Protection and Due Process Clauses by not requiring the state to prove the absence of any mitigating factors or that death is the only appropriate penalty.  ECF No. 38 at PageID #: 6355-56.  He also asserts it is

unconstitutionally vague in defining the process of weighing aggravating and mitigating

circumstances.  ECF No. 38 at PageID #: 6355-56.

The Sixth Circuit rejected this argument in *Buell* as well, reasoning:

> In *Proffitt v. Florida*, 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Supreme Court upheld a statutory scheme for weighing aggravating circumstances against mitigating factors that is similar to Ohio's, which lays out specific aggravating circumstances and mitigating factors that are to be considered at sentencing.  Ohio Rev. Code § 2929.04.  The Court also has approved of a statute that did not enunciate specific factors to consider or a specific method of balancing the competing considerations.  *See Franklin v. Lynaugh*, 487 U.S. 164, 172-73, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Zant v. Stephens*, 462 U.S. 862, 875, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The Court has held that "it is constitutionally required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of a death sentence."  *Sumner v. Shuman,* 483 U.S. 66, 72, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987) (quoting *Gregg*, 428 U.S. at 189-90 n. 38, 96 S.Ct. 2909). The sentence imposed on Buell complies with *Sumner* as well as the Supreme Court's holding in *Blystone*, 494 U.S. at 305, 110 S.Ct. 1078, that a death penalty is constitutional if it "is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances."  In Buell's case, both the jury at the penalty phase of trial and the reviewing courts specifically considering the aggravating circumstances and mitigating factors presented and determined that capital punishment was appropriate.  By weighing these specific considerations, it cannot be said that a mandatory death penalty was imposed on Buell.

*Buell*, 274 F.3d at 368.  This claim also is meritless.

### c.      Failing to genuinely narrow the class of individuals eligible

Spivey further contends that Ohio's death-penalty scheme is unconstitutional because

Ohio Rev. Code § 2929.04(A)(7) fails to "genuinely narrow the class of persons eligible for the

death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant

compared to others found guilty of murder."  *Zant*, 462 U.S. at 877.  Under that provision, he

argues, if a defendant commits murder during the commission of a felony, the felony can elevate a murder to aggravated murder *and* serve as an aggravating circumstance, making the defendant eligible for the death penalty without proof of an additional new factor. ECF No. 38 at PageID #: 6356-57. The Sixth Circuit also has repeatedly found this argument meritless. *See, e.g.*, *Beuke*, 537 F.3d at 652-53; *Smith v. Mitchell*, 348 F.3d 177, 214 (6th Cir. 2003); *Buell*, 274 F.3d at 369-70.

### d. "Nature and circumstances" language is unconstitutionally vague.

Spivey also argues that the phrase "nature and circumstances" is used both as a mitigating factor in Ohio Rev. Code § 2929.04(B) and as a consideration in support of aggravating circumstances in Ohio Rev. Code § 2929.03(D)(1), making Ohio's death-penalty weighing procedure unconstitutionally vague. ECF No. 38 at PageID #: 6358-60. The Sixth Circuit rejected this argument in *Cooey v. Coyle*, 289 F.3d 882, 927-28 (6th Cir. 2002), stating:

> We find this argument meritless The only conceivable way for a court properly to weigh all the aggravating and mitigating circumstances is to take a hard look in both instances at the "nature and circumstances of the offense." We cannot understand how the court's analysis could possibly become "unconstitutionally vague" by looking at the nature and circumstances of the offense in determining both aggravating and mitigating circumstances. We cannot even imagine a constitutional violation here.

*Id.* at 927-28. This claim lacks merit.

### e. Mercy consideration

Spivey finally argues that Ohio's death-penalty scheme is unconstitutional because it does not permit sentencers to consider mercy in the absence of mitigation or when the aggravating circumstances outweigh the mitigating factors. ECF No. 38 at PageID #: 6360-63.

(4:16CV0384)

But the Supreme Court rejected this argument in *Boyde v. California*, 494 U.S. 370 (1990), explaining:

> Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances "outweigh" the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty." *Franklin v. Lynaugh*, 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988) (plurality opinion).

*Id.* at 377. This claim, too, fails.

Accordingly, the Court denies Spivey's claims that Ohio's death-penalty scheme is unconstitutional.

**H.      Tenth Ground for Relief:  *Brady Claim***

In his tenth ground for relief, Spivey claims prosecutors violated his constitutional rights when they failed to disclose to defense counsel an exculpatory police report prior to trial, as required by *Brady v. Maryland*, 373 U.S. 83 (1963). ECF No. 38 at PageID #: 6365-69. He argues he recently discovered the report inside a sealed envelope that was filed with the trial court for appellate review. ECF No. 38 at PageID #: 6366-67. He states the report contains a statement that "[o]fficers also found no signs of forced entry," contradicting a police detective's trial testimony that the door of the victim's home had been kicked open and had a footprint on it. ECF No. 38 at PageID #: 6366-68; ECF No. 38-12 at PageID #: 6465 (police report).

**1.      Procedural Posture**

The State argues this claim is procedurally defaulted because Spivey never raised it in state court. ECF No. 40 at PageID #: 6563. The Court agrees.

139

Spivey claims that his federal habeas counsel found this report in a sealed envelope containing "sixty-five pages of police reports, witness statements and police officer notes" that was filed with the trial court on September 29, 1989. ECF No. 38 at PageID #: 6366-67. There is no record on the trial court's docket of such a filing on that date and no copy of the envelope or its contents in the appendix filed with the State's return of writ. *See* ECF No. 19-1 at PageID #: 238. Nevertheless, it appears from the record that the trial court filed the report under seal to preserve for appellate review after determining that the State was not obligated to disclose it to the defense. On September 29, 1989, the trial court denied a defense motion to compel the State to disclose "all police reports, witness statements, and other public records" in its possession, and stated it would place the records in question under seal to "make it part of the record for appeal." ECF No. 19-5 at PageID #: 971-72. *See also* ECF No. 19-4 at PageID #: 753 (August 3, 1989, order stating that "the State of Ohio turned over a copy of the police investigatory file in the above captioned matter which was sealed by the Court, and in which will be held by the Court and subject to opening upon appellate review"); ECF No. 19-4 at PageID #: 770) (August 7, 1989, order granting defense motion directing State to provide prosecutor's file to court for review and sealing for appellate review).

Thus, the police report was available to Spivey on direct appeal and he could have raised a *Brady* claim based upon it at that time. But he did not, and the claim is now barred under Ohio's *res judicata* rule.

Spivey tries to avoid this procedural default by arguing that "it is unclear whether the

envelope was available to be open during [his] direct appeal. . . ." ECF No. 46 at PageID #:
6654.  But he offers no explanation of why that would be true.  The only reasonable inference is
that appellate counsel had access to it.

Spivey further argues that if the claim is defaulted, his "prior counsel's ineffectiveness
for failing to present this claim will serve as cause and prejudice. . . ." ECF No. 46 at PageID #:
6654.  Again, he provides no analysis for this claim, including which counsel he alleges is at
fault.  Regardless, Spivey could not show the necessary prejudice to excuse the default.  The
standard for prejudice under the "cause and prejudice" requirement mirrors the standard for
prejudice required to establish a *Brady* claim.  *See, e.g.*, *Banks v. Dretke*, 540 U.S. 668, 691
(2004) ("coincident with the third *Brady* component (prejudice), prejudice within the compass of
the "cause and prejudice" requirement exists when the suppressed evidence is 'material' for
*Brady* purposes").  As will be explained below, Spivey has not demonstrated that he was
prejudiced by the alleged non-disclosure of this police report.  Spivey's *Brady* claim, therefore,
is procedurally defaulted.[31]

---

[31]  Therefore, Spivey cannot demonstrate good cause to depose his trial counsel,
Attorneys Zena and Krichbaum, or obtain documents from the Youngstown Police
Department, Mahoning County Sheriff's Office, and Mahoning County Prosecutor's
Office to discover information to support this claim.  *See* ECF No. 48 at PageID #: 6706-
709.  Furthermore, to the extent he claims post-conviction counsel's ineffectiveness for
failing to raise this claim should excuse the default under *Martinez v. Ryan,* 566 U.S. 1
(2012), that argument fails.  The Supreme Court expressly limited *Martinez*'s reach to
claims of ineffective assistance of trial counsel that were procedurally defaulted by the
ineffective assistance of post-conviction counsel.  *See* *Abdur'Rahman v. Carpenter*, 805
F.3d 710, 714 (6th Cir. 2015) (*Martinez* does not apply to cumulative error claims);
*Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) (*Martinez* does not apply to claims
of ineffective assistance of appellate counsel).  For the same reason, Spivey is not entitled

(continued...)

### 2. Merits

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [373 U.S. at 87](). The Court later clarified that the State's duty to disclose such evidence applies even where the defendant never requested it, and encompasses impeachment as well as exculpatory evidence. *See [Strickler v. Greene, 527 U.S. 263, 280 (1999)]().*

In order to establish a *Brady* violation, a petitioner must satisfy three requirements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *[Id.. at 281-82]().* Prejudice is demonstrated only where the suppressed evidence is "material." *[Id. at 282]().* The "touchstone of materiality is a 'reasonable probability' of a different result. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *[Kyles v. Whitley, 514 U.S. 419, 434 (1995)]().*

Spivey cannot satisfy *Brady*'s test. First, the police report at issue was not suppressed. By Spivey's own account, the report was contained in a sealed envelope the trial court filed

---

[31](...continued)
to depose state post-conviction counsel Attorneys Millhoff and Juhasz to obtain information to support that "cause-and-prejudice" argument. *See* [ECF No. 48 at PageID #: 6704]().

under seal to preserve for appellate review. The prosecutor, therefore, fulfilled his duty to the defense and to the court by submitting this evidence to the trial court, presumably in response to defense discovery requests.

Moreover, the report is not material and the defense was not prejudiced by its non-disclosure. Substantial evidence was introduced at the evidentiary hearing corroborating Detective Wallis's testimony that the door's condition demonstrated forced entry into the victim's home. Most significantly, the State introduced photographs of the door clearly showing the damage. ECF No. 20-3 at PageID #: 4338-39 (photograph trial exhibits). In addition, the victim's friend Patricia Finger, who first found the victim, testified that the door was newly damaged when she arrived at the house. ECF No. 20-3 at PageID #: 4265-67 (transcript). And another police report was admitted stating "[t]he side (east) door also revealed evidence of forced entry." ECF No. 20-3 at PageID #: 4288 (police report). The police report in question, therefore, could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Spivey's *Brady* claim, therefore, is plainly meritless.

**I.     Eleventh Ground for Relief:  *Miranda Claim***

In his eleventh ground for relief, Spivey claims the trial court's admission into evidence of a statement he made to police shortly after his arrest violated his right against self-incrimination under *Miranda v. Arizona*, 384 U.S. 436 (1966). He argues his waiver of his *Miranda* rights was not knowing and intelligent due to his "mental limitations." ECF No. 38 at PageID #: 6369-73.

(4:16CV0384)

### 1. Procedural Posture

The State argues this claim is procedurally defaulted based on Ohio's *res judicata* bar. ECF No. 40 at PageID #: 6564. Spivey replies "this is not the case, but insofar as this Court finds that the claim is procedurally defaulted, there is cause and prejudice to excuse the default." He refers to his discussion of the ineffective assistance of post-conviction and appellate counsel. ECF No. 46 at PageID #: 6655.

Spivey never raised a *Miranda* claim on direct appeal or in post-conviction proceedings. He therefore did not fairly present this claim to state courts. And, as explained above, no longer has a remedy in state court due to Ohio's filing deadlines, post-conviction procedures, and *res judicata* rules.

Spivey notes that in the context of his motion to stay this Court determined that he had been diligent in pursuing his *Atkins* claims in state court after the *Atkins* decision was issued in 2002 and equitable tolling applied. ECF No. 46 at PageID #: 6655. But that is irrelevant to this claim. Equitable tolling does not apply here; the procedural issues regarding Spivey's *Atkins* claim were unique because *Atkins* was decided after his conviction; and an *Atkins* claim is an entirely different legal claim than a *Miranda* claim, with very different legal standards.

This claim is procedurally defaulted. To the extent Spivey asserts that his appellate counsel caused the default by failing to raise this claim on direct appeal, that claim also is procedurally defaulted because it also was never raised in state court and therefore cannot provide cause for the default of this claim. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). He also cannot argue post-conviction counsel's ineffectiveness for failing to raise the claim should

144

excuse the default under *Martinez v. Ryan*, 566 U.S. 1 (2012), as the Supreme Court expressly

limited *Martinez*'s reach to claims of ineffective assistance of trial counsel that were

procedurally defaulted by the ineffective assistance of post-conviction counsel. *See*

*Abdur'Rahman*, 805 F.3d at 714 (*Martinez* does not apply to cumulative error claims); *Hodges*,

727 F.3d at 531 (*Martinez* does not apply to claims of ineffective assistance of appellate

counsel).[32]

> **2.** **Merits**

Even if Spivey had properly preserved this claim for federal habeas relief, it would fail.

The Fifth Amendment privilege against self-incrimination is implicated whenever an individual

is "taken into custody or otherwise deprived of his freedom by the authorities in any significant

way and is subjected to questioning." *Miranda,* 384 U.S. at 478. Because custodial

interrogations are said to be inherently coercive, *Miranda* established that a suspect must be

apprised of certain rights to protect the privilege against self-incrimination, including the right to

remain silent. *Id.* at 444.

A suspect may waive his *Miranda* rights, however, "provided the waiver is made

voluntarily, knowingly and intelligently." *Id.* "Even absent the accused's invocation of the right

to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial

unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived

---

[32] For that reason, Spivey is not entitled to depose state post-conviction counsel Attorneys Millhoff and Juhasz to obtain information to support that "cause-and prejudice" argument. *See* ECF No. 48 at PageID #: 6704.

[*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). The prosecution must establish waiver by a preponderance of the evidence. *Id.* at 384 (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).

"The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* at 382-83 (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). Coercive police activity "is a necessary predicate to the finding that a confession is not 'voluntary.'" *Connelly*, 479 U.S. at 167. Whether a defendant has waived his *Miranda* rights and "voluntarily" confessed cannot rest on his state of mind alone. *Id.* at 165. The second prong of the *Miranda* inquiry focuses not on whether the "criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege[,]" but on whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

"Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.,* 442 U.S. 707, 725 (1979)). Courts must examine "the particular facts and circumstances

surrounding [the] case, including the background, experience, and conduct of the accused."

*Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

The prosecution, therefore, does not need to show that a waiver of *Miranda* rights was express. *Thompkins,* 560 U.S. at 384. "An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Id.* (citing *Butler*, 441 U.S. at 376). A waiver of *Miranda* rights may be implied through "'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" *Id.*

Spivey waived his *Miranda* rights and gave a statement to police several days after Ms. Vesper's murder occurred. Once Spivey was apprehended the night of the murder, January 3, 1989, the police took him to the hospital to be treated for wounds he inflicted upon himself while hiding from the police. *See* ECF No. 20-2 at PageID #: 3777 (Spivey statement). He was released from the hospital on January 9, 1989, and taken to the police department to be interviewed. ECF No. 20-1 at PageID #: 3723-24. At that point, Spivey had been charged and was a suspect. ECF No. 20-1 at PageID #: 3725. Det. Wallis, Lieutenant Greene, and Lieutenant Kane participated in the interview. ECF No. 20-1 at PageID #: 3726.

Before speaking to Spivey, Det. Wallis read him his *Miranda* rights. ECF No. 20-1 at PageID #: 3712-13. He testified at the hearing on Spivey's motion to suppress his statement:

> Q:    At any time did you talk to [Spivey] regarding this case?
>
> A:    Yes, I did.
>
> Q:    And was he under arrest at that time?
>
> A:    Yes, he was.

Q:   And prior to speaking to him what, if anything, did you do?

A:   Well, we followed the standard procedures. I advised him of his rights. I showed him the rights sheet. He didn't appear to me like he was reading, or could read, them. I asked if he could read and write, and he said he could read a little and write a few words. So, I read his rights to him personally, verbatim, statement by statement, and asked him if he understood what I told him. And he stated, yes. After reading him his rights and after asking if if (sic) he understood I asked him if he would sign the written waiver. I explained to him what it was and he signed the rights waiver. I believe I also wrote on the bottom that I personally read him his rights because I didn't think he could read them.

ECF No. 20-1 at PageID #: 3713.

Det. Wallis testified that after reading each sentence of the form, including the statement of rights and the waiver, he paused to ask Spivey if he understood, which he said he did. ECF No. 20-1 at PageID #: 3715. He said Spivey never asked him to repeat anything or stated that he did not understand something. ECF No. 20-1 at PageID #: 3715. Spivey then signed the waiver. *See* ECF No. 20-2 at PageID #: 3773 (first *Miranda* waiver form). Det. Wallis and Lt. Kane signed the form as witnesses. ECF No. 20-1 at PageID #: 3716.

Det. Wallis then began the interview. He testified:

Q:   And did you then have occasion to speak with the defendant?

A:   Yes, I did.

Q:   And did he tell you that he did not understand what was going on?

A:   No, he did not.

Q:   Did he make any statement in connection to these rights?

A:   No.

148

> Q: And did you ask him any questions regarding this incident pror [*sic*] to reading him these rights?
>
> A: No.

ECF No. 20-1 at PageID #: 3716.

Det. Wallis testified that he questioned Spivey, but Spivey did not respond. He stated, "All I got was a blank stare." ECF No. 20-1 at PageID #: 3718-19. Lt. Greene also testified that "the first response to the first three questions we asked was a blank stare." ECF No. 20-1 at PageID #: 3732. Det. Wallis and Lt. Kane then left the room and Lt. Greene interviewed Spivey. ECF No. 20-1 at PageID #: 3726.

The interview was interrupted by Spivey's arraignment. ECF No. 20-1 at PageID #: 3734. It was established at the hearing that Spivey was indigent and wanted counsel. ECF No. 20-1 at PageID #: 3754. After the arraignment, Spivey asked Lt. Greene if he could telephone his mother, which was arranged. ECF No. 20-1 at PageID #: 3734-35. Spivey's mother encouraged him to cooperate with the police. ECF No. 20-1 at PageID #: 3735. After that call, Lt. Greene asked Spivey if he was willing to give a statement, and he said he would. ECF No. 20-1 at PageID #: 3758. Lt. Greene then read him his *Miranda* rights a second time. ECF No. 20-1 at PageID #: 3735-36. He testified that Spivey stated he understood his rights and signed a second waiver form. ECF No. 20-1 at PageID #: 3736-37; ECF No. 20-2 at PageID #: 3774 (second *Miranda* waiver form). Lt. Greene testified that at no time did Spivey "express any problem understanding his rights[.]" ECF No. 20-1 at PageID #: 3737.

Spivey's trial counsel filed a pretrial motion to suppress the statement on the ground that

Spivey's waiver was not knowing, intelligent, and voluntary. ECF No. 19-4 at PageID #: 727-28. The trial court conducted a hearing on the matter. *See* ECF No. 20-1 at PageID #: 3705-60; ECF No. 20-2 at PageID #: 3761-859. It denied the motion, reasoning:

> After a review of the evidence submitted at the hearing, this Court concludes that there was ample evidence to demonstrate that the Defendant had the ability to comprehend the consequences of executing a waiver of rights form. Prior to questioning, Det. Wallis read the standard rights form to the Defendant because he indicated he could only read and write a few words. The waiver was signed after the Defendant acknowledged that he understood what was read to him. The interrogation was interrupted so the Defendant could be arraigned. Following his arraignment, the Defendant spoke to his mother by phone. After talking to his mother, the Defendant indicated he would cooperate. Thereupon Lt. Green[e] re-read the rights waiver form to him and for the second time the Defendant expressed an understanding. Subsequently, a statement was taken and reduced to writing and signed by the Defendant. At no time during the course of the interrogation did the Defendant invoke his constitutional rights.

ECF No. 19-5 at PageID #: 961-62.

Spivey claims "[i]t was clear from the observations" of Det. Wallis and Lt. Greene that Spivey "lacked the capacity to understand his *Miranda* rights or to appreciate the consequences of waiving them." ECF No. 38 at PageID #: 6371. These "observable indications" were his difficulties reading and "blank stares" in response to the detective's initial questions. ECF No. 38 at PageID #: 6369-70, 6372; ECF No. 46 at PageID #: 6657. Despite this "awareness," Spivey argues, "the officers took insufficient precautionary measures to ensure a valid waiver." ECF No. 38 at PageID #: 6371. Spivey does not specify what those measures would be.

Spivey further argues that the "cumulative effect" of the circumstances surrounding the waiver "provide[] ample evidence for a court to find that Mr. Spivey was incapable of knowingly and intelligently relinquishing his rights." ECF No. 38 at PageID #: 6371-72. At the time of the

interview, he asserts, he had been hospitalized for almost a week; was nineteen years old; had a limited education; and "suffered from many cognitive impairments," including intellectual disability, a severe language disorder, pervasive developmental disorder, autism spectrum disorder, a history of seizures, and a chromosomal syndrome. ECF No. 38 at PageID #: 6370, 6272. He cites Dr. Eisenberg's reports and testimony; an affidavit recently obtained from a special education teach of Spivey's regarding his education and intellectual abilities; and a recently obtained report from Dr. Douglas Scambler regarding his intellectual disability and cognitive disorders. ECF No. 38 at PageID #: 6370-71.

But this evidence does not demonstrate that Spivey was incapable of knowingly and intelligently waiving his *Miranda* rights. As the State points out, the Sixth Circuit has explained that although "mental capacity is one of many factors to be considered in the totality of the circumstances analysis regarding whether a *Miranda* waiver was knowing and intelligent[,] . . . diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights." *Garner v. Mitchell*, 557 F.3d 257, 264 (6th Cir. 2009). In *Garner*, the court found assessments from three mental health experts indicating that the defendant suffered from diminished mental capacity, a troubled upbringing, and a poor education, insufficient to show a *Miranda* waiver was invalid. *Id.* Mental capacity, the court stated, "must be viewed alongside other facts, including evidence of the defendant's conduct during, and leading up to, the interrogation." *Id.*

There is nothing in the record to indicate through Spivey's conduct that he was unable to understand the rights he was waiving or the consequences of that waiver. Spivey himself points

only to the officers' recollection of his "blank stares" in response to their initial questions. In fact, at the time of his waiver, although just nineteen years old, Spivey already had a significant criminal record, including two commitments to youth detention centers and a suspended commitment with probation. *See* ECF No. 19-2 at PageID #: 531 (criminal record). He also had a serious criminal case pending against him. *See* ECF No. 19-2 at PageID #: 530 (Tracer report). The police carefully advised Spivey of his rights and repeatedly asked him if he understood them. Spivey never expressed any confusion or desire to end the interrogation, and never asserted his right to remain silent or speak with a lawyer. Spivey, therefore, has not shown that his waiver was not knowing and intelligent, and he was incapable of understanding the nature of his *Miranda* rights and the effects of his waiver on those rights.

Moreover, Spivey has offered no evidence whatsoever to demonstrate that his waiver was involuntary, and he was coerced through improper police tactics to sign the waiver and provide his statement. Without such evidence, this claim fails. *See Moran*, 475 U.S. at 421 ("the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. . . . [T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements."); *Fare*, 442 U.S. at 726-27 (the defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit. . . . The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*.").

Accordingly, Spivey is not entitled to relief on his *Miranda* claim.

## VI. CERTIFICATE OF APPEALABILITY ANALYSIS

The Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Spivey's grounds for relief. The Sixth Circuit has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).

Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C. § 2253, which provides in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --
>
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (12) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional*, rather than federal, right. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (interpreting the significance of the revision between the pre- and post-AEDPA versions of that statute).

153

Furthermore, if a habeas claim is not procedurally defaulted, then the court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id.* at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

After taking the above standards into consideration, the Court finds as follows:

The Court will not issue a COA for grounds for relief: 2 (*Atkins*); 7 (trial counsel ineffective assistance), sub-claims (d) and (e) (plea in open court); 8 (appellate counsel ineffective assistance); and 9 (constitutionality of death penalty). No jurist of reason would debate the Court's conclusions on these claims.

No COA will issue for grounds for relief: 5 (prosecutorial misconduct); 6 (plea in open court); 7 (trial counsel ineffective assistance), sub-claims (f), (g), (h) (mitigation); 10 (*Brady*); and 11 (*Miranda*) because they are unequivocally procedurally defaulted. In addition, no COA will issue for grounds for relief 3 (motion to withdraw plea) and 12 (ineffective assistance of *Atkins* counsel) because they are not cognizable on federal habeas review.

The Court will, however, issue a COA for Spivey's grounds for relief 1 (regarding his competency to stand trial); 4 (relating to the State's alleged violation of his plea agreement); and 7 (relating to his trial counsel's performance with respect to his competency (sub-claims (a), (b), (c))). A reasonable jurist could debate the Court's conclusions regarding these claims.

(4:16CV0384)

## VII. CONCLUSION

For the foregoing reasons, this Court denies Spivey's Amended Petition for Writ of Habeas Corpus (ECF No. 38).  The Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could be taken in good faith as to Spivey's first, fourth, and seventh (sub-claims (a) through (c)) grounds for relief, and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b) as to those claims only. As to all remaining claims, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

The Court also denies Spivey's Motion for Discovery (ECF No. 48).


IT IS SO ORDERED.


  November 30, 2017                          /s/ Benita Y. Pearson
Date                                         Benita Y. Pearson
                                             United States District Judge